IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| GENERAL ELECTRIC COMPANY,<br><br>                    Plaintiff,<br><br>v.<br><br>SIEMENS ENERGY, INC.,<br><br>                    Defendant. | Case No. 3:21-cv-00025<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff General Electric Company ("GE"), by and through its undersigned attorneys, upon personal knowledge with respect to itself and its actions and otherwise on information and belief, alleges as follows:

**<u>Introduction</u>**

1.      This suit arises from the willful and malicious misappropriation of GE's trade secrets by defendant Siemens Energy, Inc. ("Siemens"), one of GE's principal competitors in the manufacturing and servicing of gas turbines.  Gas turbines are combustion engines that convert natural gas to mechanical energy to power the generators that provide electricity to large communities of homes and businesses.  The supply and maintenance of gas turbines are more important than ever to ensure the resiliency of the existing electric power grid.  GE uses its trade secrets, including its confidential unit specs and pricing structure, to compete for lucrative contracts to supply gas turbine units to public utilities across the world.  GE strongly believes in the benefits of full and fair competition, particularly in the highly competitive field of gas turbine manufacturing and servicing, to ensure that utilities make merit-based awards to the most capable and innovative suppliers, as well as to ensure the most cost-effective use of public funds.

2.      But what happened here was patently unfair and unlawful.  During a confidential bidding process, a current Siemens account manager knowingly and surreptitiously received GE's trade secrets using his personal email address on multiple occasions.  Rather than reject or destroy GE's trade secrets, he forwarded them to his Siemens email address and widely disseminated them to dozens of other Siemens employees, including the employees directly responsible for analyzing and preparing Siemens' bid responses, who then—critically—used GE's trade secrets to improve Siemens' own bid, ultimately winning a lucrative contract to provide gas turbine units and maintenance services in Virginia worth at least $225 million, and potentially as much as $340 million.  Compounding this injustice, Siemens then waited ***sixteen months*** before disclosing to GE that it possessed GE's trade secrets in a "nothing to see here, folks" letter, in which Siemens misrepresented and minimized the scope and impact of its unlawful scheme.

3.      The resulting harm to GE is not limited to the loss of the Virginia contract. The trade secrets misappropriated by Siemens are relevant to at least ***eight*** other gas turbine contracts that Siemens unfairly won over GE's competing bid in the sixteen-month period before it first notified GE.  The trade secrets are also directly relevant to a pending South Carolina RFP for which GE is ***currently*** bidding its gas turbine units against Siemens.  The sprawling and calculated theft of GE's trade secrets has enabled Siemens to win, so far, billions of dollars of contracts and remains ongoing—all at the expense of GE's ability to fairly compete.

4.      In May 2019, GE submitted a bid in response to an RFP issued by Dominion Energy, Inc. (together with its subsidiaries, "Dominion"), a Virginia-based power utility that provides electricity to four million customers in Virginia, North Carolina, and South Carolina, for "peaker" gas turbine equipment and servicing in Danville, Virginia (the "Peakers

Project" or "Peakers Project RFP").  Dominion is an increasingly dominant power utility, with a substantial and growing share of the power generation market on the East Coast, and is a crucial strategic partner for energy equipment manufacturers like GE and Siemens.

5.     Before submitting its initial bid on the Peakers Project, GE entered into a confidentiality agreement with Dominion, in which Dominion agreed to keep confidential the trade secrets and other proprietary business information that GE would submit to Dominion during the bidding process.  After that confidentiality agreement was executed, and in reliance on that agreement, GE submitted a bid package to Dominion that contained GE's confidential trade secrets about four separate gas turbine models, including information about the technical specifications for those turbine models, the pricing structure for different combinations of turbine units, and the proprietary processes by which GE would service and maintain those turbine models (collectively, GE's "Trade Secrets").  GE submitted its bid package to Dominion through a confidential online portal to which it understood only the Dominion employees overseeing the Peakers Project RFP would have access.  Dominion subsequently requested several supplemental bid responses from GE by email, which required GE to transmit by email to Dominion additional Trade Secrets, including GE's confidential volume discount pricing for Dominion's potential purchase of multiple gas turbine units.

6.     Siemens was one of two other bidders for the Peakers Project RFP.  In May 2019, after Siemens and GE had submitted their initial bid packages for the Peakers Project RFP—and unbeknownst to GE—a senior Dominion employee, Ted Fasca, began sending GE's Trade Secrets to a Siemens account manager, Michael Hillen.  Fasca, who is no longer employed by Dominion, was a Manager in Dominion's Power Generation Planning division.  In that capacity, Fasca played a critical role in defining Dominion's product development strategies and

was the Dominion employee responsible for testifying as an expert before public utility commissions regarding Dominion's long-term Integrated Resource Plans. Critically, the documents Fasca unlawfully provided to Hillen contained not only GE's Trade Secrets, but also Dominion's internal analyses and evaluations of all competitors' confidential bids, including GE's. As a result, Siemens was handed the "blueprint" for how to win the Virginia contract (and other Dominion RFPs) by tailoring its unit specifications and pricing to most effectively compete against GE, while GE and other competitors remained in the dark.

7.     Fasca disclosed GE's Trade Secrets to Hillen not just once, but on six separate occasions in May and June 2019. Fasca did so by sending GE's Trade Secrets to his personal email address, and then forwarding them from his personal email address to Hillen's personal email address or, in some instances, the personal email address of Hillen's wife.

8.     Hillen was an active and willing participant in this scheme to misappropriate GE's Trade Secrets for Siemens' competitive advantage. Hillen knew Fasca was sending him GE's Trade Secrets in violation of Fasca's duty not to disclose a competitor's confidential bid information. Yet, Hillen at no point instructed Fasca to stop sending him communications containing GE's Trade Secrets or destroyed the confidential information he unlawfully received from Fasca. Instead, Hillen forwarded GE's Trade Secrets from his personal email address to his Siemens email address and then willfully and repeatedly sent the GE Trade Secrets to other Siemens employees, who, in turn, widely disseminated GE's Trade Secrets throughout Siemens' business organization. No fewer than ■ *Siemens employees* across three different offices directly received GE's Trade Secrets through this chain of illegal dissemination. The Siemens recipients included employees at the highest levels of Siemens' gas power business, including Mehran Sharifi, a Siemens Regional Sales Manager who played a critical role in

preparing Siemens' bid package for the Peakers Project RFP, and other employees directly responsible for designing and preparing Siemens' bid packages for gas turbine RFPs for which GE and Siemens compete head-to-head.

9.      Siemens' employees did not just receive and disseminate GE's Trade Secrets.  They aggressively and affirmatively exploited the Trade Secrets to gain an unfair commercial advantage in preparing competitive bids against GE.  Siemens employees took great pains to incorporate GE's Trade Secrets into Siemens' competitor tracking databases, through which Siemens monitors competitive bidding activity in the gas turbine technology market.

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████████████

████████████████████     ██████████████████████████

██████████████████████████████████████████

██████████████████████████████     This willful exploitation of GE's Trade Secrets led Dominion to select Siemens as the winning bidder for the Peakers Project in July 2019.  GE was given no opportunity to respond to Siemens' adjusted bid and no explanation of why it had lost.  Even after Dominion awarded the Peakers Project contracts to Siemens, Siemens employees *continued* to disseminate and use GE's Trade Secrets to tailor Siemens' responses to at least two additional gas turbine RFPs.  And, because GE's Trade Secrets were incorporated into Siemens' competitor databases and bid pricing analyses documents, countless additional Siemens employees have indirectly accessed or otherwise used—and are continuing to use—GE's Trade Secrets for Siemens' own commercial advantage.

10.    Hillen and the other Siemens employees who disseminated and used GE's Trade Secrets understood that they were acting unlawfully.  They knew the Trade Secrets belonged to GE and came from a common customer, Dominion, which was under a duty not to disclose that information, just as Dominion would be duty-bound not to disclose Siemens' confidential information to its competitors.  They knew their dissemination and use of GE's Trade Secrets was a flagrant violation of law and Siemens' Business Conduct Guidelines.  And yet, they deliberately proceeded with this unlawful scheme, seeking to cover it up by using personal email accounts and directing their colleagues not to "forward" the information and to keep it "within a small circle."

11.    Shockingly, Siemens did not terminate Hillen or the other senior Siemens employees who participated in the wrongful and widespread dissemination and pervasive and strategic use of GE's Trade Secrets throughout Siemens.  The vast majority of the ▉ Siemens employees who accessed GE's Trade Secrets remain employed by Siemens and responsible for its gas turbine bid response processes.  Hillen remains responsible for gas turbine equipment sales and servicing as a Siemens Regional Account Manager in Power System Sales, the same position he has held since 2011.  Sharifi also remains employed as a Siemens Regional Sales Manager.  Both Hillen and Sharifi continue to have responsibility for gas turbine projects for which Siemens bids directly against GE.

12.    Siemens' motivation to win the Peakers Project contracts by any means necessary is clear.  At the same time that Siemens was bidding for the Peakers Project, its German-based parent corporation, Siemens Energy AG ("Siemens Energy"), was preparing to be "spun off" from Siemens AG, a larger conglomerate entity, and to become an independent, publicly traded company that would house the energy components of Siemens AG's business,

6

including its Power Generation (*i.e.*, gas turbine power) and Renewable Energy divisions. Siemens Energy became an independent company, following its initial public offering ("IPO") in September 2020.  In 2019 and 2020, leading up to the IPO, Siemens Energy and its subsidiary entities were highly motivated to win as many energy contracts (both gas turbine and renewable) as possible, and draw industry attention, to bolster Siemens Energy's financial outlook and increase the projected value of its IPO.

13.     In September 2020, sixteen months after its employees first misappropriated GE's Trade Secrets and fourteen months after Dominion awarded Siemens the Peakers Project contracts, Siemens finally disclosed to GE that the Trade Secrets GE submitted as part of its bid package for the Peakers Project RFP had been shared by an unnamed Dominion employee with an unnamed Siemens employee in May and June 2019, and that the Siemens employee forwarded GE's Trade Secrets to other unidentified Siemens employees.  Notably, Siemens decided not to disclose this information to GE until *after* it had (1) discovered and completed an "internal investigation" of the wrongdoing; (2) reported its wrongdoing to Dominion; and (3) permitted Dominion to complete its own internal investigation.  In fact, it was Dominion—not Siemens—that first notified GE that GE's Trade Secrets had been improperly disclosed to Siemens.

14.     Since notifying GE, and while purporting to "cooperate," Siemens has, at every turn, sought to minimize and cover up the magnitude and commercial success of its unlawful misappropriation scheme.  Conspicuously missing from Siemens' initial disclosure to GE was any information regarding the number and seniority of Siemens employees who broadly disseminated GE's Trade Secrets within Siemens; how Siemens employees incorporated GE's Trade Secrets into their analyses and work product, and imported GE's Trade Secrets into

Siemens' central repositories and databases; or how Siemens employees unlawfully used GE's Trade Secrets to unfairly improve Siemens' own bid package for the Peakers Project RFP and thereby secure the lucrative contract.

15.     Compounding the harm to GE, Siemens to this day has steadfastly refused to assure GE that the stolen Trade Secrets have been destroyed.  For example, Siemens has relied on an unverified "self-reporting" scheme to collect communications containing GE's Trade Secrets on its employees' personal mobile devices, even though Hillen (and potentially others) used personal email addresses to disseminate GE's Trade Secrets throughout the Siemens organization.  Siemens refuses to confirm that GE's Trade Secrets have been eradicated from Siemens' systems altogether.  Likewise, Siemens has refused to wall off the █ Siemens employees who accessed GE's Trade Secrets from all aspects of current and future RFPs for the same or similar gas turbine equipment that was the subject of the Peakers Project—and for which their knowledge of GE's Trade Secrets would give Siemens a clear and substantial unfair advantage in competing against GE.  Siemens knows full well that its possession of GE's confidential pricing information and specifications for gas turbines allows it to undercut GE's price and/or engineer its products to match GE's specifications, or undercut GE's bids for immensely valuable long-term service and maintenance contracts, depending on what would be most advantageous to Siemens for a particular RFP.  Even for projects that GE wins, Siemens is able to use GE's confidential information to rig the bidding process and drive down the price, causing GE's successful bids on gas turbine projects to be won at razor-thin or negative margins. That is true not just for RFPs on which GE bids one of the same gas turbine models as it bid for the Peakers Project, but also for RFPs on which GE bids related gas turbine models that use the same or similar technology and pricing structure.  Siemens is a highly sophisticated gas turbine

manufacturer, with the ability to extrapolate from the pricing and specifications it knows about four of GE's gas turbine models to estimate or reverse engineer, within a small range of error, the pricing and specifications for any of GE's similar gas turbine models.

16.     Siemens' misappropriation has had a direct, significant impact on GE's ability to fairly compete for gas turbine contracts.  Since May 2019, when Siemens first misappropriated GE's Trade Secrets, Siemens has won—over GE's competing bid—seven other gas turbine RFPs on which GE bid one or more of the exact same gas turbine models as it did for the Peakers Project.  Siemens also won—over GE's competing bid—at least one other gas turbine RFP on which GE bid a different model gas turbine with highly similar specifications and cost structure to the models in GE's Peakers Project bid.  The collective value of those eight projects is more than $1 billion.  Siemens was in possession of GE's Trade Secrets, unbeknownst to GE, when GE bid on each of those eight RFPs.  Given the egregious and willful nature of Siemens' misconduct and Siemens' delay in disclosing (all the while strategically minimizing) that misconduct to GE, it is highly likely that Siemens employees used GE's Trade Secrets to effectively tailor Siemens' bid responses to GE's substantial competitive detriment.

17.     GE will continue to suffer irreparable harm, absent immediate relief.  Dominion recently issued an RFP for a major gas turbine equipment and services contract in South Carolina, for which competing bids are due by January 19, 2021.  Both GE and Siemens are bidding on the South Carolina RFP, which is significant because Dominion intends to purchase from the winning bidder a substantial number of gas turbines for installation in several Dominion power plants as part of a comprehensive fleet modernization program over the next five years.  The value of these contracts is between $120 million and $150 million, with expected long-term servicing revenue that likely will exceed $60 million. ██████████████

████████████████████████████████████████ But as a

result of Siemens' unlawful misappropriation of GE's Trade Secrets—and Siemens' unlawful

possession of Dominion's proprietary analysis of GE's gas turbine bid package—GE would

participate in this RFP at a significant competitive disadvantage.  The Siemens employees who

accessed and analyzed GE's Trade Secrets must be prohibited from participating in the South

Carolina RFP, and any other related gas turbine RFP, unless and until this action has been fully

adjudicated and appropriate relief has been awarded to GE.

18.    Based on Siemens' willful misappropriation of GE's Trade Secrets, GE

brings this action to enjoin Siemens from continuing to misappropriate GE's Trade Secrets

which Siemens currently possesses and to seek damages for Siemens' misappropriation and

misuse of the Trade Secrets for its own substantial commercial advantage and unjust enrichment.

Immediate injunctive relief is required to prevent ongoing harm to GE, including the harm GE

will incur as a result of its inability to fairly compete for Dominion's upcoming South Carolina

RFP.  Damages are required to compensate GE for Siemens' past misappropriation of its Trade

Secrets, the result of which was to provide Siemens a substantial competitive advantage in

bidding against GE for the Peakers Project and numerous other gas turbine contracts in 2019 and

2020.

**Parties**

19.    GE is a New York corporation, with its principal place of business in

Boston, Massachusetts.

20.    Siemens is a Delaware corporation, with its principal place of business in

Orlando, Florida.

**Jurisdiction and Venue**

21.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because GE's federal claim arises under the laws of the United States.  This Court has supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367(a) because the federal and state law claims derive from a common nucleus of operative facts.  This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), because there is complete diversity of citizenship among the parties and an amount in controversy in excess of $75,000.

22.     This Court has personal jurisdiction over Siemens because Siemens has an office in Richmond, Virginia, has sufficient minimum contacts with Virginia, and has purposefully availed itself of the benefits and protections of Virginia.  Siemens' Richmond, Virginia office is where Michael Hillen was located when he received and unlawfully distributed GE's Trade Secrets to other Siemens employees.  Siemens submitted its bid, as well as supplementary bid information, for the Peakers Project RFP to Dominion's office in Glen Allen, Virginia.  The Peakers Project equipment and service contracts were awarded to Siemens in Richmond, Virginia.

23.     Venue properly lies in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this district.  Michael Hillen was located in Siemens' Richmond, Virginia office when he received and unlawfully distributed GE's Trade Secrets to other Siemens employees and continues to be employed there.  Siemens submitted its bid, as well as supplementary bid information, for the Peakers Project RFP to Dominion's office in Glen Allen, Virginia.  The Peakers Project equipment and service contracts were awarded to Siemens in Richmond, Virginia.

**Background**

*GE's Gas Power Business*

24.     GE is an energy and technology company that, since its founding in 1892, has helped to produce much of the world's power.  Today, GE provides equipment and services to the power, aviation, and healthcare industries, among others.

25.     One of GE's divisions is GE Gas Power, the world's largest manufacturer and supplier of gas turbine technology, including gas and steam turbines, generators, condensers and other equipment.  Ever since GE's first gas turbine began commercial operation in 1949, GE Gas Power has been a global leader in the gas turbine manufacturing and technology fields.

26.     An important part of GE Gas Power's business is the manufacture and distribution of industrial gas turbines.  Gas turbines, also known as "combustion" turbines, convert natural gas or other liquid fuels into mechanical (*i.e.*, kinetic) energy, which is then converted into electrical energy.  In simple terms, a gas turbine operates by heating a mixture of fuel and compressed air at very high temperatures, which creates a hot gas.  The hot gas moves through a series of turbine blades, causing them to spin quickly.  The spinning turbine blades drive a generator connected to the turbine, which produces electrical energy.  A gas turbine is the most important component of any gas power plant.

27.     GE manufactures two types of gas turbines:  heavy-duty turbines and aeroderivative turbines.  Heavy-duty gas turbines come in several different "classes," including the F-class, the H-class, the B-class, and the E-class.  The F-class gas turbine is an older style of heavy-duty turbine trusted for its reliability and flexibility.  The H-class gas turbine is a more recently introduced style of heavy-duty turbine that incorporates advanced technologies.  B-class and E-class gas turbines are specialized units that are known for their ruggedness and dependability.

28.     Aeroderivative gas turbines are based on technologies first developed and used in aircraft engines and are smaller and lighter than heavy-duty turbines.  Aeroderivative turbines produce less power than heavy-duty turbines, but with higher efficiencies.

29.     GE's Gas Power division bids for energy projects around the world.  Its customers are public utilities and other power providers that purchase GE's gas turbines for use in their power generation operations.  When one of these power providers needs new gas turbine equipment, it first seeks approval for its energy project from governing regulators.  If it obtains that approval, the power provider will typically then issue an RFP that describes the provider's energy project and its equipment needs and solicits product bids from gas turbine manufacturers and service providers.  GE often competes against Siemens in RFPs for gas turbine equipment and services, both in North America and globally.

30.     GE's Gas Power division not only manufactures and sells gas turbines; it also services them.  GE regularly enters into Long-Term Service Agreements ("LTSAs") with the power providers to which it sells its gas turbines.  Those LTSAs last between 10 and 25 years.  Under those LTSAs, GE provides service, parts and maintenance for the gas turbines that it manufactures, ensuring that its customers receive a complete power generation solution for many years.  GE's gas turbine LTSAs are an essential part of its business.  Gas turbine equipment contracts provide substantial one-time revenue, whereas LTSAs provide a continuous revenue stream for more than a decade.

31.     Siemens is one of GE's principal competitors in the gas turbine market. Like GE, Siemens manufactures and distributes gas turbine products, including F-class, H-class, E-class and aeroderivative turbines, as well as smaller "industrial" gas turbines.  Other competitors in the gas turbine market include Mitsubishi Hitachi Power Systems Americas, Inc.

13

("Mitsubishi"), an American power generation company, and Ansaldo Energia ("Ansaldo"), an Italian power generation company.

32.     The gas turbine market is fiercely competitive.  Since 2000, the worldwide market for new gas turbines has contracted, as various forms of renewable energy have risen to prominence and the number of new gas turbine projects has declined accordingly.  As the size of the gas turbine market has diminished, the competition among GE, Siemens, and other competitors for gas turbine projects has grown more intense.  Each new gas turbine project that is awarded represents a meaningful percentage of the market for new gas turbine projects in a given quarter or year, and materially improves the winning company's position of strength in the market, while adversely affecting losing competitors.

33.     GE, Siemens, and other competitors in the gas turbine market own factories and production lines that were designed for the larger gas turbine markets of decades past.  Each competitor presently has excess production capacity, and is therefore incentivized to close as many new gas turbine projects as possible so that it can decrease the extent to which its factories and production lines sit unused, consuming resources while producing zero revenue. This excess capacity drives GE and its competitors to bid lower and lower prices, leading to thinner and thinner profit margins for each new project.  The result is an exaggerated "buyer's market" in which power providers regularly award contracts for projects that provide gas turbine manufacturers with razor-thin profit margins.  GE and its competitors will sometime even accept contracts to produce and sell gas turbines at negative margins, so that they can slowly make a profit on those projects over decades by providing maintenance services for the turbines sold.

34.     GE and its competitors closely monitor their positions in the gas turbine market, as do their customers (and potential customers), their investors, and market analysts.

GE's power provider customers prefer to purchase gas turbines from established, stable market players who they can expect will be around to provide maintenance and service for those turbines for decades to come.  Customers seek out gas turbine products that have long track records of success.  Manufacturers build those valuable track records through historic, sustained success in selling their specific gas turbine models hundreds of times over.

35.     Investors and market analysts pay close attention to GE's position in the gas turbine market for each quarter, half-year, and year.  Since mid-2019, when Siemens first received GE's Trade Secrets and began using them to unfairly compete against GE in the gas turbine market, GE has lost while Siemens has gained market share, with especially pronounced effects in the "heavy-duty" gas turbine sector, where GE's market share has fallen precipitously. This declining market share has a tremendous effect on GE's standing with investors and analysts, who take very seriously any loss of market share in a constricted market that has slowly contracted over the last two decades and is not likely to expand in the near term.  These declines in GE's market share in the gas turbine market have a meaningful effect on GE's bottom line and its valuation.  Further declines in GE's market share will, over time, have a devastating effect on GE's gas turbine business.

36.     In recent years, Siemens has been desperately motivated to improve its gas turbine market share by any means necessary, and has bid for all manner of energy contracts with marked aggression.  Siemens is a United States company that is owned by a German parent corporation, Siemens Energy.  Siemens Energy is a global power generation provider with over 93,000 employees that operates in more than 90 countries.  For many years, Siemens Energy was owned by a much larger German company, Siemens AG.  However, in May 2019, Siemens AG announced plans to spin Siemens Energy off into a separate publicly traded company that would

house the energy components of Siemens AG's business, including its Power Generation (*i.e.*, gas turbine power) and Renewable Energy divisions.  In September 2020, Siemens Energy conducted an IPO and became a separate publicly traded company.

37.     Between May 2019, when Siemens Energy's planned spinoff was announced, and September 2020, when the spinoff was completed, Siemens Energy was highly motivated to secure as many energy contracts (both gas turbine and renewable) as possible in order to bolster its financial outlook and raise its projected stock price for its planned IPO.  It was of paramount importance to Siemens Energy to obtain and publicize new energy contracts during this time period.

### *GE's Gas Turbine Trade Secrets*

38.     GE maintains the strictest confidentiality of its gas turbine technology trade secrets.  Those trade secrets include information about the pricing for GE's gas turbines, such as the base pricing for GE's turbines, the option pricing for available features, volume discount pricing, and shipping costs.  That information is not publicly available, and is not known to GE's competitors.  When GE responds to an RFP with a bid package that includes an offer price for its turbines, the pricing information in that bid package is for the customer's eyes only, and is always protected under a confidentiality agreement between GE and the customer.  GE's turbines are not sold on an open market.  GE zealously protects its pricing information, which is part of the core information that provides GE a competitive edge when it competes for gas turbine RFPs.  If competitors knew the price at which GE offers its turbines, they would be able to undercut GE's bids by offering prices, incentive structures, or discounts that ensure their bid packages are more attractive than GE's.

39.     GE's trade secrets include the technical specifications for GE's gas turbines, including:  (1) "output capacity," *i.e.*, the maximum amount of electricity GE's turbines

can generate, in megawatts (MW); (2) "efficiency," a measure of how effectively GE's turbines convert the mechanical energy in natural gas into electrical energy; (3) "heat rate," *i.e.*, a measure of the amount of thermal energy required for a turbine to produce a given amount of electricity; (4) "emissions levels," *i.e.*, the rate at which GE's turbines emit nitrogen oxide (NOx) and carbon monoxide (CO) gases; and (5) "capital cost," a metric that compares the prices of GE's turbines with their output capacities to show how expensive a power provider's purchase of that output capacity is, expressed in terms of how many dollars it takes to purchase one kilowatt of output capacity ($/kW).

40.     The technical specifications of GE's gas turbine units are not publicly available, and vary from project to project.  GE tailors its turbines' technical specifications to fit the needs of each specific customer and project.  To take one example, GE can set up its turbines to operate at lower or higher "heat rates" depending on how much output capacity the power provider desires.  A higher heat rate will result in a higher output capacity, but will raise maintenance costs over the life of the turbine.  For some gas turbine projects, power providers require maximum output from GE's turbines, even though maintenance will cost more.  For other projects, GE tailors its turbines to provide lower outputs at the customer's request, with corresponding savings in maintenance costs.  The precise way that GE tailors its technical specifications for each customer and project is specific to GE, and the particular technical capabilities of GE's turbines would not be knowable to anyone unless GE shared them, as it does with potential customers in its bid packages for RFPs.

41.     A competitor with knowledge of the particular technical specifications included in GE's bid packages could differentiate its products from GE's to maximum effect, by selecting products for bid packages that compare favorably to the output capacities, efficiencies,

17

heat rates, emissions levels, and/or capital costs GE has offered for its turbines.  Or, a competitor could use this information to select and tailor its products so that their specifications are similar or identical to GE's—and, combined with GE's confidential pricing information, would know precisely what price at which to offer its turbines to beat GE's bids every time.

42.    GE's trade secrets include the pricing and formulas for service and maintenance GE provides pursuant to its LTSAs, such as GE's base and option service pricing and GE's proprietary formulas and procedures for the maintenance it performs on its turbines. Like GE's turbine pricing, GE's service and maintenance pricing is not publicly available, and is only ever given to customers in confidential bid packages designed for the customer's eyes only. A competitor with knowledge of GE's service and maintenance pricing would know exactly how to structure its own service and maintenance bid to beat GE's.

43.    The formulas and procedures GE uses to service and maintenance turbines are highly technical, closely guarded secrets that rely on the immense expertise of GE's gas power engineers.  They include the "inspection intervals" for GE's turbines, *i.e.*, how many hours GE's turbines can run (or how many times they can be started and stopped) before they should be inspected and maintenanced.  The inspection intervals for GE's turbines vary from project to project, depending on the heat rate and output capacity at which GE's turbines are operated.  A turbine operating at a higher heat rate will wear out parts quicker and require more maintenance, while a turbine operating at a lower heat rate can go longer between inspections and will require fewer part replacements.  A competitor with knowledge of GE's inspection intervals could differentiate its LTSA bid package from GE's by offering favorable inspection intervals for the turbines in its product bid packages, thereby reducing the maintenance costs for its turbines relative to GE's.  Or, a competitor could tweak its turbines' inspection intervals to

match GE's, and then reduce the total cost for its LTSA bid package accordingly to ensure that it can beat GE's LTSA offering.

44.     The formulas and procedures GE uses to service and maintenance its turbines also include the precise steps that are taken during the inspection of those turbines, and the maintenance procedures that should be performed at particular moments in the lifespan of a GE turbine to ensure maximum product health and efficiency.  A competitor with knowledge of these formulas and procedures would be able to build its own formulas and procedures using the expertise of GE's engineers rather than its own.  Essentially, it would be taking GE's engineering expertise, developed through millions of dollars of research & development spending, and appropriating it for the purpose of competing against GE.

45.     A competitor with knowledge of any one of GE's gas turbine trade secrets—*e.g.*, the product price, output capacity, efficiency, heat rate, emissions levels, capital cost, service pricing, inspection intervals, or maintenance procedures GE offers and describes in its bid packages—would have a marked advantage in bidding against GE for gas turbine projects.  However, a competitor with knowledge of *all* of these trade secrets would have a crushing advantage in bidding against GE.  A competitor that knows GE's pricing and technical data across many different metrics can tailor its bid package to beat GE's in dozens of ways, depending on what is the most advantageous play for the competitor.  The competitor could simply drop its overall product price to beat GE's.  Or, the competitor could focus on ensuring that it beats GE in capital cost—*i.e.*, the cost to the power provider of purchasing each kilowatt of output capacity—if it thinks the particular customer may care more about that value measurement than about overall product price.  The competitor could simultaneously analyze the output capacity, heat rate, efficiency, and emissions levels of its offerings to make sure that some

or all of these measurements line up favorably as compared to GE's—again, depending on which of these specifications is most important to the customer in the context of the particular RFP. Finally, if the competitor nonetheless finds itself lagging behind GE in product pricing or technical specifications for its turbines, it can focus on improving its LTSA bid package by dropping its overall service pricing or tweaking the inspection intervals for its offered turbines so that it can offer advantages on the LTSA side of its bid package that outweigh GE's advantages on the product side.

46.     For all of these reasons, GE closely safeguards its trade secrets.  GE has processes for sequestering its most important confidential and proprietary information in server locations accessible only to certain employees on a need-to-know basis.  GE's Gas Power employees are instructed not to share confidential information about GE's gas turbine products and pricing outside the Gas Power division.  GE's employees sign confidentiality agreements providing that its confidential information and trade secrets must be kept confidential.  GE does not share its trade secrets with competitors.  GE requires potential customers like Dominion to sign confidentiality agreements before GE will share its trade secrets with those customers when responding to RFPs for gas turbine equipment or services.

47.     GE has expended tremendous time and money to develop its trade secrets. GE's Gas Power division spends in excess of 100 million dollars annually on research and development costs for gas turbine technologies.  GE's trade secrets have substantial economic value.  That value would be massively diminished if GE's trade secrets became known to competitors.  GE's pricing trade secrets would be worthless if they were known to competitors, because competitors would know exactly what price they would need to offer to beat GE.  A competitor that knew GE's technical trade secrets—the technical specifications of its turbines

and the proprietary formulas and procedures it uses to service and maintenance those turbines—would know exactly how to engineer its products to compete against GE's, and could essentially steal GE's service and maintenance expertise by incorporating GE's advanced maintenance formulas and procedures into its own servicing and maintenance protocols.  A competitor who knew all of these trade secrets could virtually assure itself victory in competing against GE for gas turbine projects.

### GE's Bid for the Peakers Project

48.     On March 8, 2019, Dominion issued the Peakers Project RFP, in which it sought bids for the supply and delivery of gas turbines, and for the provision of associated long-term service and maintenance for those turbines, in connection with a planned installation of "peaker" gas turbine units at Berry Hill Industrial Park in Danville, Virginia, by Virginia Electric and Power Company, a Dominion subsidiary.

49.      Dominion is a regulated power utility headquartered in Richmond, Virginia, that supplies electricity to parts of Virginia, North Carolina and South Carolina.

50.     A "peaker" gas turbine unit is a support unit that operates only when there is an intermittent peak demand for electricity.  By contrast, a baseload gas turbine unit is designed to continuously generate electricity.

51.     In the Peakers Project RFP, Dominion sought bids for the supply and delivery of a "block" of two gas turbines with the capacity to collectively deliver up to 500 MW of "peak" electricity.  Dominion also requested that bidders submit proposed pricing for the potential purchase in subsequent years of up to three additional gas turbine "blocks" (*i.e.*, up to six additional gas turbines).

52.     Prior to Dominion's release of the Peakers Project RFP, and in anticipation of that RFP, GE and Dominion entered into a Reciprocal Nondisclosure Agreement

dated February 28, 2019.  In that agreement, Dominion agreed to keep confidential the information GE submitted in response to the Peakers Project RFP, "including without limitation proprietary technical and business information, trade secrets, patent applications, manufacturing processes, know-how, methods, apparatus, formulae, compositions, financial information, software, forecasts, plans, customer lists, and any other information designated . . . as confidential or proprietary."

53.     When Dominion issued the Peakers Project RFP, it informed potential bidders that they would have until May 10, 2019, to submit a bid for the project, and that they must direct any pre-bid questions or communications, as well as their actual bid packages, through a structured procurement process handled by a single point of contact at Dominion.

54.     On May 10, 2019, GE submitted a bid package for the Peakers Project RFP to its assigned point of contact at Dominion.  In order to provide Dominion with different options to consider for the Peakers Project RFP, GE included in its bid package pricing and specifications for four of its gas turbine models: ███████████████████████████ █████████████████████████████████████████.  Each of these four turbines offered Dominion a distinct combination of price, output capacity, heat rate, efficiency, emissions levels, and capital cost.

55.     GE's bid package contained executive summaries of the price and performance capabilities of the ████████████████████ turbine models.  In each executive summary, GE stated that its bid package's "contents are proprietary to GE" and that, "[b]y taking receipt of this Submission, Dominion agrees not to reveal its contents in whole or in part beyond those persons in its own organization necessary to properly evaluate this Proposal or

22

to perform any resulting contract.  Dominion shall not reveal the contents of this Submission to a third party or make copies of this Proposal without the prior written consent of GE."

56.     Along with the four executive summaries of its turbine models, GE's bid package included:



57.     Throughout May and June 2019, GE submitted additional technical and pricing information about the ███████████████████ turbines via email in response to five Requests for Clarification that Dominion sent GE.

58.     ████████████████████████

████████████████████████████████

████████████████████████████████

███████████████████████████

██████

59.     In addition to responding to Dominion's five Requests for Clarification, on June 4, 2019, GE also provided, at Dominion's request, a summary sheet for its proposed LTSA.

60.     If its bid had been selected, GE would have earned substantial revenue from the Peakers Project equipment and service contracts.  Depending on the turbine models and equipment and service options selected by Dominion, the value of the contracts would have been at least $225 million ($125 million for the gas turbine supply contract, plus $100 million in service and maintenance fees for the first 15 years of the gas turbines' lifecycle) and potentially as much $340 million ($195 million for the turbine supply contract and another $145 million in service and maintenance fees).

61.     In addition to GE, the other bidders for the Peakers Project RFP were Siemens and Mitsubishi.

### *Dominion Discloses GE's Trade Secrets to Siemens*

62.     On six occasions in May and June 2019, unbeknownst to GE, Ted Fasca, a long-time Dominion employee, sent GE's confidential trade secrets to Michael Hillen, a Siemens account manager who at the time was responsible for managing Siemens' relationship with Dominion (the "Disclosure Incident").  Fasca was, at the time, a Manager in Dominion's Power Generation Planning division.  In that capacity, he played an essential role in defining Dominion's product development strategies.  Among other things, Fasca was the Dominion employee responsible for testifying as an expert before public utility commissions regarding Dominion's long-term Integrated Resource Plans.

63.     Ted Fasca sent documents containing GE's confidential trade secrets to Hillen on five separate days, on May 23, 2019; May 31, 2019; June 3, 2019; June 14, 2019; and June 20, 2019. ████████████████████████████████████

24

████████████████████████████████████████████████████████████

████████████████████████████████████████████

64.     In each of these six separate disclosures, Fasca sent Hillen GE's Trade Secrets—confidential pricing and technical information about the four specific gas turbine models that GE included in its bid package for the Peakers Project RFP and GE's proposed long-term service and maintenance for those turbines.

65.     ***First disclosure.***  On May 23, 2019, Fasca emailed Hillen two charts prepared by Dominion personnel, titled "Raw Summary Attachment 1" and "Raw Summary Attachment 2."  Fasca emailed the charts to a personal email account associated with Michael Hillen.  The charts were then forwarded to Hillen's Siemens email account.

66.     ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████

67.     ██████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

68.    ***Second disclosure.***   ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████

69.    ***Third disclosure.***   On May 31, 2019, Fasca emailed Hillen a spreadsheet

prepared by Dominion personnel, titled "GE Pricing Email Attachment."   ████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████

70.    ***Fourth disclosure.***   On June 3, 2019, Fasca emailed Hillen a chart

prepared by Dominion personnel, titled "Peaker Cost Summary Email Attachment."   Fasca

emailed the chart to a personal email account associated with Michael Hillen, and the chart was

then forwarded from that account to Michael Hillen's personal email account.

71.    ██████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████

72.     ***Fifth disclosure.***   On June 14, 2019, Fasca emailed Hillen an LTSA

summary sheet, titled "Service Agreement Attachment," prepared by GE personnel in response

to a May 2019 request by Dominion. ████████████████████████████

████████████████████████████████

████████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████

73.     ***Sixth disclosure.***   On June 20, 2019, Fasca emailed Hillen a presentation

prepared by Dominion personnel, titled "CT Evaluation Attachment." ████████████

██████████████████████████████████

██████████████████████████████████

████████████   ████████████████████████

████████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████   ████████████████████████████

██████████████████████████

***Siemens Employees Disseminate and Use GE's Trade Secrets to Compete Against GE in the
Peakers Project RFP***

74.     When Michael Hillen received GE's Trade Secrets from Ted Fasca, he

knew Fasca sent him that information in violation of his duty not to disclose confidential

competitor bid information.  Despite knowing this, Hillen did not reject the Trade Secrets.

Instead, he willingly participated in that scheme by arranging for Fasca to send GE's Trade

Secrets to personal email addresses associated with Hillen.  Then, Hillen sent almost all of the documents and information he received containing GE's Trade Secrets to other Siemens employees.  Those Siemens employees further disseminated GE's Trade Secrets throughout Siemens' business organization, in hundreds of subsequent emails; incorporated the Trade Secrets into Siemens-created analyses and work product; imported the Trade Secrets into Siemens' central repositories and databases, including Siemens' competitor benchmarking databases; and used GE's Trade Secrets to tailor and update Siemens' Peakers Project bid package, and, ultimately, to win the Peakers Project by unfair advantage.

75.     GE's Trade Secrets have traveled expansively across Siemens' business organization.  No fewer than ▮ Siemens employees have directly received and learned GE's Trade Secrets, including many employees who play an integral role in developing and preparing Siemens' bids for gas turbine RFPs, both in North America and globally.  Many of those individuals are still employed by Siemens.  The employees who received GE's Trade Secrets were directly responsible for preparing Siemens' bid package and supplemental bid responses for the Peakers Project RFP.  High-ranking Siemens employees have also received and learned GE's Trade Secrets, ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ █████████████████.  GE's Trade Secrets have been shared with Siemens employees located abroad.  Countless additional Siemens employees have indirectly accessed or otherwise used GE's Trade Secrets.

76.     During the Peakers Project RFP, Siemens employees disseminated and used for Siemens' competitive advantage GE's Trade Secrets about:  (1) the pricing for the gas turbines GE included in its Peakers Project bid package; (2) the technical specifications for the

gas turbines GE included in its Peakers Project bid package; and (3) the LTSA pricing and maintenance formulas GE included in its Peakers Project bid package. ███████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████

*In May 2019, Siemens Employees Use GE's Trade Secrets to Update Siemens' Peakers Project Bid Price*

77.     On May 23, 2019, Michael Hillen forwarded the Raw Summary Attachment 1 and Raw Summary Attachment 2 documents he had received from Ted Fasca to Mehran Sharifi, a Siemens Regional Sales Manager who played a critical role in preparing Siemens' bid package for the Peakers Project RFP. ████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████

78.     █████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████

79. 

80.

81.

82. ███████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████

*In June and July 2019, Siemens Employees Continue to Use GE's Trade Secrets to Analyze the Competitiveness of Siemens' Peakers Project Bid*

83. After Siemens updated its Peakers Project bid price in May 2019, Siemens employees continued to use GE's Trade Secrets to game the bidding process. ████████████

███████████████████████████████████

███████████████   ████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████



84.

85.

86.

87.     In July 2019, Siemens employees continued to use GE's Trade Secrets to analyze the competitiveness of its Peakers Project LTSA bid package.  The Service Agreement Attachment document containing data about GE's LTSA bid package and maintenance formulas was widely disseminated among Siemens employees working on the Peakers Project RFP throughout that month.  Those employees clearly used the data about GE's LTSA bid pricing in the Service Agreement Attachment as a benchmark for evaluating their own LTSA bid pricing for the Peakers Project.  To take one example, on July 18, 2019, Travis Douglas sent his annotated version of the document to Scott Bell, a Siemens Marketing Manager, and explained why he had analyzed GE's LTSA bid pricing:  "This is what I put together with the feedback we had.  I will walk you through it if you want.  It was more to validate we were at a price we needed to be at."

88.     On July 29, 2019, Scott Bell sent the Service Agreement Attachment to other Siemens employees, one of whom—Adam Hymel, Portfolio Manager for Long Term Service Projects—noted that Siemens "got this spreadsheet from Dominion whether they intentionally did it or not."  Eventually, the document made its way to a senior Bid Strategy manager, Chris Oliveri, who further disseminated the document within his group, with this caution:  "Please do not forward."

89.     ███████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████

90.     In addition to widely disseminating the Service Agreement Attachment, Siemens employees also saved that document in two separate shared folders in Siemens' computer systems, which, on information and belief, were accessible to a large number of Siemens employees.

91.     That Siemens employees wrongly—and widely—disseminated GE's LTSA Trade Secret information is highly significant.  As mentioned *supra*, LTSAs may last as long as 10–25 years and provide a substantial, continuous revenue stream for a winning bidder for decades after the initial construction of gas turbines. ██████████████████████

███████████████████████████████████████████

███████████████████████████████████  After it had updated its Peakers Project bid price, Siemens analyzed GE's LTSA pricing and maintenance formulas to make sure it was not at a disadvantage on the LTSA side of the bidding process that could undo the front-runner status Siemens had unlawfully obtained.

92.     All of the Siemens employees who disseminated and used GE's Trade Secrets knew or should have known they were misappropriating the Trade Secrets by doing so. Michael Hillen distributed the documents and information containing GE's Trade Secrets that he received from Ted Fasca, even though Hillen certainly knew or should have known Fasca owed a duty to GE to keep the Trade Secrets confidential.  To cover his tracks, Hillen used personal email addresses—his, and, on information and belief, his wife's—to receive the Trade Secrets from Fasca.

93.     The many other Siemens employees who subsequently disseminated, dissected, analyzed, and used GE's Trade Secrets for Siemens' competitive advantage also knew or should have known they were misappropriating the Trade Secrets.  Those employees knew the information had come from Dominion—in one employee's words—"whether they intentionally did it or not."  They were aware that this was not information they should have possessed to begin with.  Yet, they chose to widely distribute the Trade Secrets, and to use the Trade Secrets as a benchmark for updating Siemens' Peakers Project bid.  Each Siemens employee's dissemination and use of GE's Trade Secrets was in clear violation of Siemens' Business Conduct Guidelines, which prohibit Siemens employees from "obtain[ing] confidential information from third-parties without justification and us[ing] it in an unlawful manner, such as, for example, in the bidding process."[1]

94.     Siemens relied on the Trade Secrets it learned about GE's gas turbine product and LTSA data to adjust its Peakers Project bid package to Dominion so that it could beat GE's.  As a result, it did beat GE.  In July 2019, Dominion awarded Siemens the Peakers Project gas turbine equipment and service contracts.

***Siemens Continues to Misappropriate GE's Trade Secrets for Its Competitive Advantage***

95.     Siemens' employees did not confine their dissemination and use of GE's Trade Secrets to the Peakers Project RFP.  At a minimum, Siemens disseminated and used GE's Trade Secrets to inform its bidding analyses for two other projects unrelated to the Peakers Project.

---

[1]   *Siemens Business Conduct Guidelines*, SIEMENS AG 1, 24 (2019), https://assets.new.siemens.com/siemens/assets/public.1580482594.5c242542-e991-4b97-af63-090ad509be74.2019-sag-bcg-en.pdf.  These are the Business Conduct Guidelines issued by Siemens AG, which was—at the time of both the Disclosure Incident and the subsequent dissemination and use of GE's Trade Secrets—Siemens' ultimate parent company.

96.   ***2019 "FPL" project.***  On June 25, 2019, John Gibson sent the <u>Service</u> <u>Agreement Attachment</u> containing pricing and maintenance formulas for GE's Peakers Project LTSA bid package to Fernando Muth, a Market Intelligence Manager, and told Muth:  "We really need to understand and dissect this to support us on FPL peakers. . . . Do not forward this and keep this within a small circle."  On information and belief, "FPL" is a reference to Florida Power & Light, a Florida power utility that provides electricity to 4.9 million customers.

97.   ***2020 project involving GE, Mitsubishi, and Ansaldo.***  On February 12, 2020—nine months after Siemens first received GE's Trade Secrets, and six months after Siemens won the Peakers Project contracts—George Gakis, Siemens' Business Development Manager for Latin America, continued to disseminate the <u>Service Agreement Attachment</u> containing pricing and maintenance formulas for GE's Peakers Project LTSA bid package among Siemens employees, in discussions about a project in which Siemens anticipated GE, Mitsubishi, and Ansaldo would compete against Siemens.  Gakis sent the <u>Service Agreement</u> <u>Attachment</u> to members of Siemens' market intelligence group, and asked:  "Did we ever do a deep dive on this one?"

### Siemens Reveals Its Misappropriation of GE's Trade Secrets

98.   On September 14, 2020—sixteen months after Siemens first obtained GE's Trade Secrets—GE received a letter from Siemens revealing the Disclosure Incident.  Ex. A, Siemens Disclosure Letter.[2]  Siemens informed GE that, during the course of the Peakers Project RFP, "a Dominion employee sent confidential GE information, including information pertaining to GE's bid price, to a Siemens account manager."  Siemens informed GE that the

---

[2]   The letter was dated August 28, 2020, but Siemens sent the letter to an incorrect email address, and did not correct the error until September 14, 2020.

"Siemens account manager thereafter forwarded the information to other Siemens employees who were involved in Siemens Energy's bid preparation."

99.     Siemens reportedly learned about the Disclosure Incident through an unrelated internal review.  That internal review revealed that, after the parties submitted their initial bids for the Peakers Project RFP, but before the project was awarded, Dominion disclosed GE's Trade Secrets, as well as trade secrets belonging to Mitsubishi, to Siemens.  Siemens informed GE that, after learning about the Disclosure Incident, it engaged outside counsel to perform an investigation.  Siemens further informed GE that, after its outside counsel's investigation had revealed the Disclosure Incident, it told Dominion about the Disclosure Incident, and then "afforded Dominion the opportunity to complete its own investigation of the matter before providing notice to GE."

100.     Siemens' September 2020 disclosure letter to GE was belated and deficient.  It did not identify the Dominion employee who disclosed GE's Trade Secrets.  It did not identify the Siemens account manager who received the Trade Secrets from Dominion.  It did not identify the other Siemens employees to whom the Siemens account manager sent the Trade Secrets.  It did not identify, describe or produce the Trade Secrets that Siemens received from Dominion, beyond stating that the Trade Secrets "include[d] information pertaining to GE's bid price."  Siemens did not reveal when it first discovered the Disclosure Incident; when it began its investigation; the steps it took in its investigation; or when it notified Dominion of the Disclosure Incident.  Nor did Siemens take prompt steps, even after notifying GE, to stop further use and dissemination of GE's Trade Secrets.

101.     What Siemens did reveal is that it had decided not to promptly inform GE about the Disclosure Incident.  Instead, when Siemens first discovered the Disclosure Incident, it

performed and completed an investigation, informed Dominion about the incident, and allowed Dominion to perform and complete its own investigation.  Siemens did not extend GE the same courtesy.  It chose not to inform GE that its Trade Secrets had been misappropriated (several times over) until several months after it claims to have first learned about the Disclosure Incident.

102.    After learning of the Disclosure Incident, Dominion canceled Siemens' Peakers Project gas turbine equipment and service contracts on August 14, 2020.

103.    On September 3, 2020, GE received a letter from Dominion about the Disclosure Incident.  Ex. B, Dominion Disclosure Letter.  Dominion told GE that, in "summer" 2020, "Siemens informed Dominion" about the Disclosure Incident.  Dominion told GE that it had "confirmed that on five occasions in 2019" a "Dominion employee shared confidential GE bid information with a Siemens employee."

104.    With its September 3, 2020 letter, Dominion gave GE an index (the "Document Index") describing the documents containing GE's Trade Secrets that Siemens obtained in May and June 2019.  The Document Index listed six documents containing GE's Trade Secrets, including five "prepared by Dominion Energy personnel."  The Document Index briefly described the contents of each document.  The Document Index stated that the documents contained many types of confidential trade secret information about the gas turbine models and services GE included in its bid for the Peakers Project RFP, including ███████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████

████████████████████████████████

105.    After receiving Siemens' and Dominion's September 2020 letters, GE promptly began investigating the Disclosure Incident, including by seeking additional information from Dominion about the findings of its investigation and about the documents containing GE's Trade Secrets that have been in Siemens' possession since May and June 2019.

106.    GE also sought additional information from Siemens.  On October 20, 2020, GE sent Siemens a letter requesting that Siemens:

- Cease its misappropriation and use of GE's Trade Secrets;

- Promptly destroy the Trade Secrets in its possession;

- "[E]nsure that any employee who had access" to the Trade Secrets, "if still employed by Siemens, be prohibited from participating in any projects in which such information is possibly relevant through June 30, 2023," including "all projects on which Siemens is bidding its SGT6-8000H, SGT6-5000F, SGT6-A65, SGT-800, or SGT6-2000e technology or later-developed models of comparable outputs";

- Share the results of its investigation of the Disclosure Incident;

- Take appropriate remedial actions;

- Preserve relevant documents; and

- Provide an inventory of the Trade Secrets in Siemens' possession.

Ex. C, GE October 20, 2020 Letter.

107.    Siemens responded to GE on October 30, 2020, with another woefully deficient letter.  Ex. D, Siemens October 30, 2020 Letter.  In that communication, Siemens agreed to some of GE's requests.  But, critically, Siemens offered only to wall off employees who "received" GE's Trade Secrets from "new projects involving F-class gas turbine (60 Hz) engines for a period of two years."  GE's Trade Secrets indisputably contained information about

39

several different types and classes of GE gas turbine models, including ████████ ████████ turbines.  In addition to being widely disseminated among Siemens employees, GE's Trade Secrets were imported into Siemens' central repositories and databases, including Siemens' competitor benchmarking databases.  Moreover, and as discussed in more detail *infra*, data about certain classes of GE's turbines can indirectly but significantly inform Siemens' estimates of GE's pricing and technical specifications for any of GE's gas turbines, across any of GE's product lines.  That is why GE reasonably asked Siemens to wall off the employees who "had access" to GE's Trade Secrets—not just the employees who received them—from working on projects on which Siemens is bidding its SGT6-8000H (an H-class turbine); SGT6-5000F (an F-class turbine); SGT6-A65 (an aeroderivative turbine); SGT-800 (an "industrial" gas turbine); or SGT6-2000e (an E-class turbine), or later-developed models of comparable outputs.  Power provider RFPs are often prolonged events—competitors typically know about the RFPs months or even years before they are issued, and the RFP processes themselves can take many months to complete—which is why GE reasonably asked Siemens to wall off the employees who had access to GE's Trade Secrets from working on related projects until June 2023.  Siemens provided no explanation for its refusal to comply with GE's requests, nor its unilateral narrowing of the timeframe and the scope of projects from which Siemens employees who had access to GE's Trade Secrets would be sequestered.

108.    In November 2020, GE learned, through independent investigation, the names of the Dominion employee who disclosed GE's Trade Secrets to Siemens and the Siemens account manager who first received GE's Trade Secrets—Ted Fasca and Michael Hillen, respectively.  GE also learned that, remarkably, Hillen is still employed by Siemens.  Later, GE learned that many other Siemens employees who received, disseminated, dissected, and used

GE's Trade Secrets to engineer Siemens' victory in the Peakers Project RFP—including Mehran Sharifi, Adam Herlitzka, David Fernandes, George Gakis, Adam Hymel, and Fernando Muth, among others—are also still employed by Siemens.

109.    GE sent Siemens a follow-up letter on November 17, 2020.  Ex. E, GE November 17, 2020 Letter.  GE again requested that Siemens prohibit the employees who had access to GE's Trade Secrets from working on new projects related to multiple of Siemens' gas turbine models until June 2023, including a specific Dominion RFP related to gas turbine equipment in South Carolina that was impending at the time of GE's follow-up letter and that, as discussed *infra* in paragraphs 133–135, has now been issued.  GE requested Siemens expeditiously disclose several sets of information about the Disclosure Incident and the subsequent misappropriation and use of GE's Trade Secrets by Siemens employees, including:

- All communications to, from, or among Siemens employees concerning GE's Trade Secrets;

- All derivative documents containing GE's Trade Secrets;

- An inventory of documents that potentially include or reference GE's Trade Secrets received from Dominion;

- A list of Siemens employees who had access to GE's Trade Secrets, the dates of receipt, and the location, contact information, and title/job responsibility of each employee; and

- Further information about Siemens' remediation processes, including the search terms it used to identify relevant material, the list of Siemens employees with whom it spoke to identify potential data sources, and the scoping questions those employees were asked.

110.    On November 27, 2020, Siemens provided GE with certain communications to, from, or among Siemens employees concerning GE's Trade Secrets, and

with certain documents in Siemens' possession that contain GE's Trade Secrets.  Siemens

provided this production of materials along with a response letter and appendices.[3]

111.    The scope of Siemens' misappropriation of GE's Trade Secrets, as

revealed in the limited communications and documents that Siemens did provide to GE on

November 27, 2020, is breathtaking.  Those communications and documents—many of which

are discussed in detail *supra*—show that Siemens employees extensively disseminated GE's

confidential pricing and technical information about its gas turbines and LTSA proposals.  This

Complaint describes only a portion of the incidents in which Siemens employees freely

disseminated GE's Trade Secrets amongst themselves.

112.    The materials Siemens produced to GE show that Siemens employees

went much further than simply sending GE's Trade Secrets around to their colleagues.  They

incorporated GE's Trade Secrets into their own bidding analyses and other work product;

imported GE's Trade Secrets into Siemens' central repositories and databases, including

Siemens' competitor benchmarking databases; and used GE's Trade Secrets to analyze how best

to compete against GE, in the Peakers Project RFP and in at least two other projects. ███

████████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

113.    The materials Siemens produced to GE on November 27, 2020, make

clear the extent to which Siemens attempted, in its initial September 2020 disclosures to GE, to

---

[3]    Siemens has designated its response letter and appendices dated November 27, 2020 as
"CONFIDENTIAL – INFORMATIONAL PURPOSES ONLY."  GE disputes the
appropriateness of that designation but, in keeping with the terms of its non-disclosure
agreement with Siemens, has not attached Siemens' response letter or appendices dated
November 27, 2020, to this Complaint.

minimize, hide, and cover up its extensive misappropriation of GE's Trade Secrets.  In Siemens'

initial one-page letter to GE on September 14, 2020, in which it told GE about the Disclosure

Incident, Siemens told GE only that "a Dominion employee sent confidential GE information" to

"a Siemens account manager," and that the "Siemens account manager thereafter forwarded the

information to other Siemens employees who were involved in Siemens Energy's bid

preparation."  Ex. A.

114.    Even though it had completed its internal investigation and already knew

the scope of its misappropriation of GE's Trade Secrets, Siemens chose to downplay that

misappropriation in its September 2020 letter to GE.  Siemens told GE nothing about how GE's

Trade Secrets were not only "forwarded" by Michael Hillen to other Siemens employees, but

were subsequently further disseminated across Siemens' business organization; how Siemens

employees dissected, analyzed, and incorporated GE's Trade Secrets into their own analyses and

work product; how Siemens employees imported GE's Trade Secrets into Siemens' central

repositories and databases, including Siemens' competitor benchmarking databases; and, most

troublingly, ██████████████████████████████████████████████████████

████████████████████████████████.

### *The Competitive Value of GE's Trade Secrets in Siemens' Hands*

115.    Siemens still possesses GE's Trade Secrets.  Siemens' possession and

knowledge of those Trade Secrets gives it a tremendous competitive advantage in bidding

against GE for all types of gas turbine equipment and services projects worldwide—not just for

the Peakers Project RFP, but also for future projects.  Each future gas turbine project represents a

meaningful percentage of the market and materially improves the winning company's position of

strength in that market.

116.     As Siemens demonstrated in the Peakers Project bidding process, it can use GE's Trade Secrets to unfairly win future gas turbine projects by tailoring its bid packages to ensure that the combination of pricing and technical specifications it offers in its bid package is more favorable than GE's.  Siemens can also use GE's Trade Secrets to drive GE's profit margins lower for even projects GE wins, by offering discounts on its product or service pricing, and/or advantages in output capacity, emissions levels, capital cost, or other technical metrics, that drive the overall contract price down and force GE to respond in kind.  The result is illusory competitive "victories" for GE, in which GE's profits are decimated through Siemens' unfair maneuvers, and where GE is left with contracts won on razor-thin profit margins or even negative margins.

117.     Siemens employees'—and, in particular, Hillen's and Sharifi's—personal knowledge of confidential financial and technical data about the four specific gas turbine models GE included in its bid for the Peakers Project RFP—the ████████████████████████ ███████████████████████████████—is obviously of immense value to Siemens in bidding against GE for any project in which GE includes any of those same models in its bids.

118.     GE often includes one or more of these turbine models in bid packages for gas turbine RFPs in which Siemens is a head-to-head competitor.  Since May 2019—the month that Siemens first learned and began misappropriating GE's Trade Secrets—GE has included one or more of its ████████████████████████ turbines in bid packages for █ separate gas turbine RFPs (not including the Peakers Project RFP).  Some of those RFPs are still outstanding.  For those for which contracts have been awarded, GE is aware that Siemens has won at least seven of the RFPs since May 2019 in which GE included one or more of the turbines from its Peakers Project bid package, including projects in Belarus, Australia, Germany,

Japan, and Canada.  Discovery may reveal that Siemens used GE's Trade Secrets to gain a competitive advantage in winning one or more of those RFPs, in addition to its use of GE's Trade Secrets to unfairly win the Peakers Project contracts.

119.    GE has also won several RFPs since May 2019 in which it included one or more of the turbines from its Peakers Project bid package.  GE won some of those projects at razor-thin profit margins or at negative margins.  One of the projects GE has won since May 2019 was a project with Florida Power & Light ("FPL") to supply four of GE's 7F.05 turbines at FPL's Crist power plant in Pensacola, Florida (the "Crist Project").  GE sold its 7F.05 turbines to FPL at negative margins for the Crist Project.  As discussed in paragraph 96 *supra*, Siemens employees used GE's Trade Secrets about its service pricing and maintenance formulas to "support us on FPL peakers," which, on information and belief, was the Crist Project.  Siemens' unfair use of GE's Trade Secrets to structure its Crist Project bid package likely resulted in lower (in fact, zero) profit margins for GE than GE could have otherwise secured.  Discovery may reveal that Siemens used GE's Trade Secrets to drive GE's profit margins down for other gas turbine RFPs GE has won in competition against Siemens since May 2019.

120.    ███████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

Siemens' knowledge of the technical capabilities of the precise products GE included in its Peakers Project bid package, and the prices at which GE included them in that bid package, is, in essence, a cheat sheet for bidding against those same products in the future.

121.    Siemens' possession and knowledge of the Trade Secrets also gives it a competitive advantage in bidding for similar and related gas turbine projects that do not involve

the precise turbine models GE included in its bid for the Peakers Project RFP.  Siemens is a

sophisticated gas turbine equipment manufacturer.  It has the capacity to use the financial and

technical data in its possession about the particular ██████████████████████ turbines

GE included in its bid for the Peakers Project RFP to extrapolate—*i.e.*, use the information it has

about GE's ████████████████████ turbines to strategically guess or "reverse

engineer"—the technical capacities of, or pricing for, other models in GE's ████████████

████████ product lines.  For example, Siemens' knowledge of the pricing and technical

specifications for GE's ████████████ turbine would allow it to bid with increased confidence

against GE's similar ████████████████ turbines, because of the "informed" inferences

Siemens would be able to draw about the pricing and technical specifications of those turbines.

GE's Trade Secrets could even inform Siemens' assessment of GE's expected bids for gas

turbines in entirely different turbine classes or categories, such as gas turbines that operate on

international power grids that use a different electromagnetic frequency than United States power

grids.[4]

      122.    Since May 2019, GE has included turbines similar to the models in its

Peakers Project bid package—including, among others, its ██████████████████████ turbines

and its ████████████████ turbines—in its bid packages for at least ██ separate gas turbine

RFPs.  The turbines GE included in these bid packages rely on very similar technologies to the

technologies in the ████████████████████████ turbines that were included in GE's

Peakers Project RFP, which would allow Siemens to easily strategically guess or "reverse

---

[4]    The electricity supplied on power grids is "alternating current" electricity that oscillates
between positive and negative polarity many times per second.  The "frequency" with which
the electrical current alternates is expressed in terms of hertz (Hz).  North American power
grids operate on a frequency of 60 Hz.  Most international power grids operate on a
frequency of 50 Hz.  GE and Siemens each has a 60 Hz gas turbine product line as well as a

engineer" the pricing or technical specifications for those GE turbines.  Some of these RFPs are still outstanding.  For those for which contracts have been awarded, GE is aware that Siemens has won at least one of the RFPs since May 2019 in which GE included in its bid package turbines similar to the models in its Peakers Project bid package—specifically, a project in South Korea.  Discovery may reveal that Siemens used GE's Trade Secrets to gain a competitive advantage in winning that RFP, in addition to its use of GE's Trade Secrets to unfairly win the Peakers Project contracts.

123.    GE has also won several RFPs since May 2019 in which it included turbines similar to the models in its Peakers Project bid package.  Discovery may reveal that Siemens used GE's Trade Secrets to drive GE's profit margins down for one or more of those RFPs by altering its bid package to compete against GE, thereby forcing GE to offer further discounts in response, resulting in lower profit margins for GE than GE could have otherwise secured.

124.    ██████████████████████████████████████████████
████████████████████████████████████████████
Siemens' knowledge of the pricing and technical specifications of GE's ████████
████████████████ turbines gives it an advantage in bidding against GE not just with respect to those particular turbines, but across the board, with respect to any of GE's gas turbines that GE includes in bid packages for RFPs for which Siemens is a head-to-head competitor.

125.    Siemens' possession and knowledge of the Trade Secrets do not just give it a competitive advantage in bidding against GE for gas turbine equipment projects; they give it a similar advantage in bidding against GE for gas turbine services projects, as well.  The gas

50 Hz product line.

turbine RFPs for which Siemens and GE routinely compete against each other often combine two requests by the power provider customer, one for equipment and the other for long-term services and maintenance pursuant to an LTSA.  GE and Siemens regularly bid against each other to provide both equipment and services.  The Trade Secrets contain detailed analyses of GE's pricing and costs for long-term service and maintenance, including information about GE's proprietary maintenance formulas and procedures.  That information has been and may continue to be of significant value to Siemens in bidding against GE for gas turbine LTSAs.

126.    In sum, Siemens' possession and knowledge of GE's Trade Secrets give it a tremendous competitive advantage in bidding against GE for gas turbine equipment or services projects of any kind in the present and for years to come.

### Dominion's Upcoming Gas Turbine RFP in South Carolina

127.    Siemens' possession and knowledge of GE's Trade Secrets give it a competitive advantage in bidding against GE for any gas turbine equipment or services project for any customer anywhere in the world.  The competitive value of the Trade Secrets to Siemens is even greater—exponentially so—for future gas turbine equipment and services RFPs issued by Dominion.  The documents containing GE's Trade Secrets that Siemens has possessed since May and June 2019 do not just contain GE's Trade Secrets.  They also contain Dominion's internal analyses of GE's (and other competitors') Peakers Project RFP bidding information, which gives Siemens remarkable insight into how Dominion evaluates and appraises GE's Trade Secrets.  Moreover, the information in those documents is now known to multiple, as-yet-unknown Siemens employees.  GE should not have to bid against Siemens for future Dominion gas turbine RFPs while Siemens is in possession of GE's Trade Secrets:  GE would essentially walk blindfolded into such a bid, while Siemens would bid holding the answer sheet.

128.    An inability to bid fairly for Dominion contracts in competition with Siemens could have a destructive long-term effect for both GE's gas turbine manufacturing and service business and GE's manufacturing and service businesses for other types of energy—including GE's Hitachi Nuclear Energy division and its Renewable Energy division—which manufacture and service nuclear power, wind power, solar power, hydroelectric power, and hybrid power solutions.

129.    Dominion is a very significant and increasingly dominant force in the East Coast power generation market, and is a critical strategic partner for energy equipment manufacturers like GE and Siemens.  Originally a Virginia-only regulated utility, Dominion currently supplies electricity to 3.9 million customers in Virginia, North Carolina, and South Carolina.  Last year, Dominion purchased a South Carolina-based power provider, SCANA Corporation, in a $13.4 billion transaction that further expanded its footprint on the East Coast. Already one of the largest producers and transporters of energy in the United States, Dominion has aggressively expanded, and has announced plans to continue to expand, its power generation capacities by expanding its nuclear power, renewable (solar, wind, hydroelectric) power, and gas power facilities.

130.    Siemens and other related entities owned by parent company Siemens Energy have been—and remain—particularly aggressive competitors for Dominion business.  In the lead-up to Siemens Energy's spinoff and IPO in September 2020, Siemens Energy companies were highly motivated to secure and publicize new energy contracts (both gas turbine and renewable) with Dominion.  The Peakers Project contracts are not the only energy contracts that Siemens Energy companies secured with Dominion in 2019 and 2020 through the use of aggressive and potentially untoward tactics.

131.    In January 2020, Dominion selected Siemens Gamesa Renewable Energy S.A. ("Siemens Gamesa"), a majority-owned subsidiary of Siemens Energy, as its manufacturing partner for its planned construction of a $7.8 billion offshore wind project in Virginia (the "Offshore Wind Project").  This massive project was awarded to Siemens Gamesa under very unusual circumstances, in which Dominion issued a Request for Information ("RFI") in November 2019—essentially, a request for preliminary budgetary proposals from manufacturers that precedes the issuance of an RFP—and then went straight into the process of selecting a manufacturing partner, without the benefit of a formal RFP.  GE's Renewable Energy division submitted a budgetary proposal in response to Dominion's Offshore Wind Project RFI, and had fully intended to submit a formal bid package for a subsequent RFP for that project.  GE was stunned to learn in January 2020 that Siemens Gamesa had been selected as Dominion's partner for the Offshore Wind Project without an RFP ever having been issued.  Dominion's selection of a manufacturing partner for the Offshore Wind Project without the benefit of a formal RFP process was highly unusual, as was the short time period—two months—between Dominion's issuance of a preliminary RFI and its decision to award the project to Siemens Gamesa.  GE believes that Siemens Gamesa engaged in highly aggressive and potentially improper competitive tactics in securing the Offshore Wind Project contracts from Dominion.

132.    GE expects to compete head-to-head with Siemens for multiple high-dollar-value energy RFPs that are likely to be issued by Dominion in coming years.  If Siemens is able to leverage its knowledge of GE's Trade Secrets to gain an unfair advantage in bidding for Dominion's gas turbine projects, it will further strengthen its relationship with a critical East Coast power generation partner and could box GE out of much of the East Coast power generation market, not just for gas turbine projects but for all types of energy projects.

133.    These concerns are not merely theoretical.  On November 20, 2020, Dominion issued an RFP for a new gas turbine power generation operation in South Carolina (the "South Carolina RFP"), for which GE plans to submit a bid.  Dominion has informed GE that initial bid responses are due for the South Carolina RFP on January 19, 2021.  Supplemental bid responses may be requested after that date.  Dominion has stated that the purpose of the South Carolina RFP is to procure a significant number of gas turbines that Dominion can install in three different existing power plants as part of a multi-year fleet modernization program to be implemented over the next five years.  Essentially, Dominion has issued one RFP, and intends to select one manufacturing partner, to modernize a huge portion of its gas turbine fleet between now and 2025.  GE expects Dominion will select a winning bidder for the South Carolina RFP in or around May 2021, and that the total value of the supply and services contracts awarded will be between $120 million and $150 million, with expected long-term servicing revenue that likely will exceed $60 million.

134.    Both GE and Siemens currently intend to bid for the South Carolina RFP.

 GE thus cannot fairly compete in the South Carolina RFP if Siemens also bids, absent further relief.

135.    Shockingly, Siemens refuses to wall off the employees who had access to GE's Trade Secrets from working on any gas turbine RFPs other than those specifically involving "F-class gas turbine (60 Hz) engines." ████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████ There is thus no assurance that the Siemens employees who had personal knowledge of GE's Trade Secrets, and who worked on Siemens' Peakers Project bid, will not also work on Siemens' South Carolina RFP bid, armed with information about GE's products.  No amount of electronic "sequestering" can change the fact that GE's Trade Secrets remain in the minds of the Siemens employees with direct responsibility for Siemens' gas turbine bid packages.  It would be absolutely impossible for GE to compete effectively with Siemens for the South Carolina RFP ███████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████.

136.    Even if Siemens were to agree to a more appropriate walling off of the employees who had access to GE's Trade Secrets, that precaution alone would not be enough to ensure that GE could fairly bid for Dominion's South Carolina RFP.  GE's Trade Secrets were imported into Siemens' central repositories and databases, including Siemens' competitor benchmarking databases.  That kind of information, once subsumed within those sorts of databases, cannot easily be removed.  Even if Siemens were to remove 100% of GE's Trade Secrets from its files, repositories, and databases, that information has already been seen and

absorbed by the dozens of Siemens employees who continue to work on Siemens' gas turbine RFP bid packages.  Moreover, Siemens has already altered its pricing methodologies after it learned GE's confidential pricing information, and those alterations cannot now be erased.

137.    Siemens' grossly unfair advantage in competing against GE for gas turbine equipment and services contracts would have been avoided if the Siemens employee who received the documents containing GE's Trade Secrets had done the right thing, and turned the information in to Siemens' compliance and legal officers.  But he did not.  Nor did the Siemens executives who learned of Siemens' misappropriation of GE's Trade Secrets take prompt steps to stop that misappropriation.  Instead, Hillen distributed GE's Trade Secrets to other Siemens employees working on the Peakers Project RFP bid, triggering a widespread chain of dissemination and use of GE's invaluable Trade Secrets throughout a primary competitor's organization, while Siemens' management turned a blind eye.

## COUNT I

### Trade Secret Misappropriation Under the Defend Trade Secrets Act
### (18 U.S.C. §§ 1836(b), 1839)

138.    GE repeats and realleges, as if fully set forth herein, the allegations of Paragraphs 1 through 137 above.

139.    GE is the owner of valuable trade secrets relating to its gas turbine technologies and business operations, including confidential pricing, product, and services information.

140.    GE's trade secrets related to its gas turbine pricing, products, and services are used in, or intended for use in, interstate and foreign commerce.  GE's gas turbines and services are used both throughout the United States and globally.

141.    GE's trade secrets about its gas turbine pricing, products, and services derive substantial independent economic value, actual or potential, from not being generally known or ascertainable to GE's competitors.  GE does not reveal such information to its competitors.  GE's competitors would be able to obtain substantial economic value from knowing GE's trade secrets, including, but not limited to, ascertaining and/or extrapolating the price competitors must match and the products and services competitors must render to successfully compete with GE for current and future gas turbine equipment and services contracts.

142.    GE has taken reasonable steps to maintain the secrecy of its trade secrets, including by ensuring that its employees sign confidentiality agreements protecting the disclosure of GE's trade secrets; by sequestering confidential and proprietary information in server locations accessible only to certain employees on a need-to-know basis; and by ensuring that potential customers enter into confidentiality agreements protecting the disclosure of GE's trade secrets during the course of RFPs.

143.    Siemens misappropriated GE's Trade Secrets by disclosing and using them, including by unlawfully disclosing those Trade Secrets within Siemens' business organization and by using the Trade Secrets to obtain a competitive advantage during the course of the Peakers Project RFP.

144.    GE's Trade Secrets were disclosed and used by Siemens without GE's express or implied consent.

145.    Siemens misappropriated GE's Trade Secrets because the Trade Secrets were obtained and derived from or through a person who owed GE a duty to maintain the secrecy of the information, and Siemens knew or should have known that the Dominion

employee who gave Siemens the Trade Secrets was obligated not to disclose them under the confidentiality agreement between GE and Dominion.

146.     Siemens' misappropriation of GE's Trade Secrets was willful and malicious.

147.     GE has suffered, and continues to suffer, immediate and irreparable harm from Siemens' misappropriation of its Trade Secrets, including through the inability to fairly compete for Dominion's upcoming South Carolina RFP.

148.     GE has suffered, and continues to suffer, damages from Siemens' misappropriation of its Trade Secrets.  GE's damages from Siemens' misappropriation include at least $225 million, and potentially more than $340 million, for the loss of the Peakers Project equipment and services contracts.  In addition, they may include damages from Siemens' misappropriation of GE's Trade Secrets in any of the other eight gas turbine RFPs Siemens has won since May 2019 in competition with GE, if Siemens used GE's Trade Secrets to gain a competitive advantage to win one or more of those RFPs.  If Siemens unfairly wins the South Carolina RFP, GE's damages will further include an amount in excess of $150 million for the loss of the equipment and services contracts for that project, as well.  GE's damages from Siemens' misappropriation also include lost profits from the Crist Project and other projects GE won since May 2019 in which Siemens used GE's Trade Secrets to drive down the overall contract price and reduce GE's profit margins.  GE is entitled to an award of damages for the actual loss caused by Siemens' misappropriation, or, in the alternative, is entitled to a reasonable royalty for Siemens' unauthorized use and disclosure of GE's Trade Secrets.

149.     Siemens, while in possession of GE's Trade Secrets, won the Peakers Project equipment and services contracts, and won contracts for eight other gas turbine RFPs in

which it competed against GE while in possession of GE's Trade Secrets.  Siemens has been

unjustly enriched by its misappropriation.  GE is entitled to an award of damages for Siemens'

unjust enrichment, or, in the alternative, is entitled to a reasonable royalty for Siemens'

unauthorized use and disclosure of GE's Trade Secrets.

150.    GE is also entitled to exemplary damages in an amount equal to twice its

damages awarded, as well as attorney's fees and costs, because Siemens' misappropriation of its

Trade Secrets was willful and malicious.

## <u>COUNT II</u>

**Trade Secret Misappropriation Under the Virginia Uniform Trade Secrets Act
(Va. Code § 59.1-336 *et seq.*)**

151.    GE repeats and realleges, as if fully set forth herein, the allegations of

Paragraphs 1 through 137 above.

152.    GE is the owner of valuable trade secrets relating to its gas turbine

technologies and business operations, including confidential pricing, product, and services

information.

153.    GE's trade secrets about its gas turbine pricing, products, and services

derive substantial independent economic value, actual or potential, from not being generally

known or ascertainable to GE's competitors.  GE does not reveal such information to its

competitors.  GE's competitors would be able to obtain substantial economic value from

knowing GE's trade secrets, including, but not limited to, ascertaining and/or extrapolating the

price competitors must match and the products and services competitors must render to

successfully compete with GE for current and future gas turbine equipment and services

contracts.

154.     GE has taken reasonable steps to maintain the secrecy of its trade secrets, including by ensuring that its employees sign confidentiality agreements protecting the disclosure of GE's trade secrets; by sequestering confidential and proprietary information in server locations accessible only to certain employees on a need-to-know basis; and by ensuring that potential customers enter into confidentiality agreements protecting the disclosure of GE's trade secrets during the course of RFPs.

155.     Siemens misappropriated GE's Trade Secrets by disclosing and using them, including by unlawfully disclosing those Trade Secrets within Siemens' business organization and by using the Trade Secrets to obtain a competitive advantage during the course of the Peakers Project RFP.

156.     GE's Trade Secrets were disclosed and used by Siemens without GE's express or implied consent.

157.     Siemens misappropriated GE's Trade Secrets because the Trade Secrets were obtained and derived from or through a person who owed GE a duty to maintain the secrecy of the information, and Siemens knew or should have known that the Dominion employee who gave Siemens the Trade Secrets was obligated not to disclose them under the confidentiality agreement between GE and Dominion.

158.     Siemens' misappropriation of GE's Trade Secrets was willful and malicious.

159.     GE has suffered, and continues to suffer, immediate and irreparable harm from Siemens' misappropriation of its Trade Secrets, including through the inability to fairly compete for Dominion's upcoming South Carolina RFP.

160.    GE has suffered, and continues to suffer, damages from Siemens' misappropriation of its Trade Secrets.  GE's damages from Siemens' misappropriation include at least $225 million, and potentially more than $340 million, for the loss of the Peakers Project equipment and services contracts.  In addition, they may include damages from Siemens' misappropriation of GE's Trade Secrets in any of the other eight gas turbine RFPs Siemens has won since May 2019 in competition with GE, if Siemens used GE's Trade Secrets to gain a competitive advantage to win one or more of those RFPs.  If Siemens unfairly wins the South Carolina RFP, GE's damages will further include an amount in excess of $150 million for the loss of the equipment and services contracts for that project, as well.  GE's damages from Siemens' misappropriation also include lost profits from the Crist Project and other projects GE won since May 2019 in which Siemens used GE's Trade Secrets to drive down the overall contract price and reduce GE's profit margins.  GE is entitled to an award of damages for the actual loss caused by Siemens' misappropriation, or, in the alternative, is entitled to a reasonable royalty for Siemens' unauthorized use and disclosure of GE's Trade Secrets.

161.    Siemens, while in possession of GE's Trade Secrets, won the Peakers Project equipment and services contracts, and won contracts for eight other gas turbine RFPs in which it competed against GE while in possession of GE's Trade Secrets.  Siemens has been unjustly enriched by its misappropriation.  GE is entitled to an award of damages for Siemens' unjust enrichment, or, in the alternative, is entitled to a reasonable royalty for Siemens' unauthorized use and disclosure of GE's Trade Secrets.

162.    GE is also entitled to punitive damages in an amount equal to twice its damages awarded or $350,000, whichever is less, as well as attorney's fees and costs, because Siemens' misappropriation of its Trade Secrets was willful and malicious.

## DEMAND FOR A JURY TRIAL

Plaintiffs hereby demand a jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff GE respectfully requests that this Court enter judgment in its favor and grant the following relief:

A. Enjoin Siemens from further disclosure or use of GE's Trade Secrets.

B. Direct Siemens to destroy all materials in its possession, custody or control that contain or incorporate GE's Trade Secrets.

C. Enjoin all Siemens employees who had access to GE's Trade Secrets from working on new or existing projects through June 2023 for gas turbine equipment and services related to the equipment and services GE included in its bid for the Peakers Project RFP—including Dominion's upcoming South Carolina RFP and all projects on which Siemens is bidding its SGT6-8000H, SGT6-5000F, SGT6-A65, SGT-800, or SGT6-2000e technology or later-developed models of comparable outputs.

D. Award GE monetary damages in an amount sufficient to compensate for GE's actual loss from Siemens' misappropriation of GE's Trade Secrets, or, in the alternative, in an amount sufficient to provide GE a reasonable royalty for Siemens' unauthorized use and disclosure of GE's Trade Secrets.

E.      Award GE monetary damages in an amount sufficient to compensate GE for the unlawful benefits Siemens accrued as a result of its misappropriation of GE's Trade Secrets, or, in the alternative, in an amount sufficient to provide GE a reasonable royalty for Siemens' unauthorized use and disclosure of GE's Trade Secrets.

F.      Award GE exemplary damages in an amount equal to twice its damages awarded, as a result of Siemens' willful and malicious misappropriation of GE's Trade Secrets.

G.      Award GE punitive damages in an amount equal to twice its damages awarded or $350,000, as a result of Siemens' willful and malicious misappropriation of GE's Trade Secrets.

H.      Award GE attorney's fees and costs.

I.      Award GE such further relief as the Court deems just and proper.

Dated:  January 14, 2021

GENERAL ELECTRIC COMPANY

By:  */s/ Edward E. Bagnell, Jr*

Dana D. McDaniel (VSB No. 25419)
Edward E. Bagnell, Jr (VSB No. 74647)
Spotts Fain, P.C.
411 East Franklin Street, Suite 600
Richmond, Virginia 23219
Phone: (804) 697-2000
Fax: (804) 697-2100
dmcdaniel@spottsfain.com
ebagnell@spottsfain.com

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Brad S. Karp (*pro hac vice* forthcoming)
Brette Tannenbaum (*pro hac vice* forthcoming)
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000
bkarp@paulweiss.com
btannenbaum@paulweiss.com

Karen L. Dunn (*pro hac vice* forthcoming)
Michelle K. Parikh (*pro hac vice* forthcoming)
2001 K Street, NW
Washington, DC 20006
(202) 223-7300
kdunn@paulweiss.com
mparikh@paulweiss.com

*Counsel for Plaintiff General Electric Company*