IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| GENERAL ELECTRIC COMPANY, <br><br> Plaintiff, <br><br> v. <br><br> SIEMENS ENERGY, INC., <br><br> Defendant. | Case No. 3:21-cv-00025  (JAG) |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

Dana D. McDaniel (VSB No. 25419)
Edward E. Bagnell, Jr (VSB No. 74647)
Spotts Fain, P.C.
411 East Franklin Street, Suite 600
Richmond, Virginia 23219
Phone: (804) 697-2000
Fax: (804) 697-2100
dmcdaniel@spottsfain.com
ebagnell@spottsfain.com

Brad S. Karp (*pro hac vice* forthcoming)
Brette Tannenbaum (*pro hac vice*)
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000
bkarp@paulweiss.com
btannenbaum@paulweiss.com

Karen L. Dunn (*pro hac vice*)
Michelle K. Parikh (*pro hac vice*)
Paul, Weiss, Rifkind, Wharton & Garrison LLP
2001 K Street, NW
Washington, DC 20006
(202) 223-7300
kdunn@paulweiss.com
mparikh@paulweiss.com

*Attorneys for Plaintiff General Electric Company*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................ 1

BACKGROUND ......................................................................................... 5

    A.    The Gas Turbine Market ................................................. 5

    B.    The RFP Process and GE's Confidential Bidding Information ................. 6

    C.    The Peakers Project and Siemens'
        Misappropriation of GE's Trade Secrets ................................ 8

    D.    Siemens Uses the Trade Secrets
        in Other Projects in 2019 and 2020 ..................................... 11

    E.    Siemens' Belated and Insufficient Remediation ...................... 12

    F.    Upcoming Gas Turbine RFPs ............................................ 13

LEGAL STANDARD ................................................................................ 15

ARGUMENT ......................................................................................... 16

    I.    GE IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS .............. 16

        A.    The GE Information Fasca Provided to
            Siemens Constitutes Trade Secrets. ..................................... 16

        B.    Siemens Brazenly Misappropriated GE's Trade Secrets. ....................... 18

    II.    GE WILL SUFFER IRREPARABLE
         HARM ABSENT INJUNCTIVE RELIEF ....................................... 20

    III.    THE BALANCE OF THE EQUITIES
          FAVORS THE INJUNCTIVE RELIEF ....................................... 25

    IV.    GRANTING A PRELIMINARY INJUNCTION
          IS IN THE PUBLIC INTEREST ................................................. 27

CONCLUSION ........................................................................................ 28

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Arminius Schleifmittel GmbH v. Design Indus., Inc.*,
No. 1:06-cv-644, 2007 WL 534573 (M.D.N.C. Feb. 15, 2007) ..........................20, 26, 27, 29

*Brightview Grp., LP v. Teeters*,
441 F. Supp. 3d 115 (D. Md. 2020) ................................................................................. 20, 27

*Datatel, Inc. v. Rose & Tuck, LLC*,
No. 05-cv-495, 2005 WL 1668020 (E.D. Va. June 17, 2005) ....................................... 18, 28

*Earthbound Corp. v. MiTek USA, Inc.*,
No. 16-cv-1150, 2016 WL 4418013 (W.D. Wash. Aug. 19, 2016) .....................................22

*ePlus, Inc. v. Lawson Software, Inc.*,
No. 3:09-cv-620, 2011 WL 2119410 (E.D. Va. May 23, 2011) ..........................................28

*Henry Schein, Inc. v. Cook*,
191 F. Supp. 3d 1072 (N.D. Cal. 2016) ..............................................................................28

*Hilton Worldwide, Inc. v. Glob. Advert., Inc.*,
No. 1:15-cv-1001, 2016 WL 8223436 (E.D. Va. Apr. 8, 2016) ....................................27, 28

*Hoffman Eng'g Corp. v. Piscitelli*,
No. 3:07-cv-147, 2007 WL 2021965 (W.D.N.C. July 11, 2007) ........................................22

*Home Funding Grp., LLC v. Myers*,
No. 1:06-cv-1400, 2006 WL 6847953 (E.D. Va. Dec. 14, 2006) ........................................22

*Integrated Glob. Servs., Inc. v. Mayo*,
No. 3:17-cv-563, 2017 WL 4052809 (E.D. Va. Sept. 13, 2017) .........................17, 18, 19, 26

*Juniper Ent., Inc. v. Calderhead*,
No. 07-cv-2413, 2007 WL 9723385 (E.D.N.Y. Aug. 17, 2007) .........................................18

*Kewanee Oil Co. v. Bicron Corp.*,
416 U.S. 470 (1974) .............................................................................................................29

*MicroStrategy Inc. v. Bus. Objects, S.A.*,
331 F. Supp. 2d 396 (E.D. Va. 2004) .....................................................................17, 19, 20

*MicroStrategy Inc. v. Bus. Objects, S.A.*,
369 F. Supp. 2d 725 (E.D. Va. 2005) .................................................................................28

ii

*Mitsubishi Hitachi Power Sys. Am., Inc.* v. *Siemens Energy, Inc.*,
No. 6:20-cv-01845 (M.D. Fla.) ................................................................................25

*Nat'l Med. Care, Inc.* v. *Sharif*,
No. 20-cv-11460, 2020 WL 6318922 (D. Mass. Sept. 2, 2020) ...........................................24

*Novartis Consumer Health, Inc.* v.
*Johnson & Johnson-Merck Consumer Pharm. Co.*,
290 F.3d 578 (3d Cir. 2002) .................................................................................27

*Peraton, Inc.* v. *Raytheon Co.*,
No. 1:17-cv-979, 2017 WL 11501665 (E.D. Va. Nov. 7, 2017) ................................... passim

*RelaDyne Reliability Servs. Inc.* v. *Bronder*,
No. 2:20-cv-377, 2020 WL 5745801 (E.D. Va. Aug. 4, 2020) ...........................................23

*Salient CRGT, Inc.* v. *Sols. by Design II, LLC*,
No. 1:20-cv-236, 2020 WL 3550008 (E.D. Va. Apr. 2, 2020) ...........................................21

*SBM Site Servs., LLC* v. *Garrett*,
No. 10-cv-385, 2011 WL 7563785 (D. Colo. June 13, 2011) .......................................21, 22

*Space Sys./Loral, LLC* v. *Orbital ATK, Inc.*,
306 F. Supp. 3d 845 (E.D. Va. 2018) ....................................................................17, 18

*Va. Beach S.P.C.A., Inc.* v. *S. Hampton Roads Veterinary Ass'n*,
229 Va. 349 (1985) .........................................................................................16, 21

*Vendavo, Inc.* v. *Long*,
397 F. Supp. 3d 1115 (N.D. Ill. 2019) ......................................................................24

*Walmart Inc.* v. *Cuker Interactive, LLC*,
949 F.3d 1101 (8th Cir. 2020) ...............................................................................18

*WHIC LLC* v. *NextGen Lab'ys, Inc.*,
341 F. Supp. 3d 1147 (D. Haw. 2018) .................................................................22, 27, 28

*Winter* v. *Nat'l Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ..............................................................................................16

## STATUTES

18 U.S.C. § 1836(b)(1) ........................................................................................17

18 U.S.C. § 1836(b)(3)(A) .....................................................................................15

18 U.S.C. § 1839(5) ...........................................................................................19

Va. Code Ann. § 59.1-337(A) ................................................................................. 15

Va. Code § 59.1-336 ............................................................................................... 19

## PRELIMINARY STATEMENT

This case arises from the willful, pervasive, and ongoing misappropriation by Siemens Energy, Inc. ("Siemens") of highly confidential trade secret information concerning GE's gas turbines.  In May 2019, while bidding against Siemens on a request for proposal ("RFP") issued by Dominion Energy, Inc. ("Dominion") for a gas turbine project based in Virginia, GE provided Dominion with confidential trade secrets—highly sensitive, proprietary pricing and technical information about GE's turbine manufacturing and maintenance services. Dominion was contractually obligated to keep the information secret.  Despite that obligation, a (now former) Dominion employee illicitly shared GE's trade secrets with Siemens' sales manager for Dominion, Michael Hillen, on at least six separate occasions in May and June 2019.

Hillen indisputably knew that he should not have been given GE's trade secrets. It is standard practice for manufacturers like Siemens and GE to enter into non-disclosure agreements before providing their confidential bidding information to utility providers in response to an RFP.  Yet Hillen neither rejected GE's trade secrets, nor destroyed them after receipt.  Instead, Hillen arranged to use his personal email address to receive the trade secrets on each of the six occasions, and then forwarded the trade secrets to his Siemens email address before they were widely disseminated to dozens of other employees responsible for Siemens' gas turbine bid responses.  ***More than 25*** Siemens employees—most of whom, including Hillen, remain employed by Siemens nearly 20 months later—exchanged communications containing GE's trade secrets, even while warning their colleagues not to "forward" the information and to "keep this within a small circle."  Siemens employees incorporated GE's trade secrets into Siemens' internal pricing comparison analyses and competitor tracking databases.  And, most perniciously, ███████ ████████ ████████ ██████ ██████ ████ ██ ████████ ██████████████████████████████████████, ultimately securing (over GE) a contract that would

have been worth between $225 and $340 million in manufacturing and servicing revenue over the next 15 years.

But Siemens' misappropriation of GE's trade secrets was even more brazen. Siemens waited *16 months* before notifying GE, in September 2020, that it was in possession of GE's trade secrets. During that period, while the relevant Siemens employees were armed with detailed knowledge about GE's competing units that allowed them to tailor bid responses to gain an unfair advantage over GE, Siemens won at least *eight* other gas turbine projects over GE's competing bid. The loss of these contracts has cost GE more than $1 billion dollars in potential revenue and damage to GE's market position.

Since notifying GE, and even while purporting to "cooperate" with GE's efforts to understand what happened, Siemens has refused to provide adequate assurance to GE that it will not further exploit GE's trade secrets. To be clear: Siemens does not dispute the highly sensitive nature of the information it received, and has admitted that the information was improperly received and disseminated to more than 25 Siemens employees. However, Siemens has offered only to wall off employees with knowledge of GE's trade secrets from certain aspects of Siemens' bids on a narrow band of projects, limited to those involving F-class turbine models—even though the trade secrets Siemens misappropriated concern certain of GE's █████ ███████████████████ models, and easily could be extrapolated to discern confidential information about several other models. And Siemens has only offered this limited assurance for another five months, through June 2021, even though GE will continue to bid its relevant █████ ███████████████████ models long after that. A longer, broader employee firewall is necessary to protect the value of GE's trade secrets and ensure that GE can fairly compete against Siemens for gas turbine projects during the pendency of this litigation.

The relief GE seeks is needed urgently because Siemens is poised, yet again, to unfairly use GE's trade secrets to its own competitive and commercial advantage. GE intends to compete for an imminent RFP in Belgium in which multiple utility providers will procure new gas turbine units, and for which GE expects Siemens may compete as well. Preliminary bids for the Belgium RFP are due on February 15 and 26, 2021. Shortly thereafter, GE intends to compete for an RFP in Italy (again, against Siemens), also involving multiple utility providers, for which preliminary bids will be due sometime before March 2021. In addition, Dominion itself recently issued an RFP for numerous gas turbine projects to be built between 2021 and 2024 in South Carolina. Both GE and Siemens submitted initial bids on the South Carolina project on January 19, 2021, and supplemental bid responses are likely to follow.



And GE expects to bid the same or similar models against Siemens for up to ▮ other gas turbine RFPs over the next five months. GE will be forced to do so at an unfair competitive disadvantage, absent immediate relief.

GE therefore respectfully requests that this Court enter a preliminary injunction requiring Siemens to wall off, during the pendency of this litigation, all Siemens employees who

were exposed to GE's trade secrets from work on bids, proposals, responses to requests for proposals or other solicitations for any gas turbine project or contract on which Siemens bids its SGT6-8000H, SGT6-5000F, SGT6-A65, SGT-800, or SGT6-2000e gas turbine units or later-developed models of comparable outputs, including but not limited to the Belgium RFP ███████████████████████████████████; the Italy RFP ███████████████████████ ███████████████████████████████; and the South Carolina RFP involving Dominion.   These are the Siemens gas turbine models that compete directly with the GE gas turbine models about which Siemens possesses GE's trade secrets, ████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████.  For the following reasons, and as set forth below, this request satisfies all four requirements for preliminary injunctive relief.

*First*, GE is likely to succeed on the merits on its claims for misappropriation of trade secrets under the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, and the Virginia Uniform Trade Secrets Act ("VUTSA"), Va. Code § 59.1-336, *et seq.*   GE's confidential and carefully guarded pricing and technical information plainly constitutes trade secrets under those statutes.   Siemens has already acknowledged, and produced documents evidencing, its widespread dissemination and unlawful use of GE's trade secrets.   And Siemens already offered to implement a form of employee firewall, albeit one that is far too narrow, confirming the appropriateness of the relief GE seeks.

*Second*, GE will suffer imminent and irreparable harm unless a preliminary injunction is issued.   Gas turbine contracts, and the accompanying long-term servicing agreements, are worth hundreds of millions of dollars and the economic impact to GE from losing even one such contract due to Siemens' misconduct is substantial.   And because

customers, investors, and market analysts closely follow the reporting of gas turbine contract awards, additional contract losses due to Siemens' misconduct will negatively and unfairly affect GE's reputation and standing in the market. GE will suffer irreparable harm if it loses additional contracts due to Siemens' misappropriation—harm that, by its nature, cannot be satisfied by money damages alone.

*Third*, the balance of the equities tips decisively in GE's favor. While GE faces irreparable harm absent a preliminary injunction, the relief it seeks will cause no cognizable harm to Siemens. Siemens will still be able to bid for gas turbine projects; the only difference is that it will not do so at an unfair advantage due to its unlawful possession of GE's trade secrets. Even if Siemens were to experience some harm from an injunction, that harm would be self-inflicted and necessary to prevent Siemens from using misappropriated trade secrets to gain a competitive advantage over GE.

*Finally*, the public interest clearly favors an injunction. As reflected in the DTSA and VUTSA, protecting principles of fair competition, including the sanctity of trade secrets, is a compelling public policy. To permit Siemens to bid on additional gas turbine projects, armed with misappropriated trade secrets concerning GE's competing models, would seriously undermine that important public interest.

## BACKGROUND[1]

### A.    The Gas Turbine Market

GE is a high-tech industrial company that operates worldwide through four industrial segments, including its Power segment. GE Power manufactures and sells gas

---

[1]    In support of its motion, GE submits herewith the Declaration of Russell Young ("Young Decl."), the Declaration of Katy Wilner ("Wilner Decl."), and the exhibits attached to the Declaration of Brette Tannenbaum (cited herein as "Ex. __").

turbines—large, complex industrial machines that convert natural gas into electricity—to power providers such as public utilities, who use them as part of their power plants.  GE manufactures several kinds of gas turbines, including "F-class" turbines, "H-class" turbines, and "aeroderivative" turbines. (Wilner Decl. ¶ 3.)

The gas turbine market is highly competitive.  Every year, GE and a handful of other manufacturers, including Siemens, compete for a relatively small number of projects, each worth tens or hundreds of millions of dollars.  (*Id.* ¶¶ 5–6.)  GE and its competitors closely monitor their positions in the gas turbine market, as do their customers (including major utility providers like Dominion), investors, and market analysts.  (*Id.* ¶¶ 8–9.)  In this competitive marketplace, turbine manufacturers compete vigorously on technology and price.  Gas turbine purchases are complex business transactions where manufacturers often balance price on the gas turbine equipment with technical performance and contract risk in order to better position themselves to obtain more profitable parts-and-services sales—through contracts or otherwise— for those turbines.  (*Id.* ¶ 7.)  These market conditions have only heightened the importance and competitiveness of each individual gas turbine project.  (*Id.*)

## B.    The RFP Process and GE's Confidential Bidding Information

Gas turbine contracts typically are awarded through a formal, structured bidding process.  GE and Siemens regularly bid for the opportunity to sell gas turbines to electric utility providers in response to RFPs issued by those providers.  (Young Decl. ¶ 6.)  Such RFPs typically seek proposals for (1) new gas turbines for one or more power plants and (2) long-term maintenance services for those turbines.  (*Id.* ¶ 8.)  GE and other competing manufacturers submit formal "bid packages" containing commercial terms, pricing, and technical specifications for the turbine models being sold and the long-term maintenance of those units (which is the

primary source of revenue on any given project).  (*Id.* ¶¶ 9–10.)  The manufacturer that wins the "product" contract for an RFP almost always wins the "service" contract.  (*Id.* ¶ 10.)

GE's bid response packages—like those of its competitors—include a tremendous amount of highly confidential pricing and technical information about its turbines and maintenance services.  (*Id.* ¶ 11.)  In the regular course of its business, GE keeps that information sequestered in server locations accessible only to certain GE employees on a need-to-know basis. GE's Gas Power employees are instructed not to share the information outside the division.  (*Id.* ¶ 16.)  Those employees also sign confidentiality agreements promising to keep pricing and technical data about GE's gas turbines and services confidential.  (*Id.*)

GE carefully protects the confidentiality of the information it submits in RFP bid packages because that information has tremendous competitive value.  (*Id.* ¶ 17.)  A competitor armed with GE's confidential information could adjust its own bids in many different ways to gain a competitive advantage over GE.  For example, a competitor might change the turbine models in its bid, the exact technical specifications of the turbines (which can be adjusted from project to project to fit each customer's needs), the price of the turbines, the pricing structure for its maintenance services, or some combination of these components of the bid.  (*Id.*)  Such adjustments to a competitor's bid in response to the receipt of GE's confidential gas turbine information would substantially improve the competitor's chances of winning the contract over GE. (*See id.*)

It is broadly recognized in the industry that the confidentiality of such bidding information is paramount.  (*Id.* ¶ 18.)  As a result, before submitting bids in response to an RFP, manufacturers typically enter into non-disclosure agreements ("NDAs") with power providers to keep the bidding information they provide confidential.  (*Id.*)  GE is no exception and requires an

NDA with a power provider before submitting confidential bidding information to the provider. (*Id.*)

### C.    The Peakers Project and Siemens' Misappropriation of GE's Trade Secrets

In March 2019, Dominion issued an RFP seeking bids for the supply of up to eight gas turbines for a power plant in Virginia (the "Peakers Project").   (*Id.* ¶ 20.)   In accordance with its standard practice, GE submitted its bid for the Peakers Project only after entering into an NDA.  (*Id.* ¶¶ 22, 25; Ex. 1.)  After submitting its initial bid in May 2019, GE provided additional information over the next month in response to five Requests for Clarification from Dominion.   (Young Decl. ¶ 24.)   GE's bid package included confidential pricing and technical information about four versions of its gas turbine models— ██████████

████  ██████  ██  ████████  ████  ██████  ██████
████████  ████  ██████  ██  ████  ██  ██████—and  about  GE's

maintenance services for those turbines (collectively, the "Trade Secrets").  (*Id.* ¶ 25.)  If GE had won the Peakers Project, the resulting product and services contracts would have been at least $225 million and potentially as much as $340 million.   (*Id.* ¶ 31.)   In July 2019, Dominion awarded those contracts to Siemens.[2]  (*See id.* ¶ 30.)

████████████████████████████████████████████████

████.   In May and June 2019, Ted Fasca, a (now former) Dominion employee, sent six documents containing GE's Trade Secrets to Michael Hillen, a Siemens Regional Sales Manager responsible for managing Siemens' relationship with Dominion.[3]  (Exs. 23–27; *see also* Ex. 4.)

---

[2]    Dominion later canceled the Peakers Project contracts in August 2020, only *after* Siemens' misappropriation of GE's Trade Secrets came to light.  (Ex. 8.)

[3]    In addition to GE's Trade Secrets, the documents Fasca sent Hillen contained confidential information about gas turbines belonging to Mitsubishi Hitachi Power Systems Americas, Inc. ("Mitsubishi"), a competitor of GE's and Siemens' that also submitted a bid for the

These six documents contained a wealth of confidential pricing and technical data about the gas turbines GE included in its Peakers Project bid package, including:



Presumably because he knew that Fasca was violating Dominion's NDA with GE by sending GE's Trade Secrets to Siemens, Hillen used two personal email addresses to receive the documents from Fasca.  (Exs. 4, 23, 25.)   Hillen then forwarded the documents to his Siemens email address before sending them to other Siemens employees, including Mehran Sharifi, a Sales Manager who was working on Siemens' Peakers Project bid package.  (Exs. 4,

---

Peakers Project.  According to a complaint filed by Mitsubishi in the U.S. District Court for the Middle District of Florida, Siemens subsequently disseminated and used Mitsubishi's confidential information during the Peakers Project and other projects.  (*See* Ex. 2.)

28, 44–46.)  GE's Trade Secrets were then further disseminated to employees in Siemens' Power Systems, Power Generation, and Gas & Power business units.  (Exs. 29–31, 47–49.)  More than 25 Siemens employees received GE's Trade Secrets.  (Exs. 6, 29–31, 32–36, 48, 50–51.)  Among those employees are key personnel responsible for Siemens' gas turbine bids, including Sharifi; Adam Herlitzka, Power & Gas Sales Account Manager; David Fernandes, Competitive Bid Strategies Specialist; Adam Hymel, Portfolio Manager for Long Term Service Projects; and Fernando Muth, North American Market Intelligence Manager.  (Exs. 10–14.) ███████████

████████████████████████████████████████████████████  ███████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████.[4]  All are currently employed by Siemens.  (Exs. 15–17.)

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████  (Exs. 23, 44.)  ███████████████████████████████████

███████████  (Exs. 28, 37, 30, 32, 49, 52.)

Instead of promptly alerting GE (or Dominion) that Siemens had received GE's Trade Secrets, Siemens employees incorporated GE's Trade Secrets into their internal analyses

---

[4]  Prior to September 2020, Siemens' parent company was Siemens AG, a German conglomerate that provides products and services across numerous industries.  In September 2020, Siemens AG "spun off" the energy components of its business, including its Power Generation (*i.e.*, gas turbine power) division, into a new independent company, Siemens Energy.  (*See* Ex. 22.)

and work product, and imported GE's Trade Secrets into Siemens' central repositories and databases. (Exs. 5, 37–40.)  The Siemens employees who received GE's Trade Secrets must have been aware that they came from Dominion, which had a duty not to disclose GE's confidential bidding information.   (Young Decl. ¶ 29.)   Indeed, when sending GE's Trade Secrets to their colleagues, Siemens employees said "not [to] forward" the information and to "keep this within a small circle." (Exs. 4, 48, 50.)

Even worse, Siemens' employees *used* GE's Trade Secrets to gain a competitive advantage over GE in bidding for the Peakers Project.  They analyzed GE's Trade Secrets ▆▆



▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ to unfairly ensure aspects of Siemens' bid— including ▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆ the pricing for its maintenance services—were optimally competitive.  (Exs. 4, 32–33, 41.)  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆ (Exs. 30–31, 37–38, 42–43, 53.) ▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ (*See* Young Decl. ¶ 26.)

## D.   Siemens Uses the Trade Secrets in Other Projects in 2019 and 2020

Since May 2019, when Siemens first received GE's Trade Secrets, GE has lost at least eight additional gas turbine projects to Siemens for which GE bid models that are the same or similar to the models included in its Peakers Project bid package.  The collective lost revenue to GE represented by those projects is more than $1 billion.   (Wilner Decl. ¶ 23.)

Documents produced by Siemens reveal that Siemens used GE's Trade Secrets to unfairly compete against GE in at least two other projects.  In June 2019, Siemens employees used GE's confidential service pricing data to "support [them]" on a gas turbine RFP issued by Florida Power & Light (the "FPL Project"), which they called "FPL peakers."  (Exs. 4, 48.) Although GE ultimately won that contract, it did so on less favorable terms, including at lower margins on the equipment portion of the contract, than it would have absent Siemens' access to

GE's Trade Secrets.  (Wilner Decl. ¶ 26.)   In 2020, Siemens employees used the Trade Secrets again, to prepare for an anticipated project for which Siemens expected to bid against GE.  (Exs. 4, 34.)

E.     **Siemens' Belated and Insufficient Remediation**

On September 3, 2020—*16 months* after Siemens' misappropriation—GE first learned that Siemens had received GE's Trade Secrets in a letter from Dominion.  GE did not receive a similar communication from Siemens until September 14, 2020.[5]  (Ex. 18.)  The one-page Siemens letter made no mention of the fact that Siemens employees had widely disseminated GE's Trade Secrets and used them to prepare and update Siemens' bid packages for multiple projects.  (*See id.*)  GE subsequently made multiple requests to Siemens about the scope of its misappropriation.  (Exs. 19–20.)  In late November 2020, Siemens finally produced a limited set of relevant documents, which revealed to GE, for the first time, a glimpse into the remarkable extent to which Siemens had misappropriated GE's Trade Secrets to its own competitive advantage.

GE insisted that Siemens take appropriate remedial measures, including by prohibiting all employees with access to the Trade Secrets from working on projects to which the Trade Secrets would be relevant (specifically, projects involving Siemens' comparable SGT6-8000H, SGT6-5000F, SGT-A65, SGT-800, or SGT6-2000e technology) through June 2023 (*i.e.*, four years from Siemens' misappropriation).  (Ex. 19 at 2–3; Ex. 20 at 2–3.)  Siemens refused to do so and has instead undertaken limited and plainly insufficient remediation efforts.  Remarkably, only a few Siemens employees who accessed and analyzed GE's Trade Secrets were terminated.  (*See* Ex. 6.)  Among the many employees still employed by Siemens with

---

5    Although Siemens' initial letter to GE was dated August 28, 2020, GE did not receive that letter until it was transmitted by email on September 14, 2020.

access to GE's Trade Secrets are core gas turbine bid employees who presumably *still* have responsibility for bid responses and are *still* working on its gas turbine bids.  Mehran Sharifi, a senior manager and critical player in the construction of Siemens' Peakers Project bid package, remains in the exact same position at Siemens.  (*See id.*)  Michael Hillen, who played a central role in the dissemination of GE's Trade Secrets within Siemens, received only a written warning, required "training," and was denied a raise or a bonus.  He now has a slightly different title but continues to work for Siemens on gas turbine sales.  (*See* Ex. 7 ¶¶ 1–2; Ex. 9 at 4–5.)

While Siemens purportedly has removed GE's Trade Secrets from its employees' files, it refused GE's request that it collect or review the personal emails and text messages of its employees to determine how extensively GE's Trade Secrets were transmitted outside of Siemens' systems, and instead relied solely on employee self-reporting.  (*See* Ex. 21 at 7, 12.) Siemens has admitted that it may discover more instances of GE's Trade Secrets in its files and databases in the future.  (*See id.* at 16.)  Moreover, Siemens has implemented only a narrow employee "firewall" that removes employees with knowledge of the Trade Secrets from a limited set of projects involving "F-class" machines, (*id.* at 2), ███████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████ (Exs. 23, 44.)  And Siemens plans to permit all tainted employees to resume working on F-class projects in June 2021 (*see* Ex. 21 at 2), even though GE's Trade Secrets will not become any less relevant or valuable by that time.

### F.  Upcoming Gas Turbine RFPs

Over the next five months, GE expects to compete head-to-head against Siemens for up to ██ separate gas turbine projects on which GE intends to bid some of the same or similar gas turbine models as were included in its Peakers Project bid package, including its ██████████ ██████████████████████████████████ turbines.  (Wilner Decl. ¶ 28.)

   *Belgium RFP.* Among these projects is an impending RFP in Belgium (the "Belgium RFP") in which multiple power providers will procure new gas turbine units. (*Id.* ¶ 32.) ████████████████████████████████████████

████████████████████████████████████ (*Id.*)

██████████████████████ (*Id.* ¶ 36.) ████████████████████████

████████████████████████████████████ (*Id.* ¶ 35.) ████████████

███████████████████████████████████████████████████

████████████████████ (*Id.* ¶ 36.) ██████████████████████████

███████████████████████████████████████████████████

██████████████ (*Id.* ¶ 34.)

   *Italy RFP.* GE may also compete against Siemens for an upcoming RFP in Italy (the "Italy RFP"), in which, like the Belgium RFP, multiple power providers will procure new units. (*Id.* ¶ 37.) ████████████████████████████████████████

███████████████████████████████████████████████ (*Id.*)

████████████████████████████████████████ (*Id.* ¶ 41.) GE's preliminary bids for the Italy RFP will be due sometime before March 2021. (*Id.* ¶ 40.) ████████

███████████████████████████████████████████ (*Id.* ¶ 41.) ██████████████████████████████████████████████

████████████████████████████████████████ (*Id.* ¶ 39.)

   *South Carolina RFP.* GE and Siemens also recently bid on another Dominion RFP to build several gas turbines in South Carolina over the next four years (the "South Carolina RFP"). (Young Decl. ¶ 33.) GE expects the South Carolina equipment contracts to be worth more than $150 million, with long-term servicing revenue of at least $60 million (*Id.*) ████████

14

█████████████████████████████████████████

█████████████████████████████████████ (*Id.* ¶ 36.)

On January 19, 2021, GE submitted a bid for the South Carolina project, ████████████

█████████████████████████████████████████

████████████  GE expects to submit supplemental responses to the South Carolina RFP

and expects that Siemens will as well.  (*Id.* ¶¶ 34–35.)  Dominion is expected to select a winner

of its South Carolina RFP by May 2021.  (*Id.* ¶ 34.)

## LEGAL STANDARD

Both the DTSA and the VUTSA authorize courts to enjoin the actual or
threatened misappropriation of trade secrets.  *See* 18 U.S.C. § 1836(b)(3)(A); Va. Code Ann.
§ 59.1-337(A).  To obtain a preliminary injunction under the DTSA, a plaintiff must show: (1) a
likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of
preliminary relief; (3) that the balance of equities favors the plaintiff; and (4) that an injunction is
in the public interest.  *Winter* v. *Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

The requirements to obtain a preliminary injunction under the VUTSA are the
same as under the DTSA, except that, under the VUTSA, a plaintiff need not allege or prove
irreparable harm, but rather only that the VUTSA has been violated.  *See, e.g.*, *Peraton, Inc.* v.
*Raytheon Co.*, No. 1:17-cv-979, 2017 WL 11501665, at *4 (E.D. Va. Nov. 7, 2017) (citing
*Capital Tool & Mfg. Co., Inc.* v. *Maschinenfabrik Herkules, Hans Thoma GmgH*, 837 F.2d 171,
172 (4th Cir. 1988)).  Under Virginia state law, "[w]hen a statute empowers a court to grant
injunctive relief, the party seeking an injunction is not required to establish the traditional
prerequisites, *i.e.*, irreparable harm and lack of an adequate remedy at law, before the injunction
can issue.  All that is required is proof that the statute or regulation has been violated."  *Va.
Beach S.P.C.A., Inc.* v. *S. Hampton Roads Veterinary Ass'n*, 229 Va. 349, 354 (1985).

15

**ARGUMENT**

## I.    GE IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS

GE is likely to succeed on the merits of its claims under the DTSA and VUTSA because Siemens' brazen acts of misappropriation—through which dozens of Siemens employees shared GE's Trade Secrets, incorporated them into Siemens documents and databases, and used them to compete against GE—clearly constituted misappropriation of protected trade secrets under both statutes.   Moreover, Siemens threatens further misappropriation of GE's Trade Secrets due to its failure to take adequate and timely measures to remedy the widespread misconduct among its employees.   Based on those facts, the record clearly shows that GE will establish both elements of a trade secrets claim, which are the same under the DTSA and VUTSA:  (i) the existence of a trade secret and (ii) misappropriation of that trade secret by the defendant.  *See, e.g.*, *Space Sys./Loral, LLC* v. *Orbital ATK, Inc.*, 306 F. Supp. 3d 845, 855 (E.D. Va. 2018); *Integrated Glob. Servs., Inc.* v. *Mayo*, No. 3:17-cv-563, 2017 WL 4052809, at *6 (E.D. Va. Sept. 13, 2017) ("*IGS*").[6]

### A.    The GE Information Fasca Provided to Siemens Constitutes Trade Secrets.

The information that Fasca improperly shared with Siemens constitutes "trade secrets" as defined in both the DTSA and VUTSA.  For purposes of the DTSA, trade secrets include "all forms and types of financial, business, scientific, technical, economic, or engineering information" if (A) "the owner thereof has taken reasonable measures to keep such information secret" and (B) "the information derives independent economic value, actual or potential, from

---

[6]    The DTSA further requires that the trade secret be "related to a product or service used in, or intended for use in, interstate or foreign commerce."  18 U.S.C. § 1836(b)(1).  That requirement is easily satisfied here, because GE's Trade Secrets concern products and services—gas turbines and related long-term maintenance services—that both GE and Siemens sell around the world.  (*See* Young Decl. ¶ 5.)

not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." *Peraton*, 2017 WL 11501665, at *2 (quoting 18 U.S.C. § 1839(3)).   Similarly, under the VUTSA, information constitutes a trade secret if it meets the following criteria: "(1) independent economic value; (2) not known or readily ascertainable by proper means; and (3) subject to reasonable efforts to maintain secrecy."   *Space Sys./Loral*, 306 F. Supp. 3d at 855.   "The case law is clear that just about anything can constitute a trade secret under the right set of facts." *MicroStrategy Inc.* v. *Bus. Objects, S.A.*, 331 F. Supp. 2d 396, 416 (E.D. Va. 2004).

Here, GE's Trade Secrets fall into two broad categories: ███████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████.  (*See* Exs. 23–

27.)  ████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████  (Young Decl. ¶ 27.)   Courts frequently recognize such sensitive financial and technical information as trade secrets.   *See, e.g.*, *IGS*, 2017 WL 4052809, at *7 (finding "detailed schematics," "a confidential estimate worksheet and proposal for a project," "an estimating template" with "cost and pricing information," and other "confidential proposals and estimates" were trade secrets); *Space Sys./Loral*, 306 F. Supp. 3d at 853–54 (finding "financial data, business plans, and procurement strategies" constituted trade secrets).

GE derives significant value from keeping this information confidential.   (*See* Young Decl. ¶ 17.)   "Courts have repeatedly held that knowledge of a customer's pricing information in the context of bidding is extremely potent in the hands of a competitor and such knowledge has been held to constitute a trade secret protectable by an injunction."   *Juniper Ent.,*

*Inc.* v. *Calderhead*, No. 07-cv-2413, 2007 WL 9723385, at *23 (E.D.N.Y. Aug. 17, 2007). The same is true for technical information. *See Datatel, Inc.* v. *Rose & Tuck, LLC*, No. 05-cv-495, 2005 WL 1668020, at *7–8 (E.D. Va. June 17, 2005). ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ (*See* Exs. 4, 29–33, 37–38, 41–43, 47–49, 53.) *Cf.* *Walmart Inc.* v. *Cuker Interactive, LLC*, 949 F.3d 1101, 1109 (8th Cir. 2020) (noting that defendant's "repeated and persistent requests for [trade secrets] is indicative of their value").

GE also takes reasonable measures to maintain the secrecy of this information. It keeps the information sequestered in server locations accessible only to certain employees on a need-to-know basis, and employees in GE's Gas Power division are instructed not to share confidential technical and pricing information about GE gas turbines outside the division. (Young Decl. ¶ 16.) Employees also sign confidentiality agreements promising to keep the Trade Secrets confidential. (*Id.*) Such measures to protect secrecy are commonly recognized as reasonable. *See, e.g.*, *MicroStrategy*, 331 F. Supp. 2d at 416 ("Restricting access to information, implementing confidentiality agreements, and providing physical barriers to access are all reasonable efforts."). Moreover, when GE does share such information with customers—as it did to support its Peakers Project bid—those customers must sign NDAs. (Young Decl. ¶ 18; Ex. 1.) This measure is also designed to protect the confidentiality of GE's Trade Secrets. *See* *MicroStrategy*, 331 F. Supp. 2d at 416 ("[T]he owner of a trade secret may, without losing protection, disclose it to a licensee, an employee, or a stranger, if the disclosure is made in confidence, express or implied.").

**B.   Siemens Brazenly Misappropriated GE's Trade Secrets.**

The DTSA and VUTSA similarly define "misappropriation" to include "disclosure or use of a trade secret" by a person who "knew or had reason to know" that the trade

secret was "derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret." 18 U.S.C. § 1839(5); Va. Code § 59.1-336.   Under both statutes, either "actual" or "threatened" misappropriation suffices to support an injunction.  *See, e.g.*, *Peraton*, 2017 WL 11501665, at *3; *IGS*, 2017 WL 4052809, at *6.

Siemens plainly violated the DTSA and VUTSA when it misappropriated GE's Trade Secrets.  It is standard industry practice for bidders like GE and Siemens to enter into an NDA before sharing confidential bidding information with potential customers like Dominion. (Young Decl. ¶ 18.)   The dozens of Siemens employees who received, used, and further disseminated GE's Trade Secrets knew or should have known that they were obtained in violation of Dominion's duty to keep them secret.   Indeed, the employees' email communications confirm as much.  Hillen used personal emails to cover up the transmissions, a clear sign that he knew Fasca was not supposed to send him GE's Trade Secrets.  (*See* Exs. 4, 23, 25.)   Other Siemens employees instructed colleagues to keep the information under wraps for the same reason.  (*See* Exs. 4, 48, 50.)  *Cf. Arminius Schleifmittel GmbH v. Design Indus., Inc.*, No. 1:06-cv-644, 2007 WL 534573, at *5 (M.D.N.C. Feb. 15, 2007) (defendant's email stating "[p]lease keep this strictly confidential between me and you" demonstrated misappropriation).

Despite knowing GE's Trade Secrets were improperly obtained, dozens of Siemens employees proceeded to forward, internalize, and use the information.   After Hillen received GE's Trade Secrets from Fasca, he immediately sent them to colleagues (including Sharifi), who then broadly disseminated them throughout Siemens.  The information was shared across multiple Siemens business units, including Power Systems, Power Generation, and Gas & Power. (*See* Exs. 29–31, 47–49.)  Each such disclosure within Siemens represented an act of

19

misappropriation.  *See, e.g.*, *Brightview Grp., LP* v. *Teeters*, 441 F. Supp. 3d 115, 132–33 (D. Md. 2020).

Siemens employees incorporated the information into their internal analyses and competitor tracking databases.  (Exs. 5, 37–40.)  *See MicroStrategy*, 331 F. Supp. 2d at 424 (finding a "document was actually used by the defendant when [an employee] incorporated the schedule into her training materials").  ████████████████████

██████████████████████████████████

███████████████████████████  (*See* Exs. 4, 32–34, 37–38, 41–43, 48, 53.)  Those actions separately constitute misappropriation under the DTSA and VUTSA.

Siemens has committed misappropriation in the past and threatens to do so again in the imminent future.  The limited firewall that Siemens purports to have in place leaves dozens of employees with knowledge of GE's Trade Secrets able to participate in future RFPs for which the Trade Secrets clearly would benefit Siemens at GE's expense.  (*See* Young Decl. ¶ 26.)   "Such parallel competition for identical opportunities substantially and sufficiently 'threatens' misappropriation or misuse."  *Peraton*, 2017 WL 11501665, at *3; *see also SBM Site Servs., LLC* v. *Garrett*, No. 10-cv-385, 2011 WL 7563785, at *11 (D. Colo. June 13, 2011) (misappropriation found where trade secrets were in the hands of plaintiff's "direct competitor").

## II.    GE WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF

As an initial matter, courts in this district have found that irreparable injury is not even required once a VUTSA violation has been established.  *See Salient CRGT, Inc.* v. *Sols. by Design II, LLC*, No. 1:20-cv-236, 2020 WL 3550008, at *7 (E.D. Va. Apr. 2, 2020); *Peraton*, 2017 WL 11501665, at *4; *see also Va. Beach S.P.C.A.*, 229 Va. at 354 ("All that is required" under the VUTSA "is proof that the statute or regulation has been violated.").

But to the extent a showing of irreparable harm is required, it is easily satisfied here. When a plaintiff's business trade secrets have been misappropriated by a competitor and remain in that competitor's possession, courts routinely issue preliminary injunctions to stop the irreparable harm that would otherwise follow, such as lost business opportunities, lost market share, or lost goodwill. *See, e.g.*, *WHIC LLC* v. *NextGen Lab'ys, Inc.*, 341 F. Supp. 3d 1147, 1165 (D. Haw. 2018) (enjoining competitor from continuing to service plaintiff's former clients due to "threatened loss of prospective customers or goodwill," which "certainly supports a finding of the possibility of irreparable harm"); *SBM Site Servs.*, 2011 WL 7563785, at *5 (enjoining competitor from using or disclosing plaintiff's trade secrets due to "substantial likelihood that [plaintiff] will lose market share and customer business"); *Hoffman Eng'g Corp.* v. *Piscitelli*, No. 3:07-cv-147, 2007 WL 2021965, at *3–4 (W.D.N.C. July 11, 2007) (enjoining competitor from producing products using plaintiff's trade secrets due to threat of lost sales that "would be devastating to [plaintiff's] business and harmful to its overall financial position"). Prompt action is also required to prevent further disclosure, which would lead to "immediate irreparable harm because 'a trade secret, once lost is, of course, lost forever.'" *Home Funding Grp., LLC* v. *Myers*, No. 1:06-cv-1400, 2006 WL 6847953, at *2 (E.D. Va. Dec. 14, 2006) (quoting *Acierno* v. *New Castle Co.*, 40 F.3d 645, 647 (3d Cir. 1994)).

████████████████████████████████████████

████████████████████████████████████████ (Exs. 30–31, 37–38.) Then, in the FPL Project, Siemens employees again used GE's service pricing information to "support [them]" in revising down their proposal. (Exs. 4, 48.) As a result, GE was forced to drive down its own proposal to remain competitive. (Wilner Decl. ¶ 26.) This recent record of egregious misconduct by Siemens highlights the need for an injunction, without which GE will suffer lost

business opportunities, as well as resulting harm to its market share and reputation. *See Earthbound Corp.* v. *MiTek USA, Inc.*, No. 16-cv-1150, 2016 WL 4418013, at *10, 12 (W.D. Wash. Aug. 19, 2016) (plaintiff established irreparable harm where it had "presented evidence that Defendants have already won a project the client intended to award to [plaintiff] by using [plaintiff's] information to underbid it"); *see also RelaDyne Reliability Servs. Inc.* v. *Bronder*, No. 2:20-cv-377, 2020 WL 5745801, at *3 (E.D. Va. Aug. 4, 2020) ("Harms to a party's market share, reputation, and workforce constitute irreparable injury.").

To prevent that same harm in the future, GE (twice) asked Siemens to wall off all Siemens employees who accessed GE's Trade Secrets from working on any project for which GE bids the models to which the stolen Trade Secrets pertain: ████████████████

████████████████████████████████████████████. (Exs. 19–20.)   GE also proposed a reasonable end date of June 2023, four years after Siemens' misconduct began (two and a half years from now), because gas turbine RFPs are often prolonged events.  Competitors typically know about the RFPs months or even years before they are issued, and the RFP process can last for many months before a contract is awarded. (Young Decl. ¶ 7.)[7]

---

[7] Even GE's proposed wall-off may be too narrow because Siemens can use the Trade Secrets to prepare any bid in which Siemens includes its own ████████████████ turbines—as well as other similar classes of turbines, by extrapolating from the data it has to other models. (Young Decl. ¶¶ 38–40.); (*see also* Ex. 9 at 8) (denying Mitsubishi's request for a "use" and "disclosure" preliminary injunction, while also noting that "[i]t is [] not clear that [Siemens'] walling-off of employees was extensive enough," particularly because Siemens has "limited its more extensive walling off to its F-class engines but has offered no evidence that the remaining [Siemens] engines are not comparable . . ."). And discovery, which GE intends to aggressively pursue, may reveal that Siemens is using GE's Trade Secrets outside of the bidding process, such as for research and development or business strategy decisions. (*See id.* at 8) (noting that the confidential gas turbine information that "[Siemens] wrongfully obtained could give it a competitive advantage in research and development, commercial strategy, and business planning  moving forward . . .").

Nevertheless, Siemens has refused to adopt GE's reasonable and necessary proposal. Instead, it has offered a grossly insufficient half-measure, restricting employees who received GE's Trade Secrets from working on only future gas turbine projects involving "F-class" gas turbines, and only through June 2021. (Ex. 21 at 2.) This approach does not adequately address the range of products at issue, nor does it last long enough to be effective.

And while Siemens claims to have "quarantined" GE's Trade Secrets within its systems (*id.*), Siemens cannot make its employees forget what they already know. *See Vendavo, Inc.* v. *Long*, 397 F. Supp. 3d 1115, 1144 (N.D. Ill. 2019) (noting former employee "undoubt[edly] knows and remembers certain details about her former clients . . . [and], it is fair to infer that she will use those trade secrets, perhaps even inadvertently, unless prohibited from working on projects for her former or prospective clients at Plaintiff"); *Nat'l Med. Care, Inc.* v. *Sharif,* No. 20-cv-11460, 2020 WL 6318922, at *15 (D. Mass. Sept. 2, 2020) (finding plaintiff had satisfied burden of irreparable harm where it was "difficult to conceive how all of the information stored in [Defendant's] memory can be set aside as he applies himself to a competitor's business and its products").

If Siemens is required only to implement a limited employee firewall with respect to "F-class" turbine bids through June 2021, GE will be forced to compete for certain RFPs on an uneven playing field. GE's Trade Secrets remain in the minds of dozens of Siemens employees, including Hillen, Sharifi, Herlitzka, Fernandes, Hymel, and Muth, who continue to participate in Siemens' gas turbine bids. (Exs. 7, 10–14.) ████████████████████

██████████████████████████████ ███████████████

████████████████████████████████████████

████████████████████████████████ (Exs. 23, 44; Young Decl. ¶ 37; Wilner Decl.

¶¶ 36, 41.)  The Siemens employees who accessed and analyzed GE's Trade Secrets can and will use their knowledge to help Siemens unfairly win projects over GE's competing bid, or pressure GE to lower its profit margins to compete effectively against Siemens.  *See Peraton*, 2017 WL 11501665, at \*4–5 (enjoining defendant's employees who had knowledge of plaintiff's strategic, financial, and technical trade secrets from working on projects where they could use the trade secrets to defendant's competitive advantage).

The need for relief is urgent.  Over the next five months, GE expects to compete head-to-head against Siemens for up to ▇ separate gas turbine projects, each of which is worth tens or even hundreds of millions of dollars.  (Wilner Decl. ¶¶ 28–29.)  More importantly, losing any one of those projects could negatively impact GE's reputation among customers, investors and market analysts—harms that cannot be compensated by money damages alone.  (*Id.* ¶ 31.)

███████████████████████████████████████████████████████████████

███████████████████████████████████████████  (*See* Exs. 23, 44.)

To avoid further damage to GE, the Court should require Siemens to adopt the appropriate and reasonable wall-off GE has proposed during the pendency of this litigation.[8]

---

[8]   In October 2020, Mitsubishi  sued Siemens in the U.S. District Court for the Middle  District of Florida,  asserting a claim for misappropriation  of trade secrets under the DTSA arising out of the same incidents  as this lawsuit.  *See Mitsubishi Hitachi Power Sys. Am., Inc.* v. *Siemens Energy, Inc.*, No. 6:20-cv-01845  (M.D. Fla.).  Mitsubishi  moved for a preliminary  injunction to bar Siemens from continuing  to use or disclose  its confidential  gas turbine information  and to compel Siemens to return that information  to Mitsubishi.  (*See* Ex. 3.)  On January 6, 2021, the court denied Mitsubishi's  motion.  (*See* Ex. 9.)  Notably, the court found that Mitsubishi  had established Siemens'  misappropriation  of its trade secrets, and noted that "[i]t is [] not clear that Defendant's walling-off  of employees"  who learned confidential  gas turbine information  during the course of the Peakers Project "was extensive  enough to completely  prevent any possible future harm."  (*See* Ex. 9 at 8.)  Nonetheless, the court found that Mitsubishi  failed to establish  that it would face irreparable  harm in the absence of an injunction,  due to the fact that Mitsubishi  had offered the court only speculation  about whether Siemens  continued to possess Mitsubishi's  confidential  information  and about whether Mitsubishi  and Siemens will be competing  for any upcoming gas turbine projects.

## III.   THE BALANCE OF THE EQUITIES FAVORS THE INJUNCTIVE RELIEF

The balance of the equities decisively tips in GE's favor, because the threatened harm to GE if its requested relief is denied greatly outweighs any cognizable harm to Siemens if relief is granted.   As explained in detail above, GE faces imminent and irreparable harm from Siemens' continuing misappropriation, including loss of reputation and standing in the marketplace.   Indeed, "[t]he fact that Defendants' misappropriation activities may deprive Plaintiff to some degree of [ ] ongoing, profitable business relationships creates a harm to Plaintiff that cannot be easily quantified . . . ." *Arminius*, 2007 WL 534573, at *6; *see also IGS*, 2017 WL 4052809, at *9 (irreparable injury found when there was a "possibility of permanent loss of customers to a competitor").   The size and importance of turbine contracts suggest that the harm, while incalculable, is great indeed: ██████████████████████████

███████  ██████  ████  ██████████████████  (Young Decl. ¶ 33; Wilner Decl. ¶¶ 34, 39.)   And that of course is just one component of the overall reputational and economic damage GE faces.

By contrast, GE's requested relief would merely require Siemens to fully remedy its continued possession of GE's Trade Secrets, and while such remediation may have an impact

---

(*See id.* at 9–11.)
GE's request for a preliminary injunction stands on a completely different footing than Mitsubishi's.   *First*, GE has identified numerous upcoming gas turbine projects in which GE and Siemens will compete, including a specific impending project involving Dominion. *Second*, rather than idly speculate that its Trade Secrets remain in Siemens' "systems," GE has identified more than 25 Siemens employees who had access to its Trade Secrets and have knowledge of those Trade Secrets in their heads.   Most of those employees remain employed by Siemens today.   Additionally, GE has alleged that the Trade Secrets have been incorporated into Siemens' databases such that Siemens is continuing to use them derivatively.   *Third*, GE requests different relief.   Rather than seek a preliminary injunction barring Siemens from using or disclosing its Trade Secrets, GE seeks something far more specific and tangible:   a wall-off of the affected Siemens employees for a limited period of time from projects in which Siemens will bid its own comparable gas turbine projects and would inevitably use GE's Trade Secrets to inform its bids, absent this relief.

on Siemens, that impact does not—and indeed cannot—constitute cognizable harm that outweighs the harm to GE.  Such self-inflicted injuries cannot "tip the equities in [a defendant's] favor."  *Brightview Grp.*, 441 F. Supp. 3d at 142; *see also Novartis Consumer Health, Inc.* v. *Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir. 2002) (holding that "the injury a defendant might suffer if an injunction were imposed may be discounted by the fact that the defendant brought that injury upon itself"); *Hilton Worldwide, Inc.* v. *Glob. Advert., Inc.*, No. 1:15-cv-1001, 2016 WL 8223436, at *9 (E.D. Va. Apr. 8, 2016) ("[T]he only hardship suffered by defendant if an injunction is entered is an obligation to follow . . . the VUTSA.  Thus the balance of hardships clearly weighs in Hilton's favor.").

For example, in *Arminius*, the court issued a preliminary injunction shutting down defendants' sanding tool business pending that litigation's final resolution.  2007 WL 534573, at *7.  Although the court acknowledged the costs that such a "broad" injunction would impose on the defendants, it nonetheless determined that the balance of equities tipped "decidedly in favor of Plaintiff" because defendants were not deprived of using their "own skills and talents in the marketplace," and instead only prevented from illegitimately relying on "the expertise [they] obtained from Plaintiff's trade secrets."  *Id.*  Similarly, the district court in *NextGen Laboratories* enjoined a defendant drug testing services provider from continuing to serve plaintiff's former clients, determining that the defendant's harm was "totally self-inflicted and would be caused by their own improper actions."  341 F. Supp. 3d at 1166.

The ongoing harm GE faces—namely, the prospect of competing against bids prepared by Siemens employees armed with knowledge of GE's Trade Secrets—is orders of magnitude greater than any cognizable effect on Siemens.  Indeed, the relief GE seeks is far less onerous than the injunctions granted in *Arminius* and *NextGen Laboratories*.  GE merely asks

26

that Siemens not "greatly benefit" from its own wrongdoing by participating in future bid proposals with the assistance of employees who have misappropriated GE's Trade Secrets. Siemens will still be able to bid for future gas turbine projects; the only difference is it will not be allowed to do so at an unfair advantage.  And, a broader employee "firewall"—necessary to ensure fair competition for future projects—imposes only minimal costs on Siemens, the subsidiary of Siemens Energy, a large multinational company with over 93,000 employees.  (*See* Ex. 22); *see also ePlus, Inc.* v. *Lawson Software, Inc.*, No. 3:09-cv-620, 2011 WL 2119410, at *16 (E.D. Va. May 23, 2011) (granting a permanent injunction preventing further use of plaintiff's infringed patents, in part because "[t]here is no contention that an injunction will drive [defendant] out of business; rather, it appears that an injunction will have little collateral effect on [defendant] as a whole.  [Defendant] is a large company . . .").  Thus, the balance of the equities tips decidedly in GE's favor, justifying equitable relief.

## IV.     GRANTING A PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST

Finally, granting GE's requested injunction would serve the public interest by protecting and promoting fair, free, and robust market competition.  Courts in this District and nationwide have repeatedly held that there is a "significant public interest in maintaining the confidentiality of trade secrets and preventing their misappropriation."  *MicroStrategy, Inc.* v. *Bus. Objects, S.A.*, 369 F. Supp. 2d 725, 736 (E.D. Va. 2005); *see also Hilton Worldwide*, 2016 WL 8223436, at *9; *Henry Schein, Inc.* v. *Cook*, 191 F. Supp. 3d 1072, 1078 (N.D. Cal. 2016); *NextGen Lab'ys*, 341 F. Supp. 3d at 1166; *Datatel*, 2005 WL 1668020, at *10.  Indeed, "[t]he injunction provisions in VUTSA and DTSA reflect a legislative recognition that the public interest is furthered by the protection of trade secrets through appropriate injunctive relief." *Peraton*, 2017 WL 11501665, at *4; *see also Kewanee Oil Co.* v. *Bicron Corp.*, 416 U.S. 470,

481 (1974) ("The maintenance of standards of commercial ethics and the encouragement of invention are the broadly stated policies behind trade secret law.").

Granting an injunction here would further these weighty public interests by leveling the playing field that has been slanted by Siemens' misconduct:  GE's requested injunction would restore fair competition by ensuring that Siemens appropriately walls off Siemens employees in future projects.  By contrast, denying injunctive relief would disserve the public interest by permitting Siemens to continue profiting from its misappropriation of GE's trade secrets.  *See Arminius*, 2007 WL 534573, at *7 ("[P]ublic policy favors a free market and disfavors allowing a competitor to drive another competitor out of business by unfairly misappropriating trade secrets.").  Thus, GE's requested injunction is in the public interest and its motion should be granted.

## CONCLUSION

For the foregoing reasons, GE respectfully requests that the Court enter an order enjoining, during the pendency of this litigation, Siemens employees who were exposed to GE's trade secrets from working on bids, proposals, responses to requests for proposals or other solicitations for any gas turbine project or contract on which Siemens is bidding its SGT6-8000H, SGT6-5000F, SGT6-A65, SGT-800, or SGT6-2000e technology or later-developed models of comparable outputs, including but not limited to the Belgium RFP ██████████████; the Italy RFP ████████████████████████████████; and the South Carolina RFP involving Dominion.

February 1, 2021

GENERAL ELECTRIC COMPANY

By: */s/ Edward E. Bagnell, Jr*
Dana D. McDaniel (VSB No. 25419)
Edward E. Bagnell, Jr (VSB No. 74647)
Spotts Fain, P.C.
411 East Franklin Street, Suite 600
Richmond, Virginia 23219
Phone: (804) 697-2000
Fax: (804) 697-2100
dmcdaniel@spottsfain.com
ebagnell@spottsfain.com

Brad S. Karp (*pro hac vice* forthcoming)
Brette Tannenbaum (*pro hac vice*)
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000
bkarp@paulweiss.com
btannenbaum@paulweiss.com

Karen L. Dunn (*pro hac vice*)
Michelle K. Parikh (*pro hac vice*)
Paul, Weiss, Rifkind, Wharton & Garrison LLP
2001 K Street, NW
Washington, DC 20006
(202) 223-7300
kdunn@paulweiss.com
mparikh@paulweiss.com

*Attorneys for Plaintiff General Electric Company*

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, do hereby certify that on the 1st day of February 2021, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

<u>/s/ *Edward E. Bagnell, Jr*</u>
Edward E. Bagnell, Jr (VSB No. 74647)
ebagnell@spottsfain.com
Spotts Fain, P.C.
411 East Franklin Street, Suite 600
Richmond, Virginia 23219
Phone: (804) 697-2065
Fax: (804) 697-2165

*Counsel for General Electric Company*