**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| **GENERAL ELECTRIC COMPANY**<br><br>        **Plaintiff,**<br><br>**v.**<br><br>**SIEMENS ENERGY, INC.**<br><br>        **Defendant.** | **Case No. 3:21-cv-00025-JAG** |

**SIEMENS ENERGY, INC.'S ("SEI'S") MEMORANDUM IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

<b>Page</b>

BACKGROUND ............................................................................................................. 2

    A.    SEI Discovers and Discloses the Dominion Matter to GE. .................... 2

    B.    GE Sits on Its Hands for Months. ............................................................ 3

    C.    The 2019 GE Information Primarily Concerns GE's ▮▮▮▮ Turbine...................... 5

    D.    GE's Alleged "Trade Secrets" Do Not Include Design Drawings or Anything of the Sort—and Actually Include Publicly-Available Information. ................................................................................................ 6

    E.    The South Carolina, Belgium, and Italy RFPs........................................ 7

    F.    Bid Information Cannot Be "Extrapolated" Between Turbines. ............. 9

LEGAL STANDARD..................................................................................................... 11

ARGUMENT ................................................................................................................. 12

I.      GE IS NOT LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS. ................. 13

II.     GE CANNOT DEMONSTRATE AN IMMINENT RISK OF IRREPARABLE HARM................................................................................................................ 15

    A.    Both the DTSA Claim and the VUTSA Claim Require a Likelihood of Irreparable Harm to Support a Preliminary Injunction. ........................ 16

    B.    GE's Delay in Seeking a Preliminary Injunction Is Fatal to Its Claim of Irreparable Harm. ............................................................................... 18

    C.    GE's Theory of Harm Is Speculative...................................................... 20

    D.    GE's Claim for Alleged Monetary Damages Underscores That There Is No Risk of Irreparable Harm Supporting Preliminary Injunctive Relief............. 24

III.    THE BALANCE OF THE EQUITIES CUTS AGAINST INJUNCTIVE RELIEF. ....... 24

IV.    A PRELIMINARY INJUNCTION IS NOT IN THE PUBLIC INTEREST................... 26

V.     GE'S REQUESTED INJUNCTION IS FACIALLY OVERBROAD. ........................... 27

VI.    GE IS REQUIRED TO POST A BOND. .................................................................. 29

CONCLUSION............................................................................................................... 30

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abrasic 90 Inc. v. Weldcote Metals, Inc.,*
364 F. Supp. 3d 888 (N.D. Ill. 2019) ...................................................................23

*Adalis Corp. v. Forbo Adhesives, LLC,*
2007 WL 673764 (M.D.N.C. Feb. 27, 2007)..........................................................13

*Adarand Constructors, Inc. v. Pena,*
515 U.S. 200 (1995)...............................................................................................21

*Am. Can Co. v. Mansukhani,*
742 F.2d 314 (7th Cir. 1984) .................................................................................26

*Arminius Schleifmittel GmbH v. Design Indus., Inc.,*
2007 WL 534573 (M.D.N.C. Feb. 15, 2007).................................................17, 25

*Ben E. Keith, Co. v. Dining All., Inc.,*
2020 WL 8300513 (N.D. Tex. Dec. 10, 2020) ......................................................14

*Brightview Grp., LP v. Teeters,*
441 F. Supp. 3d 115 (D. Md. 2020) .......................................................................25

*Buckingham Corp. v. Karp,*
762 F.2d 257 (2d Cir. 1985)...................................................................................13

*Capital Tool and Manufacturing Co., Inc. v. Maschinenfabrik Herkules,*
837 F.2d 171 (4th Cir. 1988) ...................................................................16, 17, 18

*CDI Energy Servs. v. W. River Pumps, Inc.,*
567 F.3d 398 (8th Cir. 2009) .................................................................................27

*Chateau Hip, Inc. v. Gilhuly,*
1996 WL 437929 (S.D.N.Y. Aug. 2, 1996)............................................................14

*Direx Israel, Ltd. v. Breakthrough Med. Corp.,*
952 F.3d 802 (4th Cir. 1991) ...........................................................................21, 27

*District 17, United Mine Workers of Am. v. A&M Trucking, Inc.,*
991 F.2d 108 (4th Cir. 1993) .................................................................................30

*Edgar v. MITE Corp.,*
457 U.S. 624 (1982)...............................................................................................30

CONFIDENTIAL - FILED UNDER SEAL

*ExamWorks, LLC v. Baldini*,
    835 F. App'x 251 (9th Cir. 2020) ...................................................................26

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
    559 F.3d 110 (2d Cir. 2009) .........................................................................13

*Gen. Elec. Co. v. Am. Wholesale Co.*,
    235 F.2d 606 (7th Cir. 1956) .......................................................................17

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018).................................................................................27

*Gov't Tech. Servs., Inc. v. Intellisys Tech. Corp.*,
    51 Va. Cir. 55 (1999)..................................................................................14

*Graham Webb Int'l v. Helene Curtis, Inc.*,
    17 F. Supp. 2d 919 (D. Minn. 1998)..........................................................27

*Henderson for Nat'l Labor Rel. Bd. v. Bluefield Hosp. Co., LLC*,
    902 F.3d 432 (4th Cir. 2018) ......................................................................12

*Hill-Rom Co. v. Gen. Elec. Co.*,
    No. 2:14-cv-187 [Dkt. 40] (E.D. Va. June 23, 2014) ...............................20

*Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*,
    17 F.3d 691 (4th Cir. 1994) ........................................................................24

*Instant Air Freight Co. v. C.F. Air Freight, Inc.*,
    882 F.2d 797 (3d Cir. 1989)........................................................................17

*John Paul Mitchell Sys. v. Quality King Distribs., Inc.*,
    106 F. Supp. 2d 462 (S.D.N.Y. 2000)........................................................17

*Kentuckians for the Commonwealth, Inc. v. Rivenburgh*,
    317 F.3d 425 (4th Cir. 2003) ......................................................................27

*Kreuger Int'l, Inc. v. Nightingale Inc.*,
    915 F. Supp. 595 (S.D.N.Y. 1996)..............................................................20

*Lewis v. Casey*,
    518 U.S. 343 (1996).....................................................................................27

*Madsen v. Women's Health Ctr., Inc.*,
    512 U.S. 753 (1994).....................................................................................27

*Magnussen Furniture, Inc. v. Collezione Europa USA, Inc.*,
    116 F.3d 472 (4th Cir. 1997) ......................................................................19

CONFIDENTIAL - FILED UNDER SEAL

*Motion Control Sys., Inc. v. East*,
   546 S.E.2d 424 (Va. 2001)..........................................................................14, 22

*Novozymes A/S v. Danisco A/S*,
   2010 WL 3783682 (W.D. Wis. Sept. 24, 2010) ..............................................20

*PBM Prods., LLC v. Mead Johnson & Co.*,
   639 F.3d 111 (4th Cir. 2011) .........................................................................29

*Peraton, Inc. v. Raytheon Co.*,
   2017 WL 11501665 (E.D. Va. Nov. 7, 2017)..................................................18

*Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*,
   872 F.2d 75 (4th Cir. 1989) ...........................................................................19

*Ram Prods. Co., Inc. v. Chauncey*,
   967 F. Supp. 1071 (N.D. Ind. 1997) ..............................................................17

*S. Milk Sales, Inc. v. Martin*,
   924 F.2d 98 (6th Cir. 1991) ...........................................................................17

*Salient CRGT, Inc. v. Sols. by Design II, LLC*,
   2020 WL 3550008 (E.D. Va. Apr. 2, 2020) ...................................................18

*Sampson v. Murray*,
   415 U.S. 61 (1974)........................................................................................24

*Schmidt v. Lessard*,
   414 U.S. 473 (1974)......................................................................................29

*Scotts Co. v. United Indus. Corp.*,
   315 F.3d 264 (4th Cir. 2002) .....................................................................24, 25

*Signature Flight Support Corp. v. Landow Aviation Ltd. P'ship*,
   2009 WL 111603 (E.D. Va. Jan. 14, 2009) ...................................................25

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
   345 F. Supp. 3d 614 (E.D. Va. 2018) ............................................................25

*Uncle B's Bakery, Inc. v. O'Rourke*,
   920 F. Supp. 1405 (N.D. Iowa 1996).........................................................13, 17

*Va. Carolina Tools, Inc. v. Int'l Tool Supply, Inc.*,
   984 F.2d 113 (4th Cir. 1993) .........................................................................23

*Viad Corp. v. Cordial*,
   299 F. Supp. 2d 466 (W.D. Pa. 2003)............................................................17

CONFIDENTIAL - FILED UNDER SEAL

*Vienna Beef, Ltd. v. Red Hot Chi., Inc.*,
   833 F. Supp. 2d 870 (N.D. Ill. 2011) ....................................................................27

*W.R. Grace & Co. v. Local Union 759*,
   461 U.S. 757 (1983) ..............................................................................................30

*WHIC LLC v. NextGen Laboratories, Inc.*,
   341 F. Supp. 3d 1147 (D. Haw. 2018) ..................................................................25

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ...........................................................................11, 12, 15, 21

**Statutes**

18 U.S.C. § 1836(b)(3)(A) ...........................................................................13, 14

Va. Code Ann. § 59.1-337 ...................................................................................13

Virginia Code § 8.01-628 .....................................................................................18

**Rules**

Fed. R. Civ. P 65 ..................................................................................................30

Fed. R. Civ. P 65(c) ..............................................................................................29

Fed. R. Civ. P 65(d)(1)(B) ...................................................................................29

GE's motion concerns year-and-a-half-old pricing information that no one at SEI is using because SEI has already taken steps to firewall relevant employees and remove the information at issue from its files and systems.  And despite GE's feigned urgency, GE has known this for months. Contrary to what its motion tries to convey, GE waited five months after becoming aware of this issue, two months after learning of SEI's actions to firewall employees, and over two weeks after filing its complaint, before seeking this so-called "preliminary" injunction.  Worse still, GE now tries to claim "irreparable" injury based on a U.S. bid that was already submitted before it filed its motion, and nascent European projects that involve different gas turbines than those ultimately considered in the 2019 Dominion Peakers Project that gave rise to this case.  For these reasons and more, GE's motion falls well short of the showing necessary to justify the extraordinary relief of any preliminary injunction, much less the sweeping injunction GE demands.

GE's motion has nothing to do with any legitimate risk of irreparable harm, and instead seeks to distract from business problems unrelated to SEI or the issues complained of here: negative attention from a $200M penalty the U.S. Securities and Exchange Commission ("SEC") recently imposed after finding GE "misled investors" about the performance of the very same power generation business at issue in this case.  In fact, within days of filing its complaint, a J.P. Morgan industry report noted glaring inconsistencies between what GE has been telling the marketplace, what GE executives have been saying internally, and what GE is now saying here in Court.  Against this backdrop, GE seeks to exploit an already-remediated issue by demanding an unprecedented injunction designed not to prevent any actual or threatened irreparable injury to GE—but to impede Siemens Energy's ability to compete in the gas turbine market far beyond anything related to the alleged disclosure in this case.  GE's requested relief should be denied.

## BACKGROUND[1]

GE does not and cannot claim that its motion turns on anything new, because SEI discovered, disclosed, and remediated the underlying circumstances months ago.

### A.    SEI Discovers and Discloses the Dominion Matter to GE.

In May and June 2019, SEI, GE, and Mitsubishi were bidding on a Dominion gas turbine "peaker" project in Virginia—so named because the turbines were to be used for additional power during periods of peak demand.  SEI later discovered and ultimately determined in 2020 that after initial bids were submitted on the Dominion Peakers Project, a Dominion employee named Ted Fasca shared unsolicited information about competitors' bids with an SEI employee named Michael Hillen.  SEI promptly retained an outside law firm to conduct a privileged internal investigation of what occurred, and took extensive remedial measures:  removing the information at issue from its files and systems to ensure it could not be accessed or used by SEI personnel, requiring additional training, ordering disciplinary action (including multiple terminations and reassignments of other personnel), and out of an abundance of caution, firewalling individuals who received the GE information at issue from working on new proposals, pricing, or customer negotiations, as explained further below.

Importantly, SEI also voluntarily notified both Dominion and GE of its discovery.  SEI first contacted its customer Dominion, whose employee had provided the information, and Dominion requested the opportunity to conduct its investigation of the matter prior to any other notifications.  Once Dominion completed its investigation, SEI notified GE on August 28, 2020 that a "Dominion employee sent confidential GE information, including information pertaining to

---

[1] In support of its motion, SEI is submitting the Declaration of James Bedont ("Bedont Decl.") and the exhibits attached to the Declaration of Alexandra I. Russell (cited as "Ex. __").

GE's bid price, to a Siemens account manager [who] thereafter forwarded the information to other Siemens employees who were involved in [SEI's] bid preparation."  (GE Ex. 18.)

### B.    GE Sits on Its Hands for Months.

For all of its current posturing, GE waited some seven weeks[2] to respond to SEI's notification—with a series of demands.  (GE Ex. 19.)  In its very next response, SEI assured GE that "Siemens will not directly or indirectly use the GE Confidential Information for any purpose," described the firewall that SEI had already implemented, and explained the remediation process used to remove the GE information at issue from SEI's files and systems.  (GE Ex. 21.)  These were more than adequate assurances with respect to information from GE's Dominion Peakers Project bid, which at that point had been submitted more than 16 months earlier.

GE waited two weeks to respond.  Then, for the first time, GE demanded in a November 17, 2020 letter that SEI restrict a wide swath of employees from work on "Dominion's upcoming RFP related to gas turbine equipment in South Carolina."  (GE Ex. 20.)  On November 27, 2020, SEI responded and specifically addressed the South Carolina RFP.  (*See* Ex. 1.)  As SEI explained, "GE's position seems to be based on a misconception regarding the disclosures made in the Dominion Peakers Project . . . . As you will see, the GE Confidential Information is not a unitary set and was not circulated in full to all employees that we identify as having received GE Confidential Information."  (*Id*. at 1-2.)  To make its point clearer, SEI provided a detailed document-by-document list showing which turbine information was involved and a corresponding log showing which individuals saw what.  (*See id.* at Appendix B.)  SEI also emphasized to GE

---

[2] Although GE claims that it did not receive SEI's August 28, 2020 letter until mid-September because of an email transmission error, GE admits that it learned of the matter from Dominion by letter dated September 3, 2020 (and actually earlier, because Dominion's General Counsel called GE before that letter was sent).

that "[t]o the extent you have any outstanding concerns after you have reviewed those documents we are willing to discuss this issue further." (*Id.* at 2.)

GE never responded. Instead, GE went silent for over eight weeks before eventually launching a press campaign and filing its complaint on January 14, 2021—*58 days after* GE first raised its supposed concerns about the South Carolina RFP. And GE delayed further still—waiting until *after* bids for the South Carolina RFP were already submitted on January 19, 2021 before filing this motion shortly before midnight on February 2, 2021.

Only two things changed from the time GE learned of the events at issue to the date it filed for a preliminary injunction. *First*, Mitsubishi (the other unsuccessful bidder on the ultimately-canceled Dominion Peakers Project) filed a related lawsuit against SEI in the Middle District of Florida based on the same underlying events and unsuccessfully sought a similar preliminary injunction against SEI. The district court denied Mitsubishi's motion and refused to enter an injunction, concluding that Mitsubishi failed to identify a single future project in which it faced irreparable harm in competing against SEI. (GE Ex. 9 at 10-11.) *Second*, J.P. Morgan issued an analyst report calling out GE for significant inconsistencies between its allegations in this complaint—including GE's claims about supposed harm to its business—and GE's prior contradictory statements to shareholders and the public. Specifically, J.P. Morgan emphasized that the SEC had imposed a $200 million penalty on GE stemming from its use of improper accounting and efforts to "misle[a]d investors" about problems with its gas turbine business, including evidence that GE's own executives internally "questioned whether the GE Power Services business model was economically viable" at all. (Ex. 2; *see also* Ex. 3 (Dec. 2020 SEC Order).) Only in the wake of GE's significant delay and unfavorable public attention on the performance and management of its gas turbine business did GE shift gears and file this motion.

4

### C.     The 2019 GE Information Primarily Concerns GE's ███ Turbine.

The Dominion Peakers Project ultimately considered proposals from GE and SEI for what are known as ████ turbines.  For that reason, virtually all the information that the Dominion employee sent to an SEI employee in 2019 related to GE's proposed pricing on its ████ turbine. Contrary to GE's misleading contention that the Dominion disclosure provided numerous SEI employees with confidential information about ████████ GE turbines, in reality only two documents contained in the same email (*see* GE Ex. 23) concerned bid information for ██████ turbines, and only two SEI employees, Michael Hillen and Mehran Sharifi, saw those documents.[3] These two key facts—that only two documents contained bid information concerning anything other than ████ turbines, and that only two people at SEI saw them—are not news to GE.  SEI provided that information to GE on November 27, 2020.  (*See* Ex. 1.)

Moreover, GE never responded to SEI's letter.  If GE had responded or even picked up the phone, GE could have asked about SEI's voluntary firewalling measures that restricted those two individuals—Hillen and Sharifi—from working on new proposals, pricing, or customer negotiations not just for the F-class turbine in its Dominion Peakers Project bid (the SGT6-5000F), but more broadly for the SGT6-8000H, SGT6-5000F, SGT-A65, SGT-800, and SGT6-2000e gas turbines.  (*See* Bedont Decl. ¶ 11-15.)  And as SEI had already explained to GE at the time, employees who saw bidding information about GE's ████ turbine were and remain firewalled from preparing bids involving SEI's comparable SGT6-5000F turbine.  GE's attacks on the sufficiency of SEI's firewalling are baseless—and underscore that GE's actual goal is to obtain a tactical advantage over one of its few competitors in the gas turbine business.

---

[3] GE incorrectly identifies GE Exhibit 26 as a third document containing supposedly confidential information about its ████████ turbines.  As explained below, however, that information is actually available on GE's own public website. *See infra* at 6.

5

**D.    GE's Alleged "Trade Secrets" Do Not Include Design Drawings or Anything of the Sort—and Actually Include Publicly-Available Information.**

Apparently recognizing that its year-and-a-half-old 2019 pricing information has limited competitive value—an element of both the federal Defend Trade Secrets Act (DTSA) and Virginia Uniform Trade Secrets Act (VUTSA) claims—GE tries to paint its alleged trade secrets with a broad brush, repeatedly calling them "confidential pricing and technical data."  For instance, GE points the Court to a specific document from the Peakers Project and claims that it gave SEI access to "███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████."  (Br. at 9, citing GE Ex. 26.)  Yet this so-called "█████████████" for maintaining the "████████████ ███████████████████████████████████"—and the technical information accompanying it—is anything but confidential: it is readily available ***in identical form on GE's own public website***.  (*See* Ex. 4 (comparing GE Ex. 26 *with* SEI Ex. 5 (GE's public website[4]).)

GE's "█████████████████████████" is neither a "███████████████" nor a GE trade secret.  (*See id.*)  Similarly, GE falsely portrays its █████████████████████ as trade secrets provided to SEI.  (Br. at 16.)  But, yet again, those very same ████████████ appear on GE's own public website.  *Compare* GE Ex. 23 (████████████████████████) *with* SEI Ex. 6 (7HA Fact Sheet[5] (listing identical CO emission level of 9 ppm)) and Ex. 7 (7F.04/7F.05 Fact Sheet[6] (same).)  As its own documents reveal, GE's alleged trade secrets are at best limited to its 2019 bid pricing information and not the performance specifications of its gas turbines.

---

[4] Hyperlink to GE Website: <u>Heavy-Duty Gas Turbine Operating And Maintenance Considerations</u> at 32.

[5] Hyperlink to GE Website: <u>7HA.01/.02 Gas Turbine Fact Sheet</u> at 1.

[6] Hyperlink to GE Website: <u>7F.04/.05 Gas Turbine Fact Sheet</u> at 1.

### E.      The South Carolina, Belgium, and Italy RFPs.

GE contends that relief is "urgently" needed because it "intends to compete" on forthcoming RFPs in Belgium and Italy and because it recently submitted a bid in response to the South Carolina RFP.  (Br. at 3.)  GE's request is premised upon its inaccurate speculation that "the same Siemens employees who unlawfully acquired, disseminated, analyzed, and used GE's trade secrets to improve Siemens' gas turbine bids for more than a year are no doubt involved in crafting Siemens' responses to the Belgium, Italy, and South Carolina RFPs."  (*Id.*)  GE's assertions are flat-out wrong.

*First*, the SEI employees who received documents containing information about GE's ███████████ turbine have *already* been firewalled from working on new proposals involving SEI's comparable SGT6-5000F turbine.

*Second*, GE itself acknowledges that "████████████████████████████ ██████," (Br. at 3), and Siemens Energy is not bidding its SGT6-5000F (or any other F-class turbines) on the Belgium, Italy, or South Carolina RFPs.

*Third*, Hillen and Sharifi—the only employees who received GE bid information about products other than the ███████████ turbine—have not participated and will not participate in in the Belgium, Italy, or South Carolina RFPs.  (*See* Bedont Decl. ¶¶ 23, 37-38.)  They are not working on new gas turbine proposals.  (*See id.* ¶ 14.)

*Fourth*, the opportunities that GE characterizes as the "Belgium RFP" and the "Italy RFP" appear to consist of various potential projects—most of which are so preliminary that they have not even resulted in the issuance of actual RFPs.  GE's brief and supporting declarations state that GE intends to bid its █████████████████████ to multiple power developers including "████████████" in Belgium and "███████████ ██████████████████" in Italy.  (Br. at 14; Wilner Decl. ¶¶ 35, 37.)  This amounts to

nothing more than a laundry list of Belgian and Italian utility names.  After being pressed by SEI's counsel for more specifics, GE provided only slightly more information about these purported "projects."[7]  Of the five Belgium opportunities identified by GE's counsel, .  As for the purported Italian projects, GE's counsel identified a list of seven opportunities, however .  In short, GE has simply failed to identify any projects in Belgium or Italy for which a bid from SEI is imminent.

*Fifth*, SEI's bid in response to the South Carolina RFP—which has already been submitted—was prepared after SEI took steps to remove the GE information at issue from its files and systems, and after SEI implemented restrictions to prevent employees who received GE information on the Dominion Peakers Project from working on future comparable projects as described above.  (*See* Bedont Decl. ¶ 22.)

---

[7] Following GE's preliminary injunction motion, SEI's counsel repeatedly asked for clarification about the "Belgium RFP" and "Italy RFP" that GE had in mind, but repeatedly received incomplete responses from GE's counsel over several weeks.  (Russell Decl. ¶ 14; Ex. 13.)  On March 8, 2021 (the day before SEI's opposition was due), GE provided a one-page spreadsheet listing opportunity names, end customers, and "RFP issue or bid" dates—while refusing to provide copies of any actual RFPs.  That spreadsheet only confirms the problems with GE's claim of imminent irreparable harm.  For example, the "bid due date[s]" listed in the spreadsheet for half of the Belgium and Italy projects has already passed, in some cases months before GE filed this lawsuit.  The list contained in the spreadsheet also conflicts with some of the information described by GE's declarant.  And GE's spreadsheet makes passing reference to additional countries, but none of them is discussed in GE's preliminary injunction motion.

GE therefore has not identified a single project presenting a risk that any SEI personnel who received GE information are working on upcoming bids that could benefit from that information.  GE's fallback suggestion that there could be follow-up questions from customers later is speculative—and does not change the relevant points above.

### F.      Bid Information Cannot Be "Extrapolated" Between Turbines.

Because GE knows that only two SEI employees saw confidential information about ███ ███ GE turbines, and no SEI personnel working on the South Carolina RFP, Belgian projects, or Italian projects received any GE information about the turbines involved in those projects, GE resorts to a speculative "extrapolation" theory that fails to withstand even minimal scrutiny.  GE's declarant summarily asserts that SEI personnel might "extrapolate" GE's confidential information from one turbine to "strategically ***guess*** the technical capacities of, or pricing for, other models," and develop "'informed' ***inferences***" that "***could*** even inform Siemens' assessment of GE's expected bids for different gas turbines or entirely different turbine classes or categories." (Young Decl. ¶ 39 (emphasis on rank speculation added).)  But GE's own description of its alleged trade secrets undermines its "extrapolation" theory by underscoring how the pricing and technical capabilities of different turbine models vary dramatically from one model to the next.



As shown in GE's Exhibit 23 at left, the only performance specifications on turbine models that are similar are the ██████████████████████████ and ███████████████████████████████ the ██████████████████████████. But those numbers are not confidential at all—GE publishes them on its public website.  (*See* SEI Ex. 6 (7HA Fact Sheet (listing CO of 9 ppm)); Ex. 7 (7F.04/7F.05 Fact Sheet

(same)); Ex. 8 (LM6000 Fact Sheet[8] (listing NOx at 25 ppm)); Ex. 9 (LMS100 Fact Sheet[9] (same)).)  None of the other numbers are even remotely similar or suggest any relationship across models.  (*See* GE Ex. 23 (showing dollars-per-kilowatt amounts of ███████████████████ ███████████████████████████████).)

GE's motion thus rests on the conclusory assertion by one of its declarants that one might "extrapolate" confidential information from one turbine to "guess" the pricing or capabilities of other engines in formulating bids.  (Young Decl. ¶ 39.)  That assertion overlooks both the differences between turbine classes and the unique nature of individual gas turbine projects that objectively undermine such a theory, as well as the fact that the two employees who saw information about other models are not working on new gas turbine proposals at all.

- Aeroderivative turbines are based on different technology than light industrial turbines, which in turn are different than heavy-duty gas turbines.  (*See* Bedont Decl. ¶¶ 97-100.)

- Within these types of turbines, there are different "classes" of turbine, generally based on size and efficiency.  Even within each class of turbine, there are different models, which can vary widely in terms of size, output, efficiency—and cost.  (*See id.* ¶¶ 109-115.)

- Performance specifications vary so widely between different types of gas turbines that information on one type does not translate to others.  For example, both aeroderivative and F-class gas turbines produce carbon monoxide (CO).  But knowing a CO emissions level for an F-class project—where published CO emissions generally range under 10 ppm—does not tell you what CO emissions level to bid on an aeroderivative project, where published CO emissions are 80 ppm or more.  (*See id.* ¶ 103.)

- Equipment pricing is also too dissimilar to provide any useful comparison across turbines.  While simple division can be used to calculate a $/kw figure for any turbine, that calculation provides no strategic value ***across*** turbine classes, because prices per kilowatt for aeroderivatives are significantly higher compared to heavy-duty gas turbines.  Knowing that a competitor bid ████████████████████ would provide

---

[8] Hyperlink to GE Website: <u>LMS6000 Fact Sheet</u> at 1.

[9] Hyperlink to GE Website: <u>LMS100 Fact Sheet</u> at 1.

no help in determining whether to bid an aeroderivative at $290 or $300 or $310/kw. (*See id.* ¶¶ 104-108.)

The same goes for service contracts.

- Aeroderivative turbines are designed to be high cycle machines, meaning they are stopped and started regularly.  For that reason, maintenance intervals (and thus service cost information) for these turbines are usually tied to the number of planned starts. (*See id.* ¶ 106.)

- In contrast, F-class turbines are heavy-duty machines that run for longer periods of time with fewer stops and starts.  For that reason, maintenance intervals for F-class turbines are usually tied to the number of *hours* that the machine is running.  (*See id.* ¶ 99, 100-108.)

Finally, GE's "extrapolation" theory of misappropriation fails to consider that in certain countries, key bidding information is "laid open" as a matter of course, thus revealing exactly what each competitor proposed.  Indeed, even in the United States, some public utilities allow bidding information to be obtained through public records requests, especially after the procurement process is completed.  (*See* Bedont Decl. ¶ 120.)  The fact that these bids are accessible—with full performance specifications and pricing data available to see—means that even if GE could build its case on speculative "extrapolation," publicly-available information from one engine model would likewise permit "strategic guessing" about other engine models.  Thus, GE's extrapolation theory fails even on its own terms because the same "extrapolation" could be performed using publicly-available information, which unravels any trade secrets claim based on strategic guessing.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  A plaintiff has the burden to establish that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of the equities tips in its favor, and (4) an injunction is in the

public interest.[10]  *See id.* at 20.  Importantly, "**each** of these four factors must be satisfied to obtain preliminary injunctive relief."  *Henderson for Nat'l Labor Rel. Bd. v. Bluefield Hosp. Co., LLC*, 902 F.3d 432, 439 (4th Cir. 2018) (citing *Winter*, 555 U.S. at 23-24) (bold emphasis added).  It is "unnecessary to address all four factors when one or more ha[s] not been satisfied."  *Id.*

## ARGUMENT

GE fails to meet the requirements necessary to obtain the extraordinary remedy of preliminary injunctive relief.  ***First***, GE cannot establish a likelihood of success on the merits because it cannot demonstrate that an injunction is necessary to prevent any actual or threatened misappropriation.  ***Second***, GE has not shown that it will face immediate and irreparable injury absent the sweeping injunction it seeks.  GE's speculative theory of harm—that it will lose future bids due to alleged ongoing use of its 2019 Dominion Peakers Project bid information—ignores the remedial measures that SEI has already undertaken to moot GE's concerns and inflates the significance of dated bidding information on a now-canceled project from May and June of 2019. ***Third***, the balance of equities weighs heavily against GE's position because the sweeping injunction it seeks would impede SEI's ability to complete and submit upcoming bids on different projects involving different products.  GE's requested injunction would restrict SEI from using its personnel without regard to who-saw-what—in other words, GE seeks to sideline SEI personnel regardless of whether an individual actually reviewed information about a particular GE turbine model, what level of information the person reviewed, and whether that information was actually a trade secret or publicly available.  ***Fourth***, GE's proposed injunction will harm the public interest by restraining one of its few competitors in what is already a concentrated market with a handful

---

[10] As explained below in Section II.A., GE incorrectly asserts that a showing of irreparable harm is not required to obtain a preliminary injunction on its VUTSA trade secrets claim.  That argument misstates Fourth Circuit precedent and should be rejected.

of bidders.  **Finally**, the scope of GE's proposed injunction is impermissibly overbroad and fails to address GE's mandatory bond-posting requirement.

## I.      GE IS NOT LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS.

To succeed on the merits of its trade secret claims, GE must demonstrate that an injunction is necessary to "**prevent** any actual or threatened misappropriation."  18 U.S.C. § 1836(b)(3)(A)(i) (emphasis added); *see also* Va. Code Ann. § 59.1-337 ("Actual or threatened misappropriation may be enjoined.").  GE's discussion of the likelihood of success on the merits focuses on alleged misappropriation in the **past**—on the now-cancelled Dominion Peakers Project followed by the Florida Power and Light ("FPL") Crist Peakers Project that GE ultimately won.  (Br. at 19-20). But "injury caused by past conduct does not justify the extraordinary remedy of a preliminary injunction[]."  *Adalis Corp. v. Forbo Adhesives, LLC*, 2007 WL 673764, at *4 (M.D.N.C. Feb. 27, 2007); *Uncle B's Bakery, Inc. v. O'Rourke*, 920 F. Supp. 1405, 1436-37 (N.D. Iowa 1996); *Buckingham Corp. v. Karp*, 762 F.2d 257, 260-63 (2d Cir. 1985).  An injunction is not necessary to prevent any "actual or threatened misappropriation" on past projects, especially when there is no future work to be done by SEI on those projects because the Dominion Peakers Project was cancelled for unrelated market and supply reasons (*see* Bedont Decl. ¶ 7), and GE won the FPL Crist Peakers Project.

GE also has not demonstrated that an injunction is necessary to prevent any threat of "actual or ongoing misappropriation" concerning the South Carolina RFP or potential opportunities in Belgium and Italy.   Instead, GE relies on the sort of speculative theory of threatened misappropriation that courts routinely deny as a basis for injunctive relief.  *See, e.g.*, *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 119-20 (2d Cir. 2009) (refusing to grant preliminary injunction as a "precautionary measure" despite past misappropriation).  GE's only basis for its argument that SEI "threatens" to misappropriate trade secrets in the "imminent future"

is speculation that SEI's firewall "leaves dozens of employees with **knowledge** of GE's Trade Secrets able to participate in future RFPs for which the Trade Secrets clearly would benefit Siemens at GE's expense."  (Br. at 20 (emphasis added).)  GE does not—and cannot—argue that SEI threatens to use documents containing its trade secrets because the information has been removed from SEI's files and systems.  Instead, GE focuses on mere allegations of prior exposure to trade secrets, which is not a viable theory of misappropriation under Virginia law and the DTSA. *See Motion Control Sys., Inc. v. East*, 546 S.E.2d 424, 426 (Va. 2001) ("Mere knowledge of trade secrets is insufficient to support an injunction under the terms of [the VUTSA]."); *see also Gov't Tech. Servs., Inc. v. Intellisys Tech. Corp.*, 51 Va. Cir. 55, 55 (1999) ("Virginia does not recognize the inevitable disclosure doctrine."); 18 U.S.C. § 1836(b)(3)(A) (precluding injunctive relief under the DTSA "merely on the information the person knows").

Moreover, SEI has barred employees who have seen information about GE's ▮▮▮▮ turbine from working on future ▮▮▮▮ projects.  Only two employees (Hillen and Sharifi) received information about GE's ▮▮▮▮▮▮▮▮ turbines, and they are not working on **any** new bids for **any** class or model of gas turbine.  Courts have denied requests for preliminary injunctive relief where, as is the case here, a defendant has already taken significant remedial measures to prevent future harm.  *See, e.g.*, *Chateau Hip, Inc. v. Gilhuly*, 1996 WL 437929, at *3 (S.D.N.Y. Aug. 2, 1996) (denying preliminary injunction because "defendants have stipulated to cease any allegedly wrongful use of" trade secret and trademark); *Ben E. Keith, Co. v. Dining All., Inc.*, 2020 WL 8300513, at *2 (N.D. Tex. Dec. 10, 2020) (denying preliminary injunction because "defendant has agreed" to stop using trade secrets and "the court has no reason to believe that it will not comply with its agreement").

14

One of GE's declarants nevertheless suggests that an SEI employee who has information about GE's ███████ could "extrapolate" that information to "strategically guess" technical capacity and pricing for other models in GE's ███████████████ product lines.  (Young Decl. ¶¶ 39-42.)  That is incorrect.  Information about GE's █████ turbine from the Dominion Peakers Project is irrelevant to the South Carolina, Belgium, and Italy projects, which do not involve F-class turbines at all.  (*See* Bedont Decl. ¶¶ 26; 38-52; 59-93.)  Indeed, GE's own alleged trade secrets show that the technical and pricing information for its █████ model is dramatically different than for its ████████████ models.  (GE Ex. 23.)  The only performance specifications that are similar are publicly available emissions numbers.  *See supra* at 6.

GE's alleged "threat" of future misappropriation is thus based on a series of erroneous assumptions:  that year-and-a-half old information about GE's █████ turbine *may* be relevant to upcoming projects despite rapidly evolving turbine technology and pricing strategies; that year-and-a-half old information for GE's █████ turbine in the context of a "peaker" project *may* be relevant to non-peaker projects that involve GE's aeroderivative turbines; that an SEI employee who saw information about GE's █████ turbine *may* remember the detailed technical and pricing information a year and a half later; and that the employee *may* "extrapolate" that information to "strategically guess" technical and pricing information for other projects.  GE's speculative allegations of threatened misappropriation fail to demonstrate a likelihood of success on the merits.

## II.  GE CANNOT DEMONSTRATE AN IMMINENT RISK OF IRREPARABLE HARM.

GE also cannot show that it is "likely to suffer irreparable harm in the absence of preliminary relief."  *Winter*, 555 U.S. at 20.  **First**, despite being on notice of the Dominion disclosure for months, and despite raising supposed concerns about the South Carolina RFP as early as November 2020, GE waited and waited to request a preliminary injunction, which is strong

15

evidence that its alleged injuries are neither imminent nor irreparable.  ***Second***, GE's theory of harm is entirely speculative and therefore does not justify the extraordinary remedy of a preliminary injunction.  GE cannot establish an imminent threat that SEI will use GE's bid information to compete against it unfairly because SEI has already firewalled the relevant employees from using the GE information at issue, it has already taken steps to remove that information from its files and systems, and indeed, GE did not even file its motion until ***after*** the South Carolina RFP bids were already submitted.  ***Third***, GE cannot establish irreparable harm because its own declarant has already attempted to quantify the alleged harm that serves as the basis for GE's preliminary injunction motion, thus contradicting any claim that equitable relief is required even under its overall theory of the case.

### A.      Both the DTSA Claim and the VUTSA Claim Require a Likelihood of Irreparable Harm to Support a Preliminary Injunction.

GE agrees that it must demonstrate a likelihood of irreparable harm to obtain a preliminary injunction under its DTSA claim.  But it argues that state law does not require irreparable harm to obtain an injunction under the VUTSA.  (Br. at 15.)  GE's argument ignores settled Fourth Circuit precedent.

The Fourth Circuit has expressly held that plaintiffs must meet the irreparable harm requirement regardless of whether the underlying claim is based on the federal DTSA or the state VUTSA.  In *Capital Tool and Manufacturing Co., Inc. v. Maschinenfabrik Herkules*, 837 F.2d 171 (4th Cir. 1988), the plaintiff argued that "[i]rreparable injury is not a prerequisite for preliminary injunctive relief when a complainant invokes the Virginia Trade Secrets Act," and that, "[w]here an injunction explicitly authorized by state law is sought in a diversity case … state standards governing the issuance of preliminary injunctions [should] be followed."  *Id.* at 172.  The Fourth Circuit rejected both points, emphasizing that the "difficulty with [the plaintiff's] argument lies in

its failure to appreciate the difference between final and preliminary injunctions." *Id.*  A court may grant "a ***final injunction*** to enforce the [Virginia Trade Secrets Act] without requiring proof of irreparable harm" where "the complainant proved a statutory violation ***after a full trial on the merits*.**  *Id.* (emphasis added).  But in deciding whether to grant a ***preliminary injunction***, "a district court must balance the hardship the parties will suffer pending trial" in accordance with federal law standards.  *Id.*  The Fourth Circuit thus upheld the district court's decision to deny the requested preliminary injunction because the plaintiff "would suffer no irreparable injury if an injunction were withheld until the close of the trial." *Id.* at 173.

Every other federal court of appeals that has considered the issue agrees with the Fourth Circuit's conclusion that plaintiffs must meet federal law standards—including the irreparable harm requirement—when seeking a preliminary injunction in federal court, regardless of whether the underlying claim is based on federal law (like the DTSA) or state law (like the VUTSA).  *See, e.g.*, *S. Milk Sales, Inc. v. Martin*, 924 F.2d 98, 101-02 (6th Cir. 1991); *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 799 (3d Cir. 1989); *Gen. Elec. Co. v. Am. Wholesale Co.*, 235 F.2d 606, 608 (7th Cir. 1956).[11]  That conclusion comports with basic *Erie* principles, which require federal courts to apply federal procedural rules even when the underlying claim is one of state law.  *See Southern Milk*, 924 F.2d at 102 (holding that the standard for issuing preliminary injunctions "is procedural").

In any event, GE would have to demonstrate irreparable harm even if the Court were to follow the standard for preliminary injunctions under Virginia law.  *Capital Tool* is crystal clear:

---

[11] So do the vast majority of district courts.  *See, e.g.*, *Arminius Schleifmittel GmbH v. Design Indus., Inc.*, 2007 WL 534573, at *2 (M.D.N.C. Feb. 15, 2007); *Viad Corp. v. Cordial*, 299 F. Supp. 2d 466, 475 (W.D. Pa. 2003); *John Paul Mitchell Sys. v. Quality King Distribs., Inc.*, 106 F. Supp. 2d 462, 478 (S.D.N.Y. 2000); *Ram Prods. Co., Inc. v. Chauncey*, 967 F. Supp. 1071, 1082 (N.D. Ind. 1997); *Uncle B's Bakery, Inc. v. O'Rourke*, 920 F. Supp. 1405, 1422 (N.D. Iowa 1996).

"[T]here is no great difference between federal and Virginia standards for preliminary injunctions. … Virginia Code § 8.01-628 provides: 'No temporary injunction shall be awarded unless the court shall be satisfied of the plaintiff's equity.'  This requires the court to examine the plaintiff's right and the existence of impending irreparable injury."  837 F.2d at 173.

GE points to two district court cases to support its contention that "irreparable injury is not even required once a VUTSA violation has been established."  (Br. at 20 (citing *Salient CRGT, Inc. v. Sols. by Design II, LLC*, 2020 WL 3550008, at *7 (E.D. Va. Apr. 2, 2020); *Peraton, Inc. v. Raytheon Co.*, 2017 WL 11501665, at *4 (E.D. Va. Nov. 7, 2017).)  SEI respectfully submits that the Court should disregard those cases as wrongly decided, especially when neither of them is binding here, and both conflict with Fourth Circuit precedent.  The *Peraton* decision mistakenly relied on the prefatory language in *Capital Tool* referring to **permanent** injunctive relief, for which the Fourth Circuit unsurprisingly said that "a complainant need not allege or prove irreparable harm when it involves a statute that authorizes injunctive relief.  All that need be proved is a violation of the statute."  *Peraton*, 2017 WL 11501665, at *4 (quoting *Capital Tool*, 837 F.2d at 172).  *Peraton* then ignored the next two paragraphs and actual holding in *Capital Tool* that rejected the very argument GE makes here and required irreparable injury for a ***preliminary*** injunction.  *See id.*  In other words, *Peraton* overlooked the critical distinction between permanent and preliminary injunctions at the core of the Fourth Circuit's *Capital Tool* decision, and GE's reliance thereon is questionable at best.  *See id.*  The *Salient* decision, in turn, simply followed the error in *Peraton* and its flawed reading of *Capital Tool*.  *See Salient*, 2020 WL 3550008, at *7.

## B.   GE's Delay in Seeking a Preliminary Injunction Is Fatal to Its Claim of Irreparable Harm.

GE's failure to seek a preliminary injunction until now confirms there is no imminent risk of irreparable harm.  It is black letter law that a plaintiff's delay in seeking injunctive relief is

strong evidence that there is no risk of irreparable harm in the absence of an injunction.  *See, e.g.*, *Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 79-80 (4th Cir. 1989) (emphasizing that "delay in seeking relief indicates that speedy action is not required" (citation and internal quotation marks omitted)); *Magnussen Furniture, Inc. v. Collezione Europa USA, Inc.*, 116 F.3d 472, 472 n.6 (4th Cir. 1997) (table).

SEI told GE on August 28, 2020 that it obtained GE's bid information from the Dominion Peakers Project.  (GE Ex. 18.)  GE does not deny that it also learned of the matter from Dominion by September 3, 2020.  (Compl. ¶ 103.)  But GE waited over seven weeks before contacting SEI. (GE Ex. 19 at 1.)  SEI promptly responded to GE, including a November 27, 2020 letter addressing GE's demands.  (*See* Ex. 1.)  In its communication, SEI specifically addressed the South Carolina project, stating that it believed its current firewall was "appropriate and is fully responsive to GE's concerns" while inviting a further discussion "to the extent any concerns relating to the South Carolina project remain[] unresolved."  (*Id.* at 2.)  GE chose not to seek additional information or respond in any way.  Nor did GE raise any concerns about projects in Belgium or Italy.  Instead, GE cut off communications, went totally silent, and then waited another eight weeks after its last letter before filing its complaint on January 14, 2021.[12]  In the days that followed, GE and SEI discussed a confidentiality agreement and GE agreed to extend SEI's answer date to March 1st— all the while without seeking expedited relief.  Not until February 1, 2021 did GE seek an injunction—over four and a half months after it first learned that a Dominion employee had shared GE's bid information with SEI, more than two months since last communicating with SEI

---

[12] GE's agenda here is also notable:  although it didn't contact SEI in any way for eight weeks about its alleged claims or impending complaint, it did take the time to plan a press campaign highlighting its allegations that coincided with its filing.

regarding the remedial measures that GE now seeks to challenge, and after the South Carolina bid had already been submitted.

If GE's need for relief is as "urgent" as it claims (Br. at 24), then GE would have filed its injunction request months ago.  GE claims that "losing any one of [the upcoming] projects,"—including the South Carolina, Belgium, and Italy projects—"could negatively impact GE's reputation among customers, investors, and market analysts."  (*Id.*)  But GE's delay in requesting an injunction flatly contradicts its claims of urgency, as the parties have already submitted bids for the South Carolina RFP, and the Belgium and Italy "RFPs" are in reality largely preliminary potential opportunities that may or may not materialize depending on later decisions by government regulators.  *See Kreuger Int'l, Inc. v. Nightingale Inc.*, 915 F. Supp. 595, 613 (S.D.N.Y. 1996) (Sotomayor, J.) ("I decline to manufacture a sense of urgency that is not supported by plaintiff's own conduct.").

GE offers no explanation for its delay.  In contrast, Mitsubishi, which also filed a trade secret case against SEI based on the Dominion Peakers disclosure, sought (unsuccessfully) a preliminary injunction **on October 6, 2020**—nearly four months before GE.  (GE Ex. 3.)  GE itself has argued as a litigant in other cases—including in this very District—that "delays of as little as two months are fatal to a preliminary injunction request."  GE Opp'n to Mot. for Prelim. Inj. at 22, *Hill-Rom Co. v. Gen. Elec. Co.*, No. 2:14-cv-187 [Dkt. 40] (E.D. Va. June 23, 2014).  Other courts have reached similar conclusions.  *See generally Novozymes A/S v. Danisco A/S*, 2010 WL 3783682, at *4 (W.D. Wis. Sept. 24, 2010) (finding that patentee's two-month delay in seeking preliminary injunction further showed it would not suffer irreparable harm).

## C.    GE's Theory of Harm Is Speculative.

GE claims that, in the absence of an injunction, it will suffer from lost business opportunities, lost market share, and damage to its reputation.  But mere speculation about

potential losses and potential reputational harm does not support the extraordinary remedy of a preliminary injunction before a full evidentiary record is developed and a trial on the merits. A "preliminary injunction will not be issued simply to prevent the possibility of some remote future injury." *Winter*, 555 U.S. at 22 (citation and internal quotation marks omitted). The alleged injury "must be neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.3d 802, 812 (4th Cir. 1991) (internal quotation marks omitted).

To succeed on its irreparable harm claim, GE must show that it faces imminent harm that SEI will use alleged trade secrets to compete against GE for the South Carolina RFP as well as the Belgium and Italy opportunities—the only upcoming projects identified in GE's motion. GE cannot make that showing here.

First, as to the South Carolina opportunity, that ship has sailed: bids were submitted on January 19, almost two weeks before GE filed its motion. Harm cannot be deemed imminent based on events that have already passed. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 210-11 (1995). Second, GE points to no evidence that any SEI employees who received its confidential information worked (or will work) on the South Carolina RFP or any potential opportunities that GE identified in Belgium and Italy. Nor could GE do so, given the extensive firewalling that SEI has in place. GE's theory of harm is based on the erroneous assumption that individuals who saw information about a particular GE turbine are working on projects involving SEI turbines comparable to GE's. As GE would have known had it raised that question in the parties' communications in November 2020, SEI barred employees who received information about GE's ▮▮▮▮▮▮▮ model from working on bids involving SEI's corresponding SGT6-5000F model, and the only two employees who saw bid information about other GE turbines, Hillen and Sharifi, are not working on any new gas turbine bids whatsoever for SEI.

GE's own papers underscore why the extensive remedial measures that SEI has already undertaken are more than sufficient to protect GE from future harm. GE's papers refer only to bidding its ██████████████████████ turbine models in response to the South Carolina RFP and the Belgium and Italy opportunities. (Br. at 14-15.) As explained above, only *two* SEI employees received any GE bid information concerning those models. Neither of them is working on any new gas turbine bids for any class or model of turbine, and they have no role in working on the South Carolina RFP or the Belgium and Italy opportunities identified in GE's motion.

GE has known for months that no SEI employees other than Hillen and Sharifi received information regarding GE's ████████████████. But even if other SEI employees had received information about GE's ██████████████—which they did not—GE provides no basis for its speculation that those individuals would somehow remember GE's Dominion Peakers Project pricing and technical information—which GE insists remains "in their heads" (Br. at 25 n.8)—a year and a half after the disclosure.[13] Even if those employees remembered that information, GE cannot demonstrate that the information would be useful for future projects. As the Dominion employee who provided the information stated at the time: "These numbers are all preliminary as we still need to dig further to figure out how to get all these numbers on the same playing field so we compare apples to apples." (Ex. 10.)[14] The fact that this "preliminary" information couldn't be used to make an "apples to apples" comparison between GE and SEI's offerings even for the Dominion Peakers Project bid itself undercuts GE's contention that such information would be

---

[13] As discussed above in Section I, "[m]ere knowledge of trade secrets is insufficient to support an injunction under the terms of [the VUTSA]." *Motion Control*, 546 S.E.2d at 426.

[14] GE's Exhibit 23 contained redactions that SEI had supplied as part of its voluntary disclosure to GE in the fall of 2020. SEI's Exhibit 10 is the same email without redactions, except for a line referring to bidding information from Mitsubishi.

useful for completely different projects because, among other reasons, those projects involve different requirements and performance specifications.

Even apart from the differences between the Dominion Peakers Project and the upcoming projects that GE identifies in its motion, the year-and-a-half-old age of the information itself defeats GE's arguments. *See Abrasic 90 Inc. v. Weldcote Metals, Inc.*, 364 F. Supp. 3d 888, 903 (N.D. Ill. 2019) ("[T]he information at issue is already many months old and becomes increasingly stale and less valuable as market conditions, prices, and profit margins change and industry relationships evolve."). As GE acknowledges, gas turbine technology and pricing strategies change rapidly. (*See* Wilner Decl. ¶ 7.)

GE's conjecture about reputational harm is even more speculative, because it requires showing that SEI will use GE's alleged trade secrets, that SEI will win bids that GE otherwise would have won, and that GE's loss of that business will cause its reputation among "customers, investors, and market analysts" to suffer as a result. *See, e.g.*, *Va. Carolina Tools, Inc. v. Int'l Tool Supply, Inc.*, 984 F.2d 113, 120 (4th Cir. 1993) (affirming district court's denial of injunction where plaintiffs' alleged injury to reputation was "highly speculative"). That theory fails at the starting block because, as explained above, GE has failed to identify a single future project where SEI is actually threatening to use GE trade secrets.

GE offers even less support for its speculation that SEI will win enough bids through the use of GE's trade secrets to meaningfully shift market share calculations to such an extent that it would harm GE's reputation. Indeed, GE claims that it has lost at least eight other projects to SEI since May 2019. But the very same industry publication that GE cites in its papers, the 2020 McCoy Report, actually shows that GE's market share ***increased*** throughout 2020 and that it remains the dominant market leader. (*Compare* Ex. 11, McCoy Report 3M 2020 *with* Ex. 12,

McCoy Report 12M 2020.)  And given that GE was just weeks earlier found by the SEC to have misled the market about the performance of its gas turbine business (to the tune of agreeing to a $200 million penalty), GE cannot credibly argue that reputational harm supports injunctive relief.

**D.      GE's Claim for Alleged Monetary Damages Underscores That There Is No Risk of Irreparable Harm Supporting Preliminary Injunctive Relief.**

GE has not demonstrated irreparable harm because any alleged harm that GE will suffer during the pendency of the litigation, if actually proven, can be addressed through monetary damages.  "Where the harm suffered by the moving party may be compensated by an award of money damages at judgment, courts generally have refused to find that harm irreparable." *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994); *see also Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.").  "[L]ost business opportunities" and "lost market share" are just different ways of GE alleging it will lose bids and potential profit.  That in and of itself is highly speculative—GE might *win* the bids, after all.  Moreover, GE's irreparable harm argument is belied by the fact that its own declarant actually quantifies its alleged harm.  (*See* Wilner Decl. ¶¶ 23, 34, 39.)

**III.     THE BALANCE OF THE EQUITIES WEIGHS AGAINST INJUNCTIVE RELIEF.**

As explained above, GE will not suffer any irreparable harm absent an injunction. Conceding that its proposed relief is likely to harm SEI, GE resorts to dismissing such harm as a "self-inflicted injury" that cannot "tip the equities in [a defendant's] favor." (Br. at 26.)  Yet again, GE gets the law wrong.  The Fourth Circuit has expressly held that "it is error for a district court to conclude that any harm that would be suffered by a defendant was self-inflicted and thus entitled to lesser weight in the balancing-of-the-harms portion of the preliminary injunction calculus."

*Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 285 (4th Cir. 2002). That is because the balance-of-the-harms inquiry assesses "the degree of harm that will be suffered by the plaintiff or the defendant if the injunction is ***improperly*** granted or denied." *Id.* at 284 (emphasis in original). "By dismissing outright or giving less weight to the harm that would be suffered by a defendant on the grounds that the harm was self-inflicted, a court is effectively considering the harms that would flow from a ***properly entered*** injunction (that is, an injunction entered against a defendant who would go on to lose) rather than considering the harms that would flow from an injunction entered in error (an injunction entered against a defendant who would go on to win)." *Id.* at 285 (emphasis added); *see also Steves & Sons, Inc. v. JELD-WEN, Inc.*, 345 F. Supp. 3d 614, 658 (E.D. Va. 2018) (vacated in part on other grounds); *Signature Flight Support Corp. v. Landow Aviation Ltd. P'ship*, 2009 WL 111603, at *7 (E.D. Va. Jan. 14, 2009).

GE's cited authorities are inapposite. In *Arminius Schleifmittel GmbH v. Design Indus., Inc.*, 2007 WL 534573 (M.D.N.C. Feb. 15, 2007), the district court noted that the requested injunction would not deprive the defendants of using their "own skills and talents in the marketplace." *Id.* at *7. But GE's proposed injunction does just that—attempting to preclude scores of SEI employees from using skills and talents that have nothing to do with GE's trade secrets, in connection with projects that have no relationship to anything they may have seen concerning GE's Dominion Peakers Project bid information. Likewise, in *WHIC LLC v. NextGen Laboratories, Inc.*, 341 F. Supp. 3d 1147 (D. Haw. 2018), the district court enjoined a defendant from servicing customers, but only those acquired through the misappropriation of trade secrets. *See id.* at 1167-68. But as explained above, GE's proposed injunction is far broader, and the Dominion Peakers Project was canceled for unrelated market and supply reasons. (*See* Bedont Decl. ¶ 7.) And in *Brightview Grp., LP v. Teeters*, 441 F. Supp. 3d 115 (D. Md. 2020), the plaintiff

sought to enjoin defendants "from accessing, using, disclosing, or disseminating" its trade secrets. *Id.* at 143.  But GE is not seeking an injunction that simply prevents SEI employees from using GE's trade secrets.  GE instead seeks to gain an unfair competitive advantage by barring any SEI employee who had access to GE's confidential information from working on ***any*** bid involving an expansive equipment scope (including F-class, H-class, or aeroderivative turbines or any later-developed models with comparable outputs), even though all but two of those employees received information concerning only GE's ████████ engine, and SEI removed the information from its files and systems.  GE's showing is far weaker than in any of the cases upon which it relies.

## IV.    A PRELIMINARY INJUNCTION IS NOT IN THE PUBLIC INTEREST.

Granting a preliminary injunction would also disserve the public interest by restricting one of GE's few competitors from using its personnel to bid on different projects involving different products in different locations.  Trade secret protection reflects a balancing of social and economic interests, recognizing that overprotecting alleged intellectual property is just as harmful as under-protecting it given the risk of unduly impacting a defendant's ability to compete.  For this reason, courts have long made clear that "trade secret protection should not extend beyond the limits needed to protect genuine trade secrets." *Am. Can Co. v. Mansukhani*, 742 F.2d 314, 329 (7th Cir. 1984).  Yet GE's proposed injunction would do precisely that.  GE seeks to bar scores of SEI employees from using public information and their own experience and knowledge (separate and apart from any GE confidential information) in dozens of projects, and without regard to what specific information any individual may have seen.  Trade secret law should not "stifle legitimate competition by prohibiting competitors from using their own" independent knowledge, skill, and experience. *Id.*  Nor should it stifle competition by precluding a defendant from "engaging in lawful business." *ExamWorks, LLC v. Baldini*, 835 F. App'x 251, 252 (9th Cir. 2020).

26

GE's sweeping proposed injunction would harm not only SEI but also its gas turbine customers and the public at large. GE's own complaint acknowledges that the gas turbine market has only a handful of competitors. (Compl. ¶¶ 31-32.) For some projects, GE and SEI are the only competitive bidders. By restricting SEI's ability to use its personnel—who do not have access to any GE trade secrets—in bidding on future projects, the preliminary injunction would deny the marketplace of the benefits of competition and could result in power plant customers (and ultimately consumers who use gas turbine power) paying more than they otherwise would. *See Direx Israel, Ltd.*, 952 F.2d at 819 (noting "public interest in free competition"); *CDI Energy Servs. v. W. River Pumps, Inc.*, 567 F.3d 398, 403 (8th Cir. 2009) (denying injunction that "would be detrimental to the customers/clients"); *Vienna Beef, Ltd. v. Red Hot Chi., Inc.*, 833 F. Supp. 2d 870, 877 (N.D. Ill. 2011) (denying injunction because "it would curtail commercial competition"); *Graham Webb Int'l v. Helene Curtis, Inc.*, 17 F. Supp. 2d 919, 931 (D. Minn. 1998) (same). Far from "leveling the playing field" or "restor[ing] fair competition" (Br. at 28), GE's injunction would give GE an unfair advantage by restricting one of its few competitors in the marketplace.

## V. GE'S REQUESTED INJUNCTION IS FACIALLY OVERBROAD.

GE's proposed injunction also should be denied because it goes well beyond what is "necessary to provide complete relief" to GE for its trade secret claims even under its overall theory of the case. *Kentuckians for the Commonwealth, Inc. v. Rivenburgh*, 317 F.3d 425, 436 (4th Cir. 2003). Both Article III and established principles of equity require that injunctive relief is "limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)). Injunctions must be no broader than "necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).

GE's requested injunction seeks to restrict SEI's ability to compete on different projects involving different turbine models without considering the scope of the potential harm at issue. Specifically, GE's proposed injunction would restrict any employees who "**_had_** access to"[15] alleged trade secrets involving any gas turbine model from working on future projects "related to" the equipment and services at issue in GE's Dominion Peakers Project bid, as well as all projects on which SEI is bidding its "SGT6-8000H, SGT6-5000F, SGT6-A65, SGT-800, or SGT6-2000e gas turbine units"—including "later-developed models of comparable outputs" through June 2023. (GE Proposed Order at 5.)

GE's broadly-worded injunction would sideline SEI employees from working on future gas turbine projects irrespective of whether an individual actually reviewed information about a particular GE turbine model, the level of information reviewed, and whether that information was actually a trade secret or publicly available. SEI has firewalled all employees who saw information about GE's ▮▮▮▮▮▮▮▮ model from working on new projects involving SEI's corresponding SGT6-5000F model, and has firewalled the only two employees who saw information about GE's ▮▮▮▮▮▮▮▮ models from bidding on projects involving those models as well. An employee who only saw alleged trade secrets regarding GE's ▮▮▮ ▮▮▮ should not be barred from working on projects involving entirely different products—such as GE's ▮▮▮▮▮▮ models. But that is precisely what GE seeks.

GE's requested injunction is also not defined with the requisite specificity. Although GE's proposed order describes five specific models—the SGT6-5000F, SGT6-8000H, SGT-A65 (misnamed in GE's papers as the "SGT6-A65"), SGT-800, and SGT6-2000E—it also seeks to

---

[15] Notably, GE's requested injunction would go beyond employees who previously "accessed" GE information, and is also broader than a typical preliminary injunction that would prevent employees only from "accessing" that information in the future following an injunction.

restrict work on future projects "related to" the equipment and services at issue in GE's Dominion

Peakers Project bid, and then goes further still by covering "later-developed models of comparable

outputs." (GE Proposed Order at 5.) While GE no doubt requested this language to benefit from

the ambiguity it would create and thereby obtain an unfair competitive advantage against SEI, it

conflicts with the settled principle that an injunction must be clear in what it does and does not

prohibit.[16] *See Schmidt v. Lessard*, 414 U.S. 473, 476 (1974); Fed. R. Civ. P 65(d)(1)(B)

(injunction "must … state its terms specifically"). Moreover, GE's proposed injunction would

apply to any projects where SEI is proposing one of the turbines identified in the proposed

injunction, without regard to facts such as whether the project is a peakers project like the

Dominion Peakers Project, or whether the project is in a jurisdiction that uses open bidding

processes in which competitors are intentionally informed of everyone else's bidding information.

Beyond GE's failure to meet the standard for a preliminary injunction, preventing SEI employees

from working on all future projects without regard to these and other distinctions overreaches.

GE's proposed injunction does not "carefully address only the circumstances in the case"—which

alone shows why it should not be entered. *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d

111, 128 (4th Cir. 2011).

## VI.    GE IS REQUIRED TO POST A BOND.

GE's proposed order ignores settled law by seeking interim, business-altering relief

without requiring GE to post a bond. Rule 65(c) is unambiguous: "The court may issue a

preliminary injunction or a temporary restraining order only if the movant gives security in an

---

[16] For example, SEI's newest flagship model, the SGT5-9000HL, is a new class of turbine with a maximum output of ***593 MW***—24% higher than the SGT6-8000H's 450 MW output. (Bedont Decl. ¶ 134.) It is a brand-new product that has no "comparable output" to anything that GE or SEI proposed on the Dominion Peakers Project.

amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."   Fed. R. Civ. P. 65(c).   GE makes passing reference to this requirement in its proposed order, suggesting that because the proposed injunction "will pose no hardship, burden, costs, or risk of harm to Siemens … GE will not be required to provide security pursuant to Fed. R. Civ. P. 65(c)."   (GE Proposed Order at 6.)   No such exception exists under Rule 65, and the Fourth Circuit has squarely held that the "[f]ailure to require a bond before granting preliminary injunctive relief is reversible error."   *District 17, United Mine Workers of Am. v. A&M Trucking, Inc.*, 991 F.2d 108, 110 (4th Cir. 1993).

There are sound reasons for the bond requirement.   Courts recognize that an erroneously granted injunction can impose significant harm on the defendant.   The bond therefore provides compensation for a defendant that has been wrongfully enjoined.   *See W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 770 n.14 (1983) ("A party injured by the issuance of an injunction later determined to be erroneous has no action for damages in the absence of a bond.").   The bond requirement also deters rash applications for preliminary injunctions and ensures that parties only ask for such extraordinary relief when they have a strong basis for doing so—and are willing to back it up if they are wrong.   *See Edgar v. MITE Corp.*, 457 U.S. 624, 649 (1982).

GE all but ignores the bond requirement because it is well aware that the financial impact to SEI of an improperly-entered injunction—and thus, the required bond—would be in the hundreds of millions of dollars.   The Court should deny the injunction motion, but if one were to issue, the Court should require that GE post a substantial bond.

## CONCLUSION

For the foregoing reasons, GE's Motion for a Preliminary Injunction should be denied.

Dated:  March 9, 2021

Respectfully submitted,


By: */s/ Heidi E. Siegmund*
Richard Cullen (VSB No. 16765)
Brian C. Riopelle (VSB No. 36454)
Rodney A. Satterwhite (VSB No. 32907)
Heidi E. Siegmund (VSB No. 89569)
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, Virginia 23219
Phone: (804) 775-1009
Fax: (804) 698-2035
rcullen@mcguirewoods.com
briopelle@mcguirewoods.com
rsatterwhite@mcguirewoods.com
hsiegmund@mcguirewoods.com


Gregg F. LoCascio, P.C. (VSB No. 38908)
Edwin John U, P.C. (admitted *pro hac vice*)
Sean M. McEldowney (admitted *pro hac vice*)
Patrick Haney (admitted *pro hac vice*)
Alexandra I. Russell (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5000
gregg.locascio@kirkland.com
edwin.u@kirkland.com
sean.mceldowney@kirkland.com
patrick.haney@kirkland.com
alexandra.russell@kirkland.com


Eugene F. Assaf, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
eugene.assaf@kirkland.com

*Counsel for Defendant Siemens Energy, Inc.*

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that on the 9th day of March 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

*/s/Heidi E. Siegmund*