IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| GENERAL ELECTRIC COMPANY,<br><br>                    Plaintiff,<br><br>          v.<br><br>SIEMENS ENERGY, INC.,<br><br>                    Defendant. | Case No. 3:21-cv-00025 (JAG) |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

Dana D. McDaniel (VSB No. 25419)
Edward E. Bagnell, Jr. (VSB No. 74647)
Spotts Fain, P.C.
411 East Franklin Street, Suite 600
Richmond, Virginia 23219
Phone: (804) 697-2000
Fax: (804) 697-2100
dmcdaniel@spottsfain.com
ebagnell@spottsfain.com

Brad S. Karp (*pro hac vice*)
Brette Tannenbaum (*pro hac vice*)
Paul, Weiss, Rifkind, Wharton
  & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000
bkarp@paulweiss.com
btannenbaum@paulweiss.com

Karen L. Dunn (*pro hac vice*)
Paul, Weiss, Rifkind, Wharton
  & Garrison LLP
2001 K Street, NW
Washington, DC 20006
(202) 223-7300
kdunn@paulweiss.com

*Attorneys for Plaintiff General Electric Company*

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ............................................................................................ 1

I.  GE'S REQUESTED INJUNCTIVE RELIEF IS APPROPRIATE ................................... 6

    A.  An Order Enforcing Siemens' Remedial Measures Is Warranted. ........................ 6

    B.  Siemens Employees Exposed to GE's "F-Class" Trade Secrets Should Be
        Firewalled From "F-Class" and "H-Class" Projects. ............................................ 7

    C.  Siemens' Firewalls Should Extend Until Final Judgment or June 30, 2022. ......... 9

II. GE HAS SATISFIED THE REQUIREMENTS FOR INJUNCTIVE RELIEF .............. 10

    A.  GE Has Shown a Likelihood of Success on the Merits. ...................................... 10

        1.  GE Has Shown Past and Threatened Future Misappropriation. ............... 10

        2.  GE Has Shown the Existence of Trade Secrets. ..................................... 11

    B.  GE Has Shown Irreparable Injury ....................................................................... 12

    C.  The Balance of the Equities Favors an Injunction. ............................................. 18

    D.  The Public Interest Favors an Injunction. ........................................................... 19

    E.  GE's Requested Relief Is Sufficiently Specific. ................................................. 19

III. GE SHOULD NOT HAVE TO PAY A BOND ............................................................. 19

CONCLUSION ................................................................................................................... 20

## **TABLE OF AUTHORITIES**

**Page(s)**

CASES

*Advanced Instructional Sys., Inc.* v. *Competentum USA, Ltd.*,
No. 1:15-cv-858, 2015 WL 7575925 (M.D.N.C. Nov. 25, 2015) ...........................................13

*API Tech. Servs., LLC* v. *Francis*,
No. 4:13-cv-142, 2013 WL 12131381 (E.D. Va. Dec. 4, 2013)............................................14

*Arminius Schleifmittel GmbH* v. *Design Indus., Inc.*,
No. 1:06-cv-00644, 2007 WL 534573 (M.D.N.C. Feb. 15, 2007) .........................................15

*BP Chemicals Ltd.* v. *Formosa Chem. & Fibre Corp.*,
229 F.3d 254 (3d Cir. 2000)...................................................................................................17

*Brightview Grp., LP* v. *Teeters*,
441 F. Supp. 3d 115 (D. Md. 2020) ...................................................................................6, 11

*Candle Factory, Inc.* v. *Trade Assocs. Grp., Ltd.*,
23 F. App'x 134 (4th Cir. 2001) .............................................................................................20

*CG Riverview, LLC* v. *139 Riverview, LLC*,
No. CL16-5083, 2018 WL 8798547 (Va. Cir. Ct. Jan. 9, 2018) ...........................................12

*ClearOne Commc'ns, Inc.* v. *Chiang*,
608 F. Supp. 2d 1270 (D. Utah 2009)...................................................................................6, 7

*Consumers Union of U.S., Inc.* v. *Admiral Corp.*,
186 F. Supp. 800 (S.D.N.Y. 1960).........................................................................................18

*Earthbound Corp.* v. *MiTek USA, Inc.*,
No. C16-1150 RSM, 2016 WL 4418013 (W.D. Wash. Aug. 19, 2016)................................10

*FMC Corp.* v. *Varco Int'l, Inc.*,
677 F.2d 500 (5th Cir. 1982) .................................................................................................10

*Forestry Sys., Inc.* v. *Coyner*,
No. 1:11-cv-295, 2011 WL 1457707 (M.D.N.C. Apr. 15, 2011)...........................................18

*Freedom Med., Inc.* v. *Sewpersaud*,
No. 6:20-cv-771, 2020 WL 8370952 (M.D. Fla. May 6, 2020) .............................................15

*Goken Am., LLC* v. *Bandepalya*,
No. 2:14-cv-1445, 2014 WL 6673830 (S.D. Ohio Nov. 24, 2014) ........................................17

*Harvey Barnett, Inc.* v. *Shidler*,
338 F.3d 1125 (10th Cir. 2003) .............................................................................................12

**TABLE OF AUTHORITIES**
(Continued)

**Page(s)**

*Hess Newmark Owens Wolf, Inc.* v. *Owens*,
    415 F.3d 630 (7th Cir. 2005) ............................................................................13, 15

*Hoechst Diafoil Co.* v. *Nan Ya Plastics Corp.*,
    174 F.3d 411 (4th Cir. 1999) ............................................................................20

*Hoffman Engineering Corp.* v. *Piscitelli*,
    No. 3:07-cv-147, 2007 WL 2021965 (W.D.N.C. July 11, 2007) ............................13

*Inventus Power* v. *Shenzhen Ace Battery Co., Ltd.*,
    No. 20-cv-3375, 2020 WL 3960451 (N.D. Ill. July 13, 2020) ................................15

*Juniper Entm't, Inc.* v. *Calderhead*,
    No. CV-07-2413-ADS-AKT, 2007 WL 9723385 (E.D.N.Y. Aug. 17, 2007).........................10

*Kewanee Oil Co.* v. *Bicron Corp.*,
    416 U.S. 470 (1974)..........................................................................................19

*Krueger Int'l, Inc.* v. *Nightingale Inc.*,
    915 F. Supp. 595 (S.D.N.Y. 1996)......................................................................17

*Life Spine, Inc.* v. *Aegis Spine, Inc.*,
    No. 19-cv-7092, 2021 WL 963811 (N.D. Ill. Mar. 15, 2021) ................................15

*Lone Star Steakhouse & Saloon, Inc.* v. *Alpha of Va., Inc.*,
    43 F.3d 922 (4th Cir. 1995) ..............................................................................13

*Magnussen Furniture, Inc.* v. *Collezione Europa USA, Inc.*,
    No. 96-1917, 1997 WL 337465 (4th Cir. June 19, 1997) (unpublished).................17

*Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Bradley*,
    756 F.2d 1048 (4th Cir. 1985) ..........................................................................18

*Monovis, Inc.* v. *Aquino*,
    905 F. Supp. 1205 (W.D.N.Y. 1994)...................................................................10

*Novozymes A/S* v. *Danisco A/S*,
    No. 10-CV-251-BBC, 2010 WL 3783682 (W.D. Wis. Sept. 24, 2010) ................17

*Optos, Inc.* v. *Topcon Med. Sys., Inc.*,
    777 F. Supp. 2d 217 (D. Mass. 2011) ................................................................15

*PeopleStrategy Inc.* v. *Lively Emp'r Servs., Inc.*,
    No. 3:20-cv-2640, 2020 WL 7237930 (D.N.J. Dec. 9, 2020) .............................13

## TABLE OF AUTHORITIES
### (Continued)

<u>Page(s)</u>

*PepsiCo, Inc.* v. *Redmond*,
No. 94 C 6838, 1996 WL 3965 (N.D. Ill. Jan. 2, 1996) ........................................................14

*Peraton, Inc.* v. *Raytheon Co.*,
No. 1:17-cv-979, 2017 WL 11501665 (E.D. Va. Nov. 7, 2017) .................................12, 13, 15

*Quince Orchard Valley Citizens Ass'n, Inc.* v. *Hodel*,
872 F.2d 75 (4th Cir. 1989) ........................................................................17

*Salient CRGT, Inc.* v. *Sols. by Design II, LLC*,
No. 1:20-cv-236, 2020 WL 3550008 (E.D. Va. Apr. 2, 2020) ................................12

*SBM Site Servs., LLC* v. *Garrett*,
No. 10-cv-00385, 2011 WL 7563785 (D. Colo. June 13, 2011) .................................13, 14, 20

*Scotts Co.* v. *United Indus. Corp.*,
315 F.3d 264 (4th Cir. 2002) ........................................................................19

*Smithfield Packaged Meats Sales Corp.* v. *Dietz & Watson, Inc.*,
452 F. Supp. 3d 843 (S.D. Iowa 2020) .............................................................14

*Splitfish AG* v. *Bannco Corp.*,
727 F. Supp. 2d 461 (E.D. Va. 2010) ...............................................................17

*WHIC LLC* v. *NextGen Lab'ys, Inc.*,
341 F. Supp. 3d 1147 (D. Haw. 2018) ...............................................................13

*Xantrex Tech. Inc.* v. *Advanced Energy Indus., Inc.*,
No. 07-CV-2324, 2008 WL 2185882 (D. Colo. May 23, 2008)..............................15

### OTHER AUTHORITIES

Brief of Appellants, *Siemens USA Holdings, Inc.* v. *Geisenberger*,
No. 20-2991, 2020 WL 6866789 (3d Cir. Nov. 19, 2020) ........................................17

Fed. R. Civ. P. 26(f)........................................................................................5

## GLOSSARY

| Term | Definition |
| --- | --- |
| "Ans." | *Siemens Energy, Inc.'s Answer and Defenses to GE's Complaint*, ECF No. 40 |
| "GE Br." | *Memorandum of Law in Support of Plaintiff's Motion for a Preliminary Injunction*, ECF No. 32 |
| "GE Ex. __" | The exhibits attached to the *Declaration of Brette Tannenbaum*, ECF No. 32-3, and the *Rebuttal Declaration of Brette Tannenbaum* (being filed herewith) |
| "Opp." | *Siemens Energy, Inc.'s Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction*, ECF No. 43 |
| "SEI Ex. __" | The exhibits attached to the *Declaration of Alexandra I. Russell*, ECF No. 43-2 |
| "Wilner Reply Decl." | *Rebuttal Declaration of Katy Wilner* (being filed herewith) |
| "Young Reply Decl." | *Rebuttal Declaration of Russell Young* (being filed herewith) |

## PRELIMINARY STATEMENT

Ever since May 2019, when it orchestrated a brazen theft of GE's confidential trade secrets, disseminating and exploiting them throughout its organization (including senior executives), Siemens has tried to cover its tracks and obfuscate the gravity of its offenses, concealing its misconduct for 16 months and then repeatedly dissembling as it concocted its "story." Siemens' opposition doubles down on this gambit by misrepresenting the facts, but the evidence exposes the truth and confirms why GE's motion for a preliminary injunction should be granted.

**Siemens would have this Court believe that GE's trade secrets were mostly public and not valuable—but that is not true.** (Opp. at 6–11.) Try as it might, Siemens cannot credibly dispute that the majority of the information it received about GE's gas turbines is confidential and competitively valuable, which is why Siemens disseminated it so broadly and used it so extensively. It is undisputed that at least *37* Siemens employees received GE's trade secrets. These employees knew they should not have had GE's confidential materials, even warning their colleagues to "not forward" the information. (GE Ex. 50.) It is also undisputed that these employees used GE's confidential pricing information to *adjust Siemens' bid price downward* and undercut GE's bid. (GE Exs. 30, 31, 37, 38, 43, 53.) This fraud was executed at the highest levels of Siemens' organization. Approval of Siemens' price reduction was obtained from ███; Karim Amin, CEO of Siemens' Power Generation division; Tim Holt, then COO of Siemens Gas and Power and now a member of Siemens' Executive Board; and █████████████. (GE Exs. 30, 43.) Siemens won the contracts in question, worth at least $225 million.

Siemens then continued to use GE's trade secrets to unfairly compete against GE on additional projects, including a gas turbine contract with Florida Power & Light in June 2019 (GE

Exs. 4, 48) and a different project in February 2020 (GE Exs. 4, 34).  This unrebutted evidence of past misconduct demonstrates that, if given the opportunity to further exploit GE's trade secrets, Siemens will do so.  Between May 2019 and September 2020—the 16-month period while in possession of GE's confidential data before its disclosure to GE—Siemens won at least eight gas turbine projects, worth more than $1 billion in revenue, over GE's competing bids.  (Wilner Decl. ¶ 23.)  And GE and Siemens are set to compete for many more projects involving the turbine models at issue, involving billions and billions of dollars.

**Siemens would have this Court believe that it promptly disclosed its misappropriation to GE—but that is not true.**  (Opp. at 2–4, 18–20.)  Siemens represents that it first "discovered" its misappropriation during an "unrelated internal review" in 2020.  (Ans. ¶ 99; Opp. at 2.)  But not even Siemens' own declarant, James Bedont, can say when or why that review was initiated.  Regardless, how can Siemens claim to have "discovered" its misconduct in 2020 when at least 37 of its employees, including two of its most senior executives, knew about the misappropriation in *May 2019*?  Siemens conspicuously provides no explanation for its decision to wait *16 months* to "voluntarily" disclose its misconduct—and now has the audacity to mischaracterize GE's trade secrets as "stale."  The most obvious explanation for Siemens' delay is self-interest:  Siemens wanted to protect the lucrative Dominion deal (it disclosed its misconduct to GE only after that deal was canceled), ward off litigation and bad press until its spin-off from its parent company was finalized in September 2020, and use GE's trade secrets for its own competitive advantage for as long as it could.  In the meantime, Holt was promoted to Siemens' Executive Board.

**Siemens would have this Court believe that GE "sat on its hands" upon learning of Siemens' misappropriation—but that is not true.**  (Opp. at 3–4, 18–20.)  The undisputed facts show that GE took decisive action upon learning of Siemens' misconduct.  Siemens' initial letter,

which GE received on September 14, 2020, contained no information about the nature of GE's stolen information, which Siemens employees were involved, when Siemens discovered its misconduct, or what remedial and disciplinary action Siemens had taken.  (GE Ex. 18.)  GE promptly retained outside counsel, investigated the issues, and sent a series of follow-up questions and demands to Siemens on October 20, 2020.  (GE Ex. 19.)  When Siemens refused to provide basic facts that GE needed to evaluate Siemens' remedial measures, GE continued to press its requests.  (GE Exs. 20, 21.)  Finally, *on November 27, 2020*, Siemens produced 528 pages of documents and a (purportedly complete) list of Siemens employees who received GE's confidential information.  This gave GE its first glimpse of the egregious, wide-ranging nature of Siemens' misappropriation, including its repeated use of GE's information to adjust bids—a fact Siemens had not previously shared.  GE did not engage further before filing suit six weeks later.

**Siemens would have this Court believe that it immediately took extensive remedial measures and completed them months ago—but that is not true.**  (Opp. at 2–7.)  The undisputed facts show that Siemens' remediation was deficient from the outset.  Since GE filed its complaint, Siemens has continued to disclose new, constantly shifting details that demonstrate the inadequacy of its prior remedial steps.  For example, Siemens touts its "disciplinary actions," but refused for months on privilege grounds to tell GE which employees, if any, it terminated.  We now know why.  Siemens' March 1, 2021 Answer disclosed that Siemens terminated just six of the dozens of employees who accessed GE's trade secrets.  Yet the most senior and most culpable wrongdoers—including Hillen, Sharifi, Amin, Holt, and ███████—all were retained and, in Holt's case, promoted to the Executive Board.

Equally misleading, Siemens represented in September 2020 that it had "sequestered and removed" GE's information, such that "any employee who had access to the GE information

cannot access or use the information in future projects." (GE Ex. 18.)  In October, Siemens provided GE an under-oath declaration stating that this removal process, including "screen share sessions in which we directed the employees to complete the deletion process in our presence," was "now complete." (GE Ex. 21, Ex. B ¶¶ 29–30.)  These representations, designed to lull GE into forgoing injunctive relief, were false.  Siemens' documents show that the "screen share sessions" remained ongoing *a month later*, on November 24, when a key wrongdoer, Mehran Sharifi, still had one of the original emails containing GE trade secrets in his inbox.  (GE Ex. 44.)

Siemens also misrepresented the sufficiency of its voluntary "firewall."  In October 2020, Siemens agreed only to wall off employees from F-class turbine projects (GE Ex. 21), a position from which it refused to budge (SEI Ex. 1), even though at least Hillen and Sharifi received information about GE's H-class and aeroderivative turbines as well.  Now, Siemens claims that no further relief is necessary because Hillen and Sharifi are walled off from F-class, H-class, and aeroderivative projects.  (Opp. at 5.)  Siemens never "picked up the phone" to tell GE that before filing its opposition.  Even more concerning is Siemens' disclosure that, on February 10, 2021, months after its remediation was "complete," it firewalled 22 employees—including *17 additional employees never before identified to GE*—from F-class, H-class, and aeroderivative projects, indefinitely.  (Bedont Decl. Ex. A.)  Because this latest firewall largely concedes the appropriateness of GE's requested relief, Siemens buries it in its papers without explanation.  On March 22, 2021, and only after GE followed up, Siemens disclosed for the first time that these 17 employees had access to databases that contained GE's confidential information.  (GE Ex. 55.)

It is undisputed that Siemens misappropriated GE's confidential bidding information, terminated six employees, and voluntarily implemented restrictions on dozens of other employees who had access to GE's confidential information.   By Siemens' own account, further

misappropriation is being prevented only by its remedial measures.  There remain just two disputes for resolution:  (i) whether Siemens' remedial measures are sufficient, and (ii) whether Siemens should be trusted to enforce those (or enhanced) measures itself or be subject to a court order.

On the first issue, it is now clear that *54* Siemens employees (48, current) accessed or had access to GE's trade secrets, and only 22 are fully prevented from using those trade secrets to Siemens' competitive advantage.  Although Siemens' newly expanded firewall—assuming it is actually in place as described—provides GE part of the relief sought by this motion, it is insufficient because 26 tainted employees are subject only to Siemens' narrow "F-class" firewall, and only for three more months, until June 2021, even though GE's "F-class" turbine trade secrets continue to be valuable and can be used to derive competitively valuable information about its H-class turbines beyond that date.  (Young Reply Decl. ¶¶ 23, 35.)  And on the second issue, Siemens' persistent misrepresentations about its remedial measures underscore the need for a court order.

GE therefore requests that this Court enter a preliminary injunction to enforce Siemens' existing remedial measures, subject to just two modest extensions:  (1) all Siemens employees who had access to trade secrets regarding GE's "F-class" turbines should be prohibited from participating in projects involving "H-class" turbines, which use the same underlying technology; and (2) all remedial measures should remain in place for the duration of this lawsuit or until June 30, 2022, whichever comes first.  A new proposed order reflecting this relief is attached.[1]

The modest additional relief GE seeks is reasonable, narrowly tailored, and satisfies all four requirements for a preliminary injunction.  GE will succeed in demonstrating not just Siemens' past misappropriation (which is conceded), but also Siemens' threatened

---

[1]   Once the parties meet and confer pursuant to Rule 26(f), GE intends to seek discovery into Siemens employees' access to confidential information about GE's aeroderivative turbines, so that it can seek an expanded firewall, if necessary, on a more developed record.

misappropriation, which is being prevented only by reason of its own remedial measures.  GE has also shown irreparable harm.  Siemens does not dispute that it won the Peakers Project and at least eight other projects over GE's competing bid while in possession of GE's confidential trade secrets, or that it will continue to regularly compete with GE for gas turbine projects, including several upcoming F-class and H-class projects.  Siemens' continued misuse of GE's trade secrets on those projects threatens GE's customer relationships and ability to fairly compete, which cannot be compensated with money damages alone.  The equities and the public interest tilt decidedly in favor of the injunction, given Siemens' corresponding failure to show any harm (which also obviates the need for a bond).  Siemens' claim that an injunction would deter competition fails; a tailored injunction would merely prohibit Siemens employees with knowledge of GE's trade secrets from participating in bidding processes, precisely the sort of unethical conduct that trade secret law is designed to prevent.

For these reasons, and those set forth in GE's opening brief, the Court should issue a preliminary injunction order substantially in the form attached hereto.

## ARGUMENT

## I.  GE'S REQUESTED INJUNCTIVE RELIEF IS APPROPRIATE

### A.  An Order Enforcing Siemens' Remedial Measures Is Warranted.

As explained above, Siemens' conduct follows a disturbing pattern:  Siemens offers incomplete or inaccurate disclosures and half-baked remedial measures and, only when pressed, relents and gives a bit more—but still far less than what is required to protect GE's trade secrets. In light of this ongoing pattern, we do not believe Siemens can police itself.  *See, e.g.*, *Brightview Grp., LP* v. *Teeters*, 441 F. Supp. 3d 115, 140 (D. Md. 2020) (assurances that defendants deleted plaintiff's trade secret information did not eliminate a "cognizable danger of [a] recurrent violation" (quotation marks omitted)); *ClearOne Commc'ns, Inc.* v. *Chiang*, 608 F. Supp. 2d 1270,

1279–81 (D. Utah 2009) (defendants' claim to have stopped using plaintiff's trade secrets did not eliminate imminent threat of irreparable harm).  Indeed, Siemens is likely to abandon these undertakings if the Court denies injunctive relief.  Thus, the Court should order Siemens to maintain the remedial measures it says it has implemented.

    **B.**    **Siemens Employees Exposed to GE's "F-Class" Trade Secrets Should Be Firewalled From "F-Class" and "H-Class" Projects.**

After this motion was filed (21 months after first receiving GE's trade secrets), Siemens put in place a two-tiered "firewall":  (i) 26 employees are barred from working on projects related to Siemens' F-class turbine, the SGT6-5000F; and (ii) 22 employees are more broadly walled off from projects involving the F-class turbine (SGT6-5000F) and four other turbines, the SGT6-8000H (H-class turbine), SGT-A65 (aeroderivative turbine), SGT-800 (industrial turbine), and SGT6-2000E (E-class turbine).  (Bedont Decl. ¶ 15 & Ex. A.)  While this is a step in the right direction, the 26 employees walled off from F-class projects also should be walled off from H-class projects to protect GE's ability to fairly compete.

Gas turbine engineers can use their expertise to analyze data from competitors' bid packages and extrapolate how a competitor will bid either the same or *similar* turbines for other projects.  (Young Decl. ¶¶ 38–40; Young Reply Decl. ¶¶ 13–23.)  For example, an engineer who knows a competitor bid's output capacity, emissions levels, and pricing for a specific past project can estimate how those numbers will change in future bids based on differences in the elevation and ambient temperature of the relevant power plants.  (Young Reply Decl. ¶ 14.)  It is especially easy to extrapolate such information across classes of heavy-duty turbines such as F-class and H-class machines, as the H-class turbine is the direct technological descendent of the F-class turbine and shares many of the same designs.  (*Id.* ¶¶ 22–23.) ██████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████.  (*See* GE Ex. 35; SEI Ex. 1.)  Siemens employees

indisputably found this information important, which is why they retained, analyzed, and

disseminated the information.  If that information were really stale, why would Siemens continue

to wall off more and more employees, notwithstanding its supposed deletion of these materials?

Siemens claims extrapolation is unlikely, but its only evidence, the declaration of

Mr. Bedont, is unpersuasive.  Mr. Bedont suggests that data about GE's heavy-duty turbines

cannot be extrapolated to its aeroderivative turbines, but GE is no longer asking for that relief.

(Bedont Decl. ¶¶ 97–108.)  GE seeks only to expand Siemens' F-class firewall to include related

H-class projects—and Mr. Bedont offers no persuasive explanation for why F-class data cannot

be extrapolated to H-class turbines.  Mr. Bedont also misses the mark when he asserts that "[e]very

project is unique and is evaluated on unique customer criteria."  (*Id.* ¶ 110; *see id.* ¶¶ 109–115.)

To be sure, each turbine project is different, and GE does not deny that manufacturers customize

turbines' technical specifications and pricing to fit each customer's project-specific needs.  (Young

Reply Decl. ¶ 12.)  But that is precisely why GE's trade secrets are so valuable:  because each bid

is different, manufacturers have a huge leg-up if they can predict how their competitors will bid.

Turbine engineers who work on bid packages can do just that, performing sophisticated

competitive analyses that can dramatically improve a manufacturer's confidence level about how

a competitor will bid for other projects.  (*Id.* ¶¶ 13–18.)

Nor is this extrapolation process "speculative," as Siemens claims.  Siemens argues that

manufacturers cannot calculate with exact precision how a competitor will bid (Opp. at 9), but it

cannot dispute that extrapolated estimates still have great competitive significance.  Even if a

manufacturer cannot predict exactly how a competitor will bid, the ability to narrow a competitor's

8

key bid terms to a smaller range is hugely beneficial.  (Young Reply Decl. ¶ 18.)

      For proof, look no further than Siemens' own conduct in this matter.  Its engineers and salespeople used GE's trade secrets to engage in precisely the sorts of purportedly "speculative" competitive analyses Siemens now derides as useless.  (*See* GE Ex. 33 (analysis by Siemens engineer of "a few not apples to apples comparisons" of the Peakers Project bid proposals); GE Ex. 47 (email from Siemens salesperson attaching his "assumptions and formulas" about the bid proposals).)  Siemens employees also used GE's confidential data to improve their bid packages for at least two other projects.  (*See* GE Exs. 34, 48.) ████████████████████████████
████████████████████.  (GE Ex. 35.)  This evidence from Siemens' own files underscores why Siemens employees who had access to confidential GE F-class turbine data should not be permitted to work on projects for the similar H-class turbines.

### C.   Siemens' Firewalls Should Extend Until Final Judgment or June 30, 2022.

      Given the ongoing competitive value of GE's misappropriated trade secrets, Siemens should be required to maintain these remedial measures during the pendency of this litigation or until June 30, 2022, whichever is earlier.  While Siemens makes the general assertion that GE's trade secrets are "dated" because turbine technology is "rapidly evolving" (Opp. at 12, 15, 23), it provides no factual support for its claim that GE's trade secrets become stale after only two years.  That simply is not true.  (Young Reply Decl. ¶¶ 34–35.)  A competitor's turbine bidding data is valuable for at least as long as that turbine retains its core technical composition and performance characteristics—which is years after being brought to market.  (*Id.*)  This is especially true of mature turbine technologies such as those in the F-class.  (*Id.* ¶ 34.)

      Siemens' "two-year" firewall is also misleading.  Siemens' F-class firewall was not implemented until September 2020 and will expire in June 2021, after only nine months.  Unless Siemens is compelled to extend its wall-off, every Siemens employee with knowledge of GE's

trade secrets will be free to bid on projects involving the same or related turbines three months from now, when those trade secrets will still be competitively valuable.

## II.     GE HAS SATISFIED THE REQUIREMENTS FOR INJUNCTIVE RELIEF

### A.     GE Has Shown a Likelihood of Success on the Merits.

#### 1.     *GE Has Shown Past and Threatened Future Misappropriation.*

Siemens concedes its misappropriation of GE's trade secrets, but argues that GE has only shown past, not future, misappropriation.  But 48 of its employees have accessed GE's trade secrets, and Siemens' remedial measures—which cannot be trusted in the absence of a court order—prohibit only 22 from participating in all projects where those trade secrets could be used. Courts recognize that employees—even acting in good faith—will likely use a competitor's trade secrets if left in a position to do so.  *See, e.g.*, *FMC Corp.* v. *Varco Int'l, Inc.*, 677 F.2d 500, 504 (5th Cir. 1982) ("Even assuming the best of good faith, Witt will have difficulty preventing his knowledge of [plaintiff's] manufacturing techniques from infiltrating his work.").[2]  And while Siemens mischaracterizes GE's request as based on its employees' "mere knowledge" of GE's trade secrets (Opp. at 14), courts have held that knowledge of a competitor's bidding information warrants an injunction to prevent further misappropriation where, as here, there is an undisputed record of extensive prior use.  *See Earthbound Corp.* v. *MiTek USA, Inc.*, No. C16-1150 RSM, 2016 WL 4418013, at *10 (W.D. Wash. Aug. 19, 2016) (injunctive relief granted when defendants used trade secret information to underbid plaintiff on past project); (*see also* GE Ex. 35).

---

[2]   *See also Juniper Entm't, Inc.* v. *Calderhead*, No. CV-07-2413-ADS-AKT, 2007 WL 9723385, at *23 (E.D.N.Y. Aug. 17, 2007) ("[K]nowledge of a customer's pricing information in the context of bidding is extremely potent in the hands of a competitor and such knowledge has been held to constitute a trade secret protectible by an injunction."); *Brightview*, 441 F. Supp. 3d at 140 (finding deletion efforts insufficient because if defendants "committed [plaintiff's] trade secrets and/or proprietary information from the contested . . . documents to memory, that information remains accessible to them, despite the emails' deletion"); *Monovis, Inc.* v. *Aquino*, 905 F. Supp. 1205, 1234 (W.D.N.Y. 1994).

### 2.      GE Has Shown the Existence of Trade Secrets.

Siemens suggests the GE information it misappropriated deserves no trade secret protection because some of it is publicly available.  (Opp. at 6.)  This argument is belied by the "extensive" remedial steps Siemens already has taken.  And Siemens does not, and cannot, dispute that the overwhelming majority of trade secrets at issue are confidential technical specifications and pricing for GE's turbine units and proposed services—the very basis on which GE and Siemens compete against each other for projects.  (*See* GE Exs. 23–27.)

Siemens points to just two small sets of data as "publicly available":  maintenance-related data in a ████████████████████████, and turbine emissions data.  (Opp. at 6.)  The maintenance data are immaterial:  while some specific data points about the service agreement are publicly available, the rest are not.  For example, documents sent to Hillen included a ██████ ███████████████████████████████████████████████████████████████████████ ████.  (*See* GE Ex. 26.)  Siemens does not dispute that this analysis was highly confidential. Indeed, its employees repeatedly used these data to analyze and improve Siemens' bids for the Peakers Project and other projects.  (*See* GE Exs. 33, 41, 50.)

Siemens' argument that GE's emissions data are publicly available rests on a misunderstanding of that data.  While certain baseline emissions levels are public, turbines' real-world emissions levels vary from project to project, depending on the turbines' firing temperatures. (Young Reply Decl. ¶ 9.)   A competitor's project-specific emissions levels, especially when combined with project-specific output capacity and pricing, are highly valuable and far more useful for competition purposes than the baseline emissions levels.  (*Id.* ¶ 10.)  ████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ██████.  (GE Ex. 32.)

Siemens argues, by analogy, that similar bid turbine data are sometimes made public. (Opp. at 11; Bedont Decl. ¶¶ 116–21.)  It is true that some information from manufacturers' bid packages is published in certain countries and available on manufacturers' websites, in industry publications, or through public records requests.  (Young Reply Decl. ¶¶ 24–25.)  But compared to full bid-package data—like the data Siemens received regarding GE's Peakers Project bid— such public data are high level, incomplete, and of limited use.  (*Id.* ¶ 26.)  Publicly available bid data have often been processed and do not provide the line-by-line technical and pricing inputs in GE's bid packages.  (*Id.* ¶¶ 27–31.)  The latter information is much more valuable to competitors. (*Id.* ¶ 32); *see Harvey Barnett, Inc.* v. *Shidler*, 338 F.3d 1125, 1130 (10th Cir. 2003) (holding that "a trade secret can exist in a combination of characteristics, each of which, considered separately, is in the public domain, but, taken together, may yield a competitive advantage").  Siemens does not contend that all the Peakers Project data it received are available anywhere, nor has it shown that it can replicate these data from public sources.  Perhaps most notably, Siemens has treated such information as highly confidential in its own documents, redacting ***its own*** comparable pricing and technical data when side-by-side with GE's (*see, e.g.*, GE Exs. 30, 32, 33), even in documents produced on an outside attorneys' eyes only basis (GE Exs. 33, 38).

### B.    GE Has Shown Irreparable Injury.

GE has established irreparable injury as a matter of law.[3]  GE faces multiple categories of harm, including to its market standing and customer relationships, that are incalculable and cannot

---

[3]    Multiple state and federal courts have held that irreparable injury is not required to obtain a preliminary injunction under the VUTSA.  *See Peraton, Inc.* v. *Raytheon Co.*, No. 1:17-cv-979, 2017 WL 11501665, at *4 (E.D. Va. Nov. 7, 2017); *Salient CRGT, Inc.* v. *Sols. by Design II, LLC*, No. 1:20-cv-236, 2020 WL 3550008, at *7 (E.D. Va. Apr. 2, 2020); *CG Riverview, LLC* v. *139 Riverview, LLC*, No. CL16-5083, 2018 WL 8798547, at *4–5 (Va. Cir. Ct. Jan. 9, 2018).  While Siemens argues that these cases were incorrectly decided under Fourth Circuit case law, the *Peraton* court was presented with the same argument (*see* GE Ex. 54), and

be adequately remedied by money damages.  These harms are supported by the evidence and, contrary to Siemens' assertions, are far from "speculative."

First, as GE explained in its opening papers, the harm that results from losing a particular gas turbine project is difficult to quantify because it causes broader damage to GE's market standing and reputation, particularly in the period in which that project is awarded.  (Wilner Decl. ¶¶ 20, 24.)  The gas turbine industry is highly concentrated and fiercely competitive.  (Wilner Decl. ¶¶ 1–13.)  Courts have recognized that valuable opportunities in concentrated industries are difficult to replace with damages.  *See Hoffman Eng'g Corp.* v. *Piscitelli*, No. 3:07-cv-147, 2007 WL 2021965, at *3 (W.D.N.C. July 11, 2007) (harm irreparable where defendant sold "only a few" machines so "expensive and specialized that there are only a few companies worldwide that design" them).  These same market features lead industry participants—including customers—to pay close attention to periodic shifts in equipment suppliers' market shares.  When Siemens announced that it had won the Peakers Project, industry analysts immediately reported Siemens' win as a loss by GE, which injured GE's reputation[4] and standing[5] (Wilner Decl. ¶¶ 20, 24)—

---

rejected it.  But the Court need not reach the issue, because GE plainly establishes irreparable injury.

[4]  *See Lone Star Steakhouse & Saloon, Inc.* v. *Alpha of Va., Inc.*, 43 F.3d 922, 938 (4th Cir. 1995) ("[A] finding of irreparable injury ordinarily follows when . . . possible risk to reputation appears."); *PeopleStrategy Inc.* v. *Lively Emp'r Servs., Inc.*, No. 3:20-cv-2640, 2020 WL 7237930, at *5 (D.N.J. Dec. 9, 2020) (holding that "future loss of reputation, trade, or goodwill [. . .] constitutes irreparable injury").  Siemens argues that GE's reputation has already been damaged by a recent SEC settlement.  (Opp. at 24.)  The Court should ignore this obvious cheap shot, which is irrelevant:  a party that has suffered past reputational harm can suffer further harm in the future.

[5]  *See Hess Newmark Owens Wolf, Inc.* v. *Owens*, 415 F.3d 630, 632 (7th Cir. 2005); *WHIC LLC* v. *NextGen Lab'ys, Inc.*, 341 F. Supp. 3d 1147, 1165 (D. Haw. 2018) ("[T]he loss of clients and market share is not economic loss that can be fully compensated by a damage award[.]" (quotation marks omitted)); *Advanced Instructional Sys., Inc.* v. *Competentum USA, Ltd.*, No. 1:15-cv-858, 2015 WL 7575925, at *5 (M.D.N.C. Nov. 25, 2015) (holding "damage that could be done to [plaintiff's] market share and future prospects would be extremely difficult to quantify"); *SBM Site Servs., LLC* v. *Garrett*, No. 10-cv-00385, 2011 WL 7563785, at *5 (D.

harms that courts routinely recognize as irreparable.  Any further use of GE's trade secrets by Siemens to win projects over GE will cause these harms to recur.

Second, such losses also cause irreparable harm to GE's relationship with customers. Customers that have purchased turbines from a manufacturer have powerful incentives to make additional purchases from that same manufacturer.  Customers can use the same spare parts across turbines that are based on the same technology, creating cost savings when purchasing similar turbines from the same manufacturers.  (Wilner Reply Decl. ¶ 5.)  Customers also benefit from having common control systems, control rooms, and operating protocols, which reduce the costs of equipment and employee training.  (*Id.*)  Moreover, manufacturers and power providers have ongoing services relationships, and when a customer buys multiple turbines from one manufacturer, that deepens the service relationship for the benefit of both parties.  (*Id.*)  For all these reasons, a loss on a major gas turbine project negatively affects GE's overall relationship with, and likelihood of winning future projects from, that customer.  (*Id.*; *see also* Wilner Decl. ¶ 7.)  Courts frequently hold that such harms are irreparable because loss of relationships with customers, and accompanying loss of goodwill, cannot be easily quantified.  *See, e.g.*, *API Tech. Servs., LLC* v. *Francis*, No. 4:13-cv-142, 2013 WL 12131381, at *3 (E.D. Va. Dec. 4, 2013) ("When the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied." (internal citation and quotation marks omitted)).[6]

---

Colo. June 13, 2011) (irreparable harm established where plaintiff "face[d] the substantial likelihood that it will lose market share and customer business.  It is difficult to calculate with any precision in monetary terms the damage to SBM in the competitive marketplace"); *PepsiCo, Inc.* v. *Redmond*, No. 94 C 6838, 1996 WL 3965, at *30 (N.D. Ill. Jan. 2, 1996) (holding "competitive position in an industry defies calculation").

[6]   *See also Smithfield Packaged Meats Sales Corp.* v. *Dietz & Watson, Inc.*, 452 F. Supp. 3d 843, 864 (S.D. Iowa 2020) (holding that, "while [plaintiff's] lost sales may be quantifiable," "losing

Siemens' arguments against irreparable harm are entirely lacking in merit.  Indeed, these arguments ultimately depend on its claim that its remedial measures are adequate to prevent any further harm to GE.  (*See* Opp. at 7, 20–24.)  But that argument highlights the need for a court order requiring Siemens to continue those measures and extend them appropriately.  Enforcing an employee firewall is an appropriate way to prevent these irreparable harms to GE.  *See Peraton*, 2017 WL 11501665, at *4–5.

Siemens argues that these harms are "speculative" unless GE can show that Siemens might win specific projects in Belgium and Italy.  (Opp. at 21.)  But courts sensibly refuse to impose such a daunting burden on plaintiffs at this early stage.  *See, e.g.*, *Hess Newmark*, 415 F.3d at 632 (rejecting a "legal rule that irreparable injury can be established *only* by a concrete demonstration" of specific loss of business).[7]  Siemens does not (and cannot) deny that GE and Siemens—two leading market participants—will continue to compete for projects involving the turbine models

---

customers—and thus market share—harms [plaintiff's] brand, goodwill, and reputation" irreparably); *Inventus Power* v. *Shenzhen Ace Battery Co., Ltd.*, No. 20-cv-3375, 2020 WL 3960451, at *13 (N.D. Ill. July 13, 2020) ("[T]he potential harm to Plaintiffs is particularly great because their business focuses on fostering long-term relationships with customers who need specially designed products on an ongoing basis."); *Life Spine, Inc.* v. *Aegis Spine, Inc.*, No. 19-cv-7092, 2021 WL 963811, at *22 (N.D. Ill. Mar. 15, 2021) (plaintiff's "showing of loss and potential loss of customers and market share in a context in which those customers would be difficult to win back supports its assertions that it will be irreparably harmed"); *Freedom Med., Inc.* v. *Sewpersaud*, No. 6:20-cv-771, 2020 WL 8370952, at *3 (M.D. Fla. May 6, 2020) ("While loss of money alone isn't typically enough for irreparable injury, loss of customers and goodwill is."); *Optos, Inc.* v. *Topcon Med. Sys., Inc.*, 777 F. Supp. 2d 217, 241 (D. Mass. 2011) (finding that "Defendants' actions [of trying to steal plaintiff's customers] could undermine [plaintiff's] business relationships with its customers and erode [its] market share in a limited market"); *Arminius Schleifmittel GmbH* v. *Design Indus., Inc.*, No. 1:06-cv-00644, 2007 WL 534573, at *6 (M.D.N.C. Feb. 15, 2007) (holding loss of "ongoing, profitable business relationships creates a harm . . . that cannot be easily quantified by this Court").

[7]     *See also Life Spine*, 2021 WL 963811, at *21 (holding plaintiff "is not required to identify the specific business or customers it has lost or might lose" to defendant); *Xantrex Tech. Inc.* v. *Advanced Energy Indus., Inc.*, No. 07-cv-2324, 2008 WL 2185882, at *16 (D. Colo. May 23, 2008) ("Simply because there is no current evidence that customers have been lost, or sales lost, does not mean that irreparable injury is lacking.").

at issue.  (Wilner Reply Decl. ¶¶ 4, 15; ████████████████████████████████

████████████████████████████████████████████████████████████)  GE

specifically identifies █ projects that are being bid now or expected to be bid in April–

October 2021.  (*Id.* ¶¶ 17–29.)  And while Siemens mischaracterizes "most" of these projects as

"preliminary," because no formal RFP has issued (Opp. at 7), equipment suppliers often compile

pre-RFP bids that include turbine pricing and technical specifications.  (Wilner Reply Decl. ¶ 7.)[8]

Ultimately, Siemens nowhere disputes that there are over ██ such projects where GE and Siemens

may compete in the coming months.  (Wilner Decl. ¶ 28; Wilner Reply Decl. ¶ 15.)[9]

████████████████████████████████████████████████████████████

████████████████████████████████████████████████  And we now

know that ***Siemens has received a preliminary indication it will win two of those projects***.

(Wilner Reply Decl. ¶ 11.)

Siemens also asserts that GE cannot show irreparable harm because it "s[at] on its hands"

before pursuing relief.  (Opp. at 3; *see id.* at 18–20.)  The record shows just the opposite.  ***Siemens***

***failed to disclose its misconduct to GE for 16 months, and then stonewalled GE's requests for basic***

***information.***  (*Supra* at pp. 2–3.)  GE acted appropriately:  After Siemens finally provided GE with

a production of (significantly redacted) documents in late November, GE evaluated its claims and

---

[8]   Similarly, while Siemens claims some due dates have passed (Opp. at 8 n.7), competitors continue to make proposals until the project has closed and a "notice to proceed" has issued.  (Wilner Reply Decl. ¶¶ 7, 10.)  None of the Belgium and Italy projects has closed.  (*Id.* ¶ 10.)  In its moving papers, GE also identified the South Carolina RFP issued by Dominion as an example, but that selection process has now ended.  (Young Reply Decl. ¶ 43.)

[9]   As we explained previously, that easily distinguishes this case from the *MHI* litigation, where a preliminary injunction was denied.  (GE Br. at 24 n.8.)  There, MHI "argue[d] that it w[ould] be harmed in competing on future similar projects but ha[d] not directed this Court to any such project that it [was] currently competing against Defendant for or that it reasonably anticipate[d] w[ould] arise in the near future."  (GE Ex. 9 at 10.)  Not so here.

the adequacy of Siemens' remedial measures before bringing suit six weeks later. Multiple courts have concluded that such conduct evinces prudence, not "delay," and does not warrant denial of a preliminary injunction. *See, e.g.*, *Splitfish AG* v. *Bannco Corp.*, 727 F. Supp. 2d 461, 467–68 (E.D. Va. 2010) (granting preliminary injunction in copyright case, even though plaintiffs waited eight months to file their complaint after learning of infringement, where plaintiffs spent that time seeking a resolution and "compil[ing] the evidence necessary" to assert their claims).[10] Siemens itself recently argued in another case that a "showing of irreparable harm is not precluded by a delay in moving for a preliminary injunction." Brief of Appellants at 29, *Siemens USA Holdings, Inc.* v. *Geisenberger*, No. 20-2991, 2020 WL 6866789, at *33 (3d Cir. Nov. 19, 2020).

Finally, Siemens incorrectly suggests that GE's injury can be readily cured by money damages on the ground that GE "quantifie[d] its alleged harm" in Ms. Wilner's declaration. (Opp. at 24.) Ms. Wilner did not purport to give a precise calculation of damages, but merely estimated the revenue associated with several past and future gas turbine projects. (Wilner Decl. ¶¶ 23, 34, 39.) GE faces reputational and other harms that are, by their nature, incalculable. Siemens' own

---

[10] *See also BP Chemicals Ltd.* v. *Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 264 (3d Cir. 2000) (holding that "a delay caused by a plaintiff's good faith efforts to investigate an infringement or to determine how serious an infringement is does not preclude a finding of irreparable harm" (quotation marks omitted)); *Goken Am., LLC* v. *Bandepalya*, No. 2:14-CV-1445, 2014 WL 6673830, at *7–8 (S.D. Ohio Nov. 24, 2014) ("A seven month delay, during which time Goken sought to uncover evidence for its litigation, is common in litigation.").

Siemens' cited cases are inapposite. In one, a citizens' group opposed to construction of a suburban highway waited six months after all necessary approvals had been obtained before filing suit. *Quince Orchard Valley Citizens Ass'n, Inc.* v. *Hodel*, 872 F.2d 75, 79 (4th Cir. 1989). In another, a plaintiff waited two years to bring a suit for copyright infringement. *Magnussen Furniture, Inc.* v. *Collezione Europa USA, Inc.*, No. 96-1917, 1997 WL 337465, at *1 (4th Cir. June 19, 1997) (unpublished); *see also Krueger Int'l, Inc.* v. *Nightingale Inc.*, 915 F. Supp. 595, 612 (S.D.N.Y. 1996) (nine-month delay). There was no comparable delay here. Siemens also cites *Novozymes A/S* v. *Danisco A/S*, No. 10-cv-251-BBC, 2010 WL 3783682 (W.D. Wis. Sept. 24, 2010), but there, the court's discussion of delay was superfluous because it independently found no irreparable harm, *see id.* at *3–4.

arguments prove the point:  It is difficult to show exactly how Siemens employees have used GE's trade secrets in particular projects, which is why Siemens will argue that the harms GE faces—while concrete—may be difficult to calculate using money damages.  The potential challenges of proving money damages are precisely why courts frequently grant injunctions in analogous circumstances.  *See, e.g.*, *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Bradley*, 756 F.2d 1048, 1054 (4th Cir. 1985) ("It may be impossible for the arbitral award to return the parties substantially to the status quo ante because the prevailing party's damages may be too speculative."); *Forestry Sys., Inc.* v. *Coyner*, No. 1:11-cv-295, 2011 WL 1457707, at *2 (M.D.N.C. Apr. 15, 2011) ("[D]issemination of Plaintiff's trade secrets would be irreparable because the extent of the dissemination would be difficult to ascertain and because the monetary harm caused by Plaintiff's loss of commercial advantage could be impossible to quantify.").

## C.     The Balance of the Equities Favors an Injunction.

Siemens does not point to any legitimate harm it would face from the requested injunction, much less any that outweighs the harm to GE if the injunction were denied.  While Siemens argues it will lose the "skills and talents" of certain employees on certain projects (Opp. at 25), Siemens makes no effort to substantiate that supposed harm—which is completely implausible for a company with over 90,000 employees (GE Ex. 22).  Siemens can afford to reassign employees to other projects, and it does not suggest otherwise.  Moreover, Siemens has already put in place many of the requested remedial measures—including those instituted after GE filed this motion.  Siemens would not have undertaken such measures if it thought they would cause it significant harm.  *See Consumers Union of U.S., Inc.* v. *Admiral Corp.*, 186 F. Supp. 800, 801 (S.D.N.Y. 1960) (explaining "if defendant has no intention of" engaging in further wrongdoing, that only means "no injury ensues to it from the granting of the injunction").  Certainly, Siemens does not explain how any such harm would be ***irreparable***—which, as the Fourth Circuit has explained in

18

the very case Siemens relies on, is the only sort of harm that matters for purposes of the balancing of the equities. *Scotts Co.* v. *United Indus. Corp.*, 315 F.3d 264, 285 (4th Cir. 2002).

> **D.      The Public Interest Favors an Injunction.**

The injunction is plainly in the public interest.  Siemens' oratory about potential harms to competition (Opp. at 26–27) is rich coming from a party that orchestrated the theft and widespread dissemination of a competitor's trade secrets, which it proceeded to cover up for 16 months.  There might well be more "competition" if competitors were free to steal each other's trade secrets without consequence, but Congress and the Virginia legislature have found that the benefits of such "competition" (if any) are outweighed by the need to protect innovation and business ethics. *See, e.g.*, *Kewanee Oil Co.* v. *Bicron Corp.*, 416 U.S. 470 (1974).

Of particular importance, trade secret law facilitates the sharing of confidential information among those who need to access it.  *See, e.g.*, *id.* (citing *Wexler* v. *Greenberg*, 160 A.2d 430, 434–435 (Pa. 1960)).  Here, in the absence of robust trade secret protection, bidders like GE would hesitate to share trade secrets with power companies like Dominion, making the bidding process less efficient to the detriment of power companies and, ultimately, citizens who must pay their power bill each month.  Vigorously enforcing the trade secret laws will facilitate the bidding process and restore fair competition in the face of Siemens' misappropriation.

> **E.      GE's Requested Relief Is Sufficiently Specific.**

Siemens complains that GE's requested relief is insufficiently specific.  (Opp. at 27–29). Most of those concerns are mooted by the narrower relief GE is now seeking in light of Siemens' concessions (*see supra* at p. 5).  The only remaining issue concerns GE's request that the injunction cover "later-developed models of comparable outputs" to the five Siemens turbine models at issue. This request was designed to ensure that, if Siemens introduces successor models similar to those specified in the injunction, it cannot evade the injunction by assigning tainted employees to work

on those models.  This is not a baseless or overbroad request:  because the gas turbine market is fluid and new projects come up frequently, the injunction must be flexible enough to prevent Siemens employees from using GE's trade secrets in competing for all bids where they could be competitively valuable.  (Wilner Reply Decl. ¶¶ 6, 15.)  If the Court deems it necessary, GE can propose alternative wording to address any concern about specificity.

## III.    GE SHOULD NOT HAVE TO PAY A BOND

While Siemens demands that GE pay a "substantial bond," it provides no support for one. Siemens faces, at most, the costs of reassigning a few dozen employees, which are not "substantial" for a firm with over 90,000 employees.  "Where the district court determines that the risk of harm is remote, or that the circumstances otherwise warrant it, the court may fix the amount of the bond accordingly.  In some circumstances, a nominal bond may suffice."  *Hoechst Diafoil Co.* v. *Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999); *see also SBM Site Servs., LLC* v. *Garrett*, No. 10-cv-00385-WJM-BNB, 2011 WL 7563785, at *11 (D. Colo. June 13, 2011) (explaining that a "bond is unnecessary absent proof of a likelihood of harm to the defendants" and that, "[a]s a practical matter, the burden is on the party opposing a preliminary injunction to provide evidence of the damages it will suffer if wrongfully enjoined" (quotation marks omitted)).  That is the case here, and so the Court should not require any bond from GE.  But, if the Court finds that a bond is warranted, it should be set at a nominal amount in light of Siemens' manifest failure to establish any substantial harm.  *See, e.g.*, *Candle Factory, Inc.* v. *Trade Assocs. Grp., Ltd.*, 23 F. App'x 134, 139 (4th Cir. 2001) (approving entry of $500 bond).

## <u>CONCLUSION</u>

For the reasons set forth above, and in its opening brief, GE respectfully requests that the Court grant GE's motion and enter an order substantially in the form attached hereto.

March 24, 2021

GENERAL ELECTRIC COMPANY


By: */s/ Edward E. Bagnell, Jr*
Dana D. McDaniel (VSB No. 25419)
Edward E. Bagnell, Jr (VSB No. 74647)
Spotts Fain, P.C.
411 East Franklin Street, Suite 600
Richmond, Virginia 23219
Phone: (804) 697-2000
Fax: (804) 697-2100
dmcdaniel@spottsfain.com
ebagnell@spottsfain.com

Brad S. Karp (*pro hac vice*)
Brette Tannenbaum (*pro hac* vice)
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000
bkarp@paulweiss.com
btannenbaum@paulweiss.com

Karen L. Dunn (*pro hac vice*)
Paul, Weiss, Rifkind, Wharton & Garrison LLP
2001 K Street, NW
Washington, DC 20006
(202) 223-7300
kdunn@paulweiss.com

*Attorneys for Plaintiff General Electric Company*

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that on the 24th day of March 2021, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

*/s/ Edward E. Bagnell, Jr*
Edward E. Bagnell, Jr (VSB No. 74647)
ebagnell@spottsfain.com
Spotts Fain, P.C.
411 East Franklin Street, Suite 600
Richmond, Virginia 23219
Phone: (804) 697-2065
Fax: (804) 697-2165

*Counsel for General Electric Company*